1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

STATE OF WASHINGTON,

               Plaintiff,

      v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
ALEX M. AZAR, in his official capacity as
the Secretary of the United States
Department of Health and Human Services,

             Defendants.

No.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

### I.    INTRODUCTION

1.      On June 15, 2020, the U.S. Supreme Court held that discrimination on the basis of sexual orientation or transgender status is unlawful discrimination because of sex. *Bostock v. Clayton County*, 590 U.S. ___, 140 S. Ct. 1731, 1748 (2020). Four days later, the U.S. Department of Health and Human Services (HHS) defied that decision and implemented a rule under Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18114 (ACA), that strips sexual orientation, sex stereotyping, and gender identity from the definition of

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

1

prohibited "sex" discrimination. Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020) (Final Rule). The Final Rule removes explicit protections from discrimination in healthcare against patients who identify as lesbian, gay, bisexual, transgender, or queer (LGBTQ), women, individuals who are limited English proficient (LEP), and those with whom they are associated.

2.      The State of Washington (Washington) challenges the Final Rule as contrary to federal law and the Constitution because the Final Rule permits unlawful discrimination and contravenes the fundamental premise of the ACA to increase the number of people who have healthcare insurance. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 596 (2012) ("[a] central aim of the ACA is to reduce the number of uninsured U.S. residents.") (citing 42 U.S.C. § 18091(2)(C) and (I) (2006 ed., Supp. IV). If healthcare providers can refuse services because of who the patient loves, how the patient dresses, whether the sex they were assigned at birth matches their gender identity, whether they have had an abortion, or whether they speak English fluently, the results in Washington will be devastating. Vulnerable people will lose healthcare coverage, be denied needed medical care, and fewer people will purchase health insurance because they would not be able to use it in many situations where they need it.

3.      The harm to Washington and its residents if the Final Rule is allowed to take effect will be substantial and far-reaching. Where Washington's inclusive anti-discrimination law would not apply, either because federal law preempts it or because a healthcare provider mistakenly believes Washington law does not apply, the Final Rule will pose a barrier to healthcare access for Washington's 305,000 residents who identify as LGBTQ, nearly 660,000 LEP residents, and everyone associated with them or someone else in a protected class. For example, transgender residents who receive healthcare coverage from plans to which Washington anti-discrimination laws do not apply, namely self-funded group health plans under the Employee Retirement Income Security Act of 1974 (ERISA), and Federal Employees Health Benefits Program, will lose coverage for gender affirming healthcare services, which will result

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                               2                 **ATTORNEY GENERAL OF WASHINGTON**
                                                                              Civil Rights Division
                                                                           800 Fifth Avenue, Suite 2000
                                                                              Seattle, WA  98104
                                                                                (206) 464-7744

in destructive mental health consequences including depression, substance abuse, and suicide. LEP residents will have trouble accessing or understanding their healthcare options. Washington itself will incur substantial costs in providing healthcare services that will now be denied elsewhere; in investigating and enforcing increased discrimination complaints; in educating individuals, agencies, and stakeholders about how health programs and activities must conform to the Final Rule; in identifying which parts of large health programs and activities must conform to the Final Rule, and monitoring the same. Even more, Washington will suffer substantial losses in tax revenue resulting from healthcare services not purchased and income not earned by residents who are not able to work as productively after the healthcare system ignores their medical needs.

4.   As Congress recognized, the healthcare system must be free of discrimination in order to function effectively. The ability to seek and receive healthcare without regard to one's sex, national origin, or association with another person is necessary to ensure health and save lives. The Final Rule's unlawful attempt to roll back anti-discrimination protections required by the ACA directly threatens the health and lives of Washingtonians, unduly burdens Washington's agencies, and undermines Washington's ability to ensure a healthy economy.

## II.   JURISDICTION AND VENUE

5.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1346 (United States as a defendant), and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705-06.

6.   Defendants' publication of the Final Rule in the Federal Register on June 19, 2020, constitutes a final agency action and is therefore judicially reviewable within the meaning of the APA. 5 U.S.C. §§ 704, 706.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is a judicial district in which the State of Washington resides, the Final Rule will directly injure Washington and will adversely affect the health and welfare of residents in this district, and this action seeks relief against federal agencies and officials acting in their official capacities.

### III.      PARTIES

8.      Plaintiff State of Washington, represented by and through its Attorney General, is a sovereign state of the United States of America. The Attorney General is Washington's chief law enforcement officer, and is authorized under Washington Revised Code § 43.10.030 to pursue this action.

9.      Washington is directly affected by the Final Rule. Washington brings this action to redress harms to its proprietary and quasi-sovereign interests, including its interests as *parens patriae* in protecting the health and well-being of its residents.

10.      Washington and its residents will suffer significant and irreparable harm if the Final Rule goes into effect.

11.      Defendant HHS is a cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f)(1). It is the agency that promulgated the Final Rule and is responsible for implementing it.

12.      Defendant Alex M. Azar II is the Secretary of HHS. Secretary Azar is sued in his official capacity in overseeing the operation and management of HHS, including the adoption of the Final Rule.

### IV.      ALLEGATIONS

**Nondiscrimination Requirements in the Affordable Care Act**

13.      In March 2010, Congress passed the Patient Protection and Affordable Care Act (ACA), Pub. L. No. 111-148, 124 Stat. 119 (2010). In promulgating the ACA, Congress's intent was "to increase the number of Americans covered by health insurance and decrease the cost of healthcare," *Nat'l Fed'n*, 567 U.S. at 538, and "to help uninsured and underserved populations

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

4

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

gain access to care," Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,433 (May 18, 2016) (codified at 45 C.F.R. pt. 92). Congress further expressly intended for patients to be able to timely access the care they need after frank consultation with their provider and for the full duration of their medical needs. *See* 42 U.S.C. § 18114.

14.    The ACA has resulted in increased insurance coverage for millions of Americans. In 2010, 49.9 million people were uninsured. Carmen DeNavas-Walt et al., U.S. Census Bureau, *Income, Poverty, and Health Insurance Coverage in the United States: 2010* 23 (2011), https://www.census.gov/prod/2011pubs/p60-239.pdf. By 2018, that number had dropped to 27.5 million. Edward R. Berchick et al., U.S. Census Bureau, *Health Insurance Coverage in the United States: 2018* 2 (2019), https://www.census.gov/content/dam/Census/library/publications/2019/demo/p60-267.pdf.

15.    A key element of the ACA's success in facilitating access to healthcare is Section 1557, the nondiscrimination provision. Section 1557 provides in relevant part:

> Except as otherwise provided for in this title [I] (or an amendment made by this title), an individual shall not, **on the ground prohibited** under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29 [Section 504 of the Rehabilitation Act of 1973], be excluded from participation in, be denied the benefits of, or be subjected to discrimination **under, any health program or activity, any part of which is receiving Federal financial assistance**, including credits, subsidies, or contracts of insurance, **or under any program or activity that is administered by an Executive Agency or any entity established under this title [I]** (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a) (emphases added).

16.    Thus, Section 1557 prohibits health programs or activities that receive federal funds from discriminating "on the ground prohibited under" four existing civil rights statutes,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

5

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

including discrimination on the bases of race, color, national origin, sex, age, or disability. 42 U.S.C. § 18116(a). Section 1557 also expressly imports the enforcement mechanisms of the four civil rights statutes to address Section 1557 violations. *Id.*

17.     HHS "may promulgate regulations to implement [Section 1557]," 42 U.S.C. § 18116(c). However, Congress prohibited HHS from promulgating any regulation that:

> (1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;
> (2) impedes timely access to healthcare services;
> (3) interferes with communications regarding a full range of treatment options between the patient and the provider;
> (4) restricts the ability of healthcare providers to provide full disclosure of all relevant information to patients making healthcare decisions;
> (5) violates the principles of informed consent and the ethical standards of healthcare professionals; or
> (6) limits the availability of healthcare treatment for the full duration of a patient's medical needs.

42 U.S.C. § 18114.

**The 2016 Rule Implementing Section 1557**

18.     In August 2013, HHS initiated an information-gathering and rulemaking process to implement Section 1557. 81 Fed. Reg. 31,376. HHS received 402 comments. *Id.*

19.     Two years later, in September 2015, HHS proposed a rule to implement Section 1557 and invited public comment. 81 Fed. Reg. 31,376. HHS received 24,875 comments over the 60-day comment period. *Id.*

20.     Around this time, HHS also enforced Section 1557's ban on sex discrimination to ensure equal treatment in healthcare for transgender individuals. *See* HHS Office for Civil Rights Bulletin, *The Brooklyn Hospital Center Implements Non-Discriminatory Practices to Ensure Equal Care for Transgender Patients* (July 14, 2015) https://www.hhs.gov/sites/default/files/ocr/civilrights/activities/agreements/TBHC/statement.pdf.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

6

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

21.     In May 2016, HHS published a final rule, Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376 (May 18, 2016) (formerly codified at 45 C.F.R. pt. 92) (2016 Rule). *Id.*

22.     The 2016 Rule specifically defined discrimination "on the basis of sex" to include gender identity discrimination. *Id.* at 31,387. The 2016 Rule clarified that under Section 1557, "even where it is permissible to make sex-based distinctions, individuals may not be excluded from health programs and activities for which they are otherwise eligible based on their gender identity." *Id.* at 31,409. HHS found this provision necessary to be consistent with the interpretations of other federal agencies[1] and decisions issued by the federal courts[2] that recognized that discrimination on the basis of gender identity is discrimination on the basis of sex. *Id.* at 31,388.

23.     The 2016 Rule further defined "gender identity" as "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth." *Id.* at 31,387. Additionally, HHS explained, "[t]he way an individual expresses gender identity is frequently called 'gender

[1] *See* 5 C.F.R. §§ 300.102(c), 300.103(c), 300.103(c), 315.806(d), 335.103(b)(1), 537.105(d), 900.603(e) (U.S. Office of Personnel Management regulations providing that discrimination on the basis of sex includes discrimination on the basis of gender identity); Directive 2014-02, U.S. Dep't of Labor, Office of Fed. Contract Compliance Programs (OFCCP), § 5 (Aug. 19, 2014), https://www.dol.gov/agencies/ofccp/directives/2014-02 (U.S. Department of Labor and OFCCP's clarification that sex discrimination encompasses gender identity and transgender status); Memorandum from Eric Holder, Att'y Gen., to U.S. Att'ys & Heads of Dep't Components (Dec. 15, 2014), https://www.justice.gov/opa/pr/attorney-general-holder-directs-department-include-gender-identity-under-sex-discrimination (U.S. Department of Justice requiring gender identity be included as sex discrimination in employment); U.S. Dep't of Educ., Questions and Answers on Title IX and Sexual Violence, B-2 (Apr. 29, 2014), http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (U.S. Department of Education determination that Title IX extends to discrimination based on gender identity).

[2] *See Rumble v. Fairview Health Servs.*, No. 14-cv-2037 (SRN/FLN), 2015 WL 1197415, at *10 (D. Minn. Mar. 16, 2015) (Section 1557) (order denying motion to dismiss); *Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir.), *cert. denied*, 546 U.S. 1003 (2005) (Title VII); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 575 (6th Cir. 2004) (Title VII); *Schroer v. Billington*, 577 F.Supp.2d 293, 304 (D.D.C. 2008) (Title VII).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

7

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

expression,' and may or may not conform to social stereotypes associated with a particular gender. A transgender individual is an individual whose gender identity is different from the sex assigned to that person at birth." *Id.*

24.    The 2016 Rule also defined "on the basis of sex" to include sex stereotyping, to "reflect[] the Supreme Court's holding in *Price Waterhouse* v. *Hopkins*," which defined discrimination on the basis of sex to include discrimination based on sex stereotypes. *Id.* (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989), *superseded on other grounds by* Civil Rights Act of 1991, 42 U.S.C. § 2000e-2(m)).

25.    The 2016 Rule defined "sex stereotypes" as:

> stereotypical notions of masculinity or femininity, including expectations of how individuals represent or communicate their gender to others, such as behavior, clothing, hairstyles, activities, voice, mannerisms, or body characteristics. These stereotypes can include the expectation that individuals will consistently identify with only one gender and that they will act in conformity with the gender-related expressions stereotypically associated with that gender. Sex stereotypes also include gendered expectations related to the appropriate roles of a certain sex.

81 Fed. Reg. at 31,468.

26.    The 2016 Rule also relied on *Price Waterhouse* and its progeny to define sex discrimination as including discrimination based on sexual orientation, where the evidence establishes that discrimination is based on gender stereotypes of how members of a certain sex should act or behave or be attracted to. *Id.* at 31,389.

27.    The 2016 Rule cited evidence for its conclusion that clear prohibitions on LGBTQ discrimination were required to increase the affordability and accessibility of healthcare for LGBTQ individuals. *Id.* at 31,460.

28.    HHS additionally observed that, around the time the ACA became law, 26.7% of transgender respondents in one survey reported that they were refused needed healthcare, citing Lambda Legal, *When Healthcare Isn't Caring: Lambda Legal's Survey on Discrimination*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

8

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

*Against LGBT People and People Living with HIV*, 10 (2010), http://www.lambdalegal.org/publications/when-health-care-isnt-caring, and that in another study 25% of transgender individuals reported being subject to harassment in medical settings, with 50% reporting having to teach their medical providers about transgender care, citing the National Center for Transgender Equality and National Gay and Lesbian Task Force, *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, 5-6 (2011), https://www.transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf. 81 Fed. Reg. at 31,460.

29.     The 2016 Rule specifically found "[b]y prohibiting discrimination on the basis of sex, Section 1557 would result in more women and transgender individuals obtaining coverage and accessing health services." *Id.*

30.     Considering the State of California's experience in enacting a statutory requirement that insurers provide healthcare coverage for transgender individuals, and relying on an Economic Impact Study of the California Department of Insurance, the 2016 Rule also found that prohibiting coverage exclusion of transgender individuals was cost-effective and would lead to reduced violence against affected individuals; reduced depression and suicide attempts among the affected population; overall declines in substance abuse, smoking, and alcohol abuse rates; and reduction of other health disparities. 81 Fed. Reg. at 31,457-61 (citing California Economic Impact Assessment, Gender Discrimination in Health Insurance, at 10-12, https://transgenderlawcenter.org/wp-content/uploads/2013/04/Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf).

31.     Based on comments received, the final 2016 Rule also contained a number of substantive changes from the original proposal. Notably, HHS "decided against including a blanket religious exemption in the [2016 Rule]; however, the [2016 Rule] included a provision noting that insofar as application of any requirement under the rule would violate applicable Federal statutory protections for religious freedom and conscience, such application would not

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

9

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

be required." 81 Fed. Reg. at 31,376. HHS explained that "certain protections already exist with respect to religious beliefs, particularly with respect to the provision of health-related services." *Id*. at 31,378. HHS reasoned that blanket religious exemptions, such as those contained in the text of Title IX, do not belong in the healthcare context because they "could result in a denial or delay in the provision of healthcare to individuals and in discouraging individuals from seeking necessary care, with serious and, in some cases, life threatening results." *Id*. at 31,380.

32.     The 2016 Rule also prohibited discrimination "against any individual or entity on the basis of a relationship or association with a member of a protected class." *Id*. at 31,439. HHS explained that the prohibition on associational discrimination is "consistent with longstanding interpretations of existing anti-discrimination laws, whether the basis of discrimination is a characteristic of the harmed individual or an individual who is associated with the harmed individual." *Id*.

33.     Recognizing that individuals with limited English proficiency (LEP) traditionally face barriers to healthcare, resulting in poorer health outcomes, the 2016 Rule also required health programs and activities to "take reasonable steps to provide meaningful access to each individual with limited English proficiency eligible to be served or likely to be encountered." 81 Fed. Reg. 31,410, 31,470. HHS explained that "[t]he key to providing meaningful access for LEP persons is to ensure that the recipient/covered entity and LEP person can communicate effectively." *Id*. at 31,410. As such, the 2016 Rule provided that "[l]anguage assistance services . . . must be provided free of charge, be accurate and timely, and protect the privacy and independence of the individual with limited English proficiency." *Id*. at 31,411. Namely, "each covered entity is required to post taglines in the top 15 languages spoken by individuals with limited English proficiency by relevant State or States, informing individuals with limited English proficiency that language assistance services are available" free of charge. *Id*. at 31,442.

34.     The 2016 Rule also restated Section 1557's scope. By its express terms, Section 1557 covers "any health program or activity, any part of which is receiving Federal financial

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

10

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  assistance, including credits, subsidies, or contracts of insurance, or under any program or

2  activity that is administered by an Executive Agency or any entity established under this title [I]

3  (or amendments)." 42 U.S.C. § 18116(a). The 2016 Rule reiterated that Section 1557 applies "to

4  every health program or activity, any part of which receives Federal financial assistance provided

5  or made available by [HHS]; every health program or activity administered by [HHS]; and every

6  health program or activity administered by a Title I entity." 81 Fed. Reg. at 31,466.

7      35.    In the 2016 Rule, HHS defined "health program or activity" as "all of the

8  operations of an entity principally engaged in providing or administering health services or

9  health insurance coverage" and "the provision of assistance in obtaining health-related services

10  or health-related insurance coverage." 81 Fed. Reg. at 31,385. HHS explained that applying an

11  anti-discrimination provision, like Section 1557, to the entire operations of an entity principally

12  providing or administering health services or health insurance, if any part of it receives HHS

13  funds, is consistent with the approach codified in the Civil Rights Restoration Act of 1987. *Id.*

14      36.    The 2016 Rule resulted in immediate improvements in coverage for transgender

15  people. In the first year the 2016 Rule was in effect, "the vast majority of insurers (95.1%)

16  removed transgender-specific exclusions" from their insurance plans. Out2Enroll, *Summary of*

17  *Findings:  2017  Marketplace  Plan  Compliance  with  Section  1557*  2,

18  https://out2enroll.org/out2enroll/wp-content/uploads/2015/10/Report-on-Trans-Exclusions-in-

19  2017-Marketplace-Plans.pdf.  Since  2017,  the  percentage  of  insurers  that  did  not  have

20  transgender-specific exclusions in their plans but excluded a transition-related procedure has

21  also dropped significantly from 55.5% to 12% in 2020. Out2Enroll, *Summary of Findings: 2020*

22  *Marketplace  Plan  Compliance  with  Section  1557*  1,  https://out2enroll.org/out2enroll/wp-

23  content/uploads/2019/11/Report-on-Trans.-Exclusions-in-2020-Marketplace-Plans-2.pdf.

24      37.    Similarly, the percentage of insurance companies that specifically included

25  transition-related care in their plans rose from 18.5 percent in 2017 to 41 percent in 2019.

26  Out2Enroll, *Summary of Findings: 2019 Marketplace Plan Compliance with Section 1557* 1,

https://out2enroll.org/out2enroll/wp-content/uploads/2018/11/Report-on-Trans-Exclusions-in-2019-Marketplace-Plans.pdf.

### HHS's Proposal to Revise the 2016 Rule

38.     In June 2019, HHS proposed a rule to replace the 2016 Rule. *See* Nondiscrimination in Health and Health Education Programs and Activities, 84 Fed. Reg. 27,846 (proposed June 14, 2019). Citing a single federal district court decision, *Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016), more than 40 times, HHS reversed many of the positions it took in the 2016 Rule. *Id.*

39.     In *Franciscan Alliance*, private healthcare providers and eight states sued to enjoin the 2016 Rule's inclusion of pregnancy termination and gender identity as bases of prohibited sex discrimination, arguing that Title IX's definition of "sex" discrimination did not include those grounds, and that religious organizations should enjoy greater exemptions from Section 1557. 227 F. Supp. 3d at 670. The district court agreed, and enjoined HHS from enforcing the 2016 Rule's prohibition against discrimination on the basis of gender identity or termination of pregnancy. *Id.* at 696. A second federal court, *citing Franciscan Alliance*, issued a stay of enforcement as to two additional plaintiffs. *See* Amended Order Staying Enforcement Action, ECF No. 36, *Religious Sisters of Mercy* v. *Burwell*, Nos. 3:16-cv-386, 3:16-cv-432 (D.N.D. Jan. 23, 2017). Following a change in presidential administrations, the federal government elected not to defend its own rule or appeal either *Franciscan Alliance* or *Religious Sisters*.

40.     Despite the fact that numerous other federal district courts came to the opposite conclusion and held Section 1557 *does* prohibit discrimination based on transgender status or gender identity, *see, e.g., Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 947-51 (W.D. Wis. 2018); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 952 (D. Minn. 2018); *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1099-100 (S.D. Cal. 2017);

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  *Rumble v. Fairview Health Servs.*, No. 14-cv-2037 (SRN/FLN), 2015 WL 1197415, at \*10 (D.

2  Minn. Mar. 16, 2015), HHS crafted a new rule to align with *Franciscan Alliance*.

3       41.     According to HHS, the 2016 Rule "exceeded [the agency's] authority under

4  Section 1557, adopted erroneous and inconsistent interpretations of civil rights law, caused

5  confusion, and imposed unjustified and unnecessary costs," and needed revision "to better

6  comply with the mandates of Congress, address legal concerns, relieve billions of dollars in

7  undue regulatory burdens, further substantive compliance, reduce confusion, and clarify the

8  scope of Section 1557." 84 Fed. Reg. at 27,849.

9       42.     HHS, therefore, proposed a rule that made sweeping changes to the 2016 Rule.

10  The Proposed Rule omitted gender identity, sex stereotyping, and sexual orientation as

11  prohibited bases for discrimination. 84 Fed. Reg. at 27,848, 27,856. It similarly eliminated sexual

12  orientation discrimination and gender identity discrimination in ten unrelated regulations under

13  the Centers for Medicare and Medicaid Services (CMS). *Id.* at 27,871. It eliminated requirements

14  to facilitate language access to healthcare and health insurance for LEP individuals and

15  individuals with hearing-related disabilities. *Id.* at 27,868. And it narrowed Section 1557's scope,

16  or the number and types of entities that Section 1557 covers, *id.* at 27,862, including through the

17  addition of a blanket religious freedom and conscience provision that would exempt all religious

18  health programs or activities from Section 1557's requirements. *Id.* at 27,864.

19                      **Washington's Objections to the Proposed Rule**

20       43.     During the comment period that ended on August 13, 2019, Washington officials

21  and state agencies submitted three comments and joined two multistate comments opposing the

22  Proposed Rule as harmful to the health and wellbeing of the state and its residents.

23       44.     Washington State Governor Jay Inslee, Washington State Attorney General Bob

24  Ferguson, and Washington State Insurance Commissioner Mike Kreidler submitted a comment

25  urging HHS to withdraw the Proposed Rule. *See* Comment Letter on Proposed Rule on

26  Nondiscrimination in Health and Health Education Programs or Activities from Jay Inslee,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

13

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  Wash. Governor, Bob Ferguson, Wash. Att'y Gen., and Mike Kreidler, Wash. Ins. Comm'r to

2  Alex M. Azar II, Sec'y of U.S. Dep't of Health & Human Servs., Roger Severino, U.S. Dep't of

3  Health & Human Servs. Office of Civil Rights Dir., Seema Verma, Ctr. for Medicare & Medicaid

4  Servs. Adm'r (Aug. 13, 2019), https://www.regulations.gov/document?D=HHS-OCR-2019-

5  0007-138340 (Washington Comment). The Washington Comment objected to a number of

6  provisions in the Proposed Rule, including the elimination of gender identity, sex stereotyping,

7  sexual orientation, and pregnancy termination from the definition of "sex" from the 2016 Rule

8  and from ten other regulations; the narrowing of the scope of "covered entities" under Section

9  1557; the removal of the prohibition on association discrimination; the removal of the

10  compliance coordinator and grievance procedure requirement; the removal of the ban on

11  discrimination in health insurance issuance, coverage, cost-sharing, marketing, and benefit

12  design; and the removal of the requirement that taglines and notices must be made available in

13  the top fifteen languages for individuals with LEP. *Id.* at 11.

14      45.     The Washington Comment explained that the proposed provisions, if adopted,

15  would violate Section 1554 of the ACA, which prohibits any regulation that creates unreasonable

16  barriers to the timely access of healthcare, *id.* at 2, as well as the APA, *id.* at 17. The Washington

17  Comment explained how the Proposed Rule would impose significant costs on the state,

18  including the costs of "investigating and enforcing complaints of discrimination, providing

19  health services sought by transgender Washingtonians and reproductive health services related

20  to unintended pregnancies, and incurring higher administrative costs and longer delays in

21  medical care for LEP individuals because they did not know how to ask for an interpreter." *Id.*

22  at 3.

23      46.     The Washington Comment also opposed the Proposed Rule's religious

24  exemption because it would "significantly empower Section 1557 healthcare entities to deny

25  patients healthcare procedures, services, or information on religious grounds, even in

26  emergencies." *Id.* at 14. The Washington Comment pointed to the number of complaints that the

HHS Office of Civil Rights has received regarding discrimination against patients as compared to discrimination against healthcare providers for their religious beliefs: "Between 2008 and January 2018, the Department's Office of Civil Rights . . . received fewer than fifty complaints alleging discrimination against healthcare providers in violation of federal religious conscience statutes. In contrast, the Office received over 30,000 complaints of discrimination against patients in fiscal year 2017 alone." *Id*. at 16. In light of the Proposed Rule's serious harms and deficiencies, the Washington Comment urged HHS to withdraw it in its entirety. *Id*. at 18.

47.     Washington separately joined a comment opposing the Proposed Rule submitted by 20 other states and the District of Columbia, including California, Massachusetts, Connecticut, Delaware, Hawaii, Illinois, Iowa, Kentucky, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Vermont, and Virginia. Comment Letter on Proposed Rule on Nondiscrimination in Health and Health Education Programs and Activities from State of California et al. to Alex Azar, Sec'y of U.S. Dep't of Health & Human Servs. (Aug. 13, 2019), https://www.regulations.gov/document?D=HHS-OCR-2019-0007-142194 (Multistate Comment). The Multistate Comment urged HHS to withdraw the Proposed Rule because it would "inflict harm on the States' and their residents—particularly underserved populations including individuals with disabilities, women, LGBTQ individuals—by undermining legal protections that guarantee healthcare as a right." *Id*. at 1. The Multistate Comment again explained that the Proposed Rule violated both the ACA and the APA due to its "flawed legal analysis" and its failure to "account for sweeping changes that will cause significant harm," including a negative impact on public health and the imposition of significant costs on the signatory states. *Id*. at 2.

48.     The Multistate Comment specifically criticized the Proposed Rule's elimination of key definitions, including the definitions for sex discrimination, and the exemption of many healthcare entities from complying with Section 1557. *Id*. at 4. The Multistate Comment observed that states will bear increased costs "if self-insured ERISA plans stop offering gender

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

15

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

transition care due to the discriminatory Proposed Rule because state laws that may guarantee comprehensive insurance coverage to transgender individuals do not extend to these plans." *Id.* at 16. The Multistate Comment also opposed the new religious exemption because it would result in denials of service related to reproductive health, which in turn will cause "an increase in unintended pregnancies which are associated with poor birth outcomes and maternal health complications, including preterm birth, low birth weight, stillbirth, and early neonatal death." *Id.* at 9. Additionally, the Multistate Comment objected to the removal of protections for individuals with LEP and individuals living with disabilities. *Id.* at 13-14. Finally, the states commented that the Proposed Rule would be detrimental to individual health as well as states' public health systems. *Id.* at 19.

49.     The Washington Health Benefit Exchange (WAHBE), the state-based health insurance marketplace in Washington, also submitted a comment opposing the Proposed Rule. *See* Wash. Health Benefit Exchange, Comments on Proposed Federal Rule: Nondiscrimination in Health and Health Education Programs or Activities (Aug. 13, 2019), https://www.regulations.gov/document?D=HHS-OCR-2019-0007-149660 (WAHBE Comment). The WAHBE Comment explained that the Proposed Rule "limits the protections offered by Section 1557 to Washingtonians who obtain subsidized health insurance coverage through *Washington Healthplan Finder* (Medicaid, CHIP, subsidized commercial insurance) or through Medicare." *Id.* at 1. WAHBE further described how the Proposed Rule would cause confusion and a lack of coordination across the health plan marketplace, especially given that Washington's own anti-discrimination protections would continue to apply to some plans. WAHBE objected to the provisions that would remove protections for LGBTQ Washingtonians, pregnant women, and LEP individuals. *Id.* at 1.

50.     Washington State Insurance Commissioner Mike Kreidler joined 17 other state insurance commissioners in a comment expressing opposition to the Proposed Rule. *See* Comment Letter on Proposed Rule on Nondiscrimination in Health and Health Education

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                    16                    **ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    Programs or Activities from State Ins. Comm'rs to Alex M. Azar, Sec'y of U.S. Dep't of

2    Health & Human Servs. (Aug. 5, 2019), https://www.regulations.gov/contentStreamer?docume

3    ntId=HHS-OCR-2019-0007-71777&attachmentNumber=1&contentType=pdf (Insurance

4    Commissioners' Comment). The Insurance Commissioners' Comment explained the importance

5    of anti-discrimination protections to state insurance markets and consumers, and how the

6    Proposed Rule would lead to considerable uncertainty for regulated entities given that "[t]he vast

7    majority of regulated entities across the country, including those [the insurance commissioners]

8    regulate, have already come into compliance with Section 1557." *Id.* at 2.

9         51.      Finally, Washington State Insurance Commissioner Kreidler submitted a separate

10   comment to express his specific concerns with the Proposed Rule's impact on the Washington

11   State health insurance market. *See* Comment Letter on Proposed Rule on Nondiscrimination in

12   Health and Health Education Programs or Activities from Mike Kreidler, Wash. Ins. Comm'r,

13   to Alex Azar, Sec'y of U.S. Dep't of Health & Human Servs. (Aug. 13, 2019),

14   https://www.regulations.gov/document?D=HHS-OCR-2019-0007-142825 (Kreidler

15   Comment). The Kreidler Comment explained that the Proposed Rule would cause 1.4 million

16   Washington residents to lose federal anti-discrimination protections that they are currently

17   guaranteed under Section 1557. *Id.* at 2. "Without these federal protections in place,"

18   Commissioner Kreidler explained, "states will bear the sole burden of ensuring enrollees receive

19   the services they are entitled to, free from discrimination, and with meaningful access to the

20   information about the services they need." *Id.* at 5.

21        52.      By law, HHS is required to review public comments and respond to each

22   significant comment received in the preamble of any final rule. *Perez v. Mortg. Bankers Ass'n*,

23   575 U.S. 92, 96 (2015).

24                    **The Final Rule and the *Bostock* Decision**

25        53.      After receiving 198,845 comments on the Proposed Rule in the two-month public

26   comment period, on Friday, June 12, 2020, HHS finalized the Proposed Rule as proposed, aside

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
17
**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  from "minor and primarily technical corrections." Final Rule, 85 Fed. Reg. at 37,160, 37,161,

2  37,164. The Final Rule is scheduled to take effect on August 18, 2020. *Id.* at 37,160.

3      54.    In finalizing the Proposed Rule, HHS maintained its definition of "sex" despite

4  its acknowledgment that a forthcoming "holding by the U.S. Supreme Court '[because] of sex'

5  under Title VII will likely have ramifications for the definition 'on the basis of sex' under Title

6  IX," to which Section 1557 refers. *Id.* at 37,168.

7      55.    On Monday, June 15, 2020, just one business day after HHS finalized the

8  Proposed Rule, the U.S. Supreme Court conclusively held that sex discrimination includes

9  discrimination based on transgender status and sexual orientation. *Bostock v. Clayton County*,

10  590 U.S. ___, 140 S. Ct. 1731, 1748 (2020) ("When an employer fires an employee for being

11  homosexual or transgender, it necessarily and intentionally discriminates against that individual

12  in part because of sex.").

13      56.    Undeterred, HHS published the Final Rule four days later. Despite the *Bostock*

14  ruling, the Final Rule continues to remove gender identity, sex stereotyping, and sexual

15  orientation as prohibited bases of discrimination because of sex. *See* 85 Fed. Reg. at 36,167.

16  HHS claims this change is necessary to comply with the *Franciscan Alliance* injunction, 84 Fed.

17  Reg. at 27,848, 85 Fed. Reg. at 37,168 and to be consistent with other federal agencies that use

18  the term "sex" in their Title IX regulations in a binary, male-female, biological sense.

19  84 Fed. Reg. at 27,856, 85 Fed. Reg. at 37,168. It also specifically states that sexual orientation

20  discrimination is not a prohibited form of sex discrimination. 85 Fed. Reg. at 37,194.

21      57.    The Final Rule also eliminates anti-discrimination provisions on the bases of

22  gender identity and sexual orientation in ten other unrelated regulations under the CMS. *Id.* at

23  37,162. HHS stated neither gender identity nor sexual orientation is a ground of discrimination

24  prohibited under any of the four civil rights statutes incorporated into Section 1557. *Id.*

25      58.    After deleting gender identity, sex stereotyping, and sexual orientation as bases

26  for sex discrimination under Section 1557 and ten unrelated CMS regulations, HHS explicitly

1   invites covered entities to "draw[] reasonable and/or medically indicated distinctions on the basis

2   of sex." *Id.* at 37,162.

3   59.    Although HHS acknowledged there would be some detrimental effects that the

4   removal of the definition of "on the basis of sex" and narrowing the definition of sex

5   discrimination would have on states like Washington with expansive anti-discrimination laws

6   and their residents, HHS failed to account for these costs, summarily stating that they would be

7   minimal. *See* 85 Fed. Reg. 37,225 ("The Department similarly lacks data to estimate what greater

8   public health costs, cost-shifting, and expenses may result from entities changing their

9   nondiscrimination policies and procedures after promulgation of this rule."). HHS admitted that

10  instead of federal enforcement of civil rights laws against covered entities who discriminate on

11  the bases of gender identity or sexual orientation, "Unprofessional conduct such as inappropriate

12  jokes or questions, excessive precautions, or concealment of treatment options, may be covered

13  under State medical malpractice, tort, or battery laws." *Id.* at 37,191. This description grossly

14  understates the many variations of healthcare discrimination experienced by LGBTQ patients,

15  while also placing the burden and costs on the states to investigate and respond to such

16  complaints.

17  60.    In fact, HHS dismissed commenters who contended that transgender individuals

18  would suffer health-related negative consequences if the Final Rule's removal of protection

19  against discrimination took effect. HHS claimed that it lacked the data necessary to estimate how

20  many transgender individuals would be impacted, to estimate how many transgender patients

21  experience negative consequences from discrimination, and to estimate "what greater public

22  health costs, cost-shifting, and expenses may result from entities changing their

23  nondiscrimination policies and procedures" as a result of the Final Rule. *Id.* at 37,225.

24  61.    The Final Rule also narrows the scope of "health programs and activities" that

25  are subject to Section 1557. Under the Final Rule, Section 1557 no longer applies to even HHS

26  programs if they are not administered under the ACA, nor to health insurers unless they receive

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

19

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

federal financial assistance or are selling plans on an ACA marketplace exchange healthcare. *Id.* at 37,169-71. HHS states that narrowing the scope of covered entities is required by the statutory text and consistent with the approach taken in the four civil rights statutes incorporated into Section 1557. *Id.* HHS admits that Section 1557's new scope of covered entities is narrower than the four underlying civil rights statutes that Congress incorporated, but reasons that Section 1557 incorporates only the statutes' prohibited grounds of discrimination, but not also their scope. *Id.* at 37,171 ("Section 1557 incorporates Section 504's prohibited grounds of discrimination but not its scope: Section 1557's scope differs from that of the underlying statutes.").

62.     As a result, large swaths of healthcare systems will no longer be subject to Section 1557 at all, including Medicare Part B, self-funded group health plans under the ERISA, Federal Employees Health Benefits Program, and short-term limited duration insurance plans, as well as those administered by the Centers for Medicare and Medicaid Services, the Centers for Disease Control and Prevention, the National Institutes of Health, and the Substance Abuse and Mental Health Services Administration. HHS acknowledged that commenters opposed the exclusion of these entities, but refused to analyze these concerns on either a quantitative or qualitative basis; instead, HHS simply stated that it was "not aware of data and methods available to make reliable estimates of all economic impacts predicted by various commenters." *Id.* at 37,169.

63.     The Final Rule also incorporates Title IX's blanket exclusion for religious educational institutions from the prohibition on discrimination based on sex, and applies that exemption to the healthcare context. *Id.* at 37,162. HHS admits that the 2020 Rule will extend the Title IX religious organization exemption to all religious healthcare organizations, like hospitals, and their employees, thereby exempting them from complying with Section 1557. *Id.* at 37,207-08.

64.     The Final Rule further eliminates discrimination on the basis of association with someone of a protected class. *Id.* at. 37,199. HHS "simply declines to use the Section 1557

20

1    regulation to identify protections beyond those specifically identified in the text of the relevant

2    statutes and regulations." *Id*.

3         65.    Finally, the Final Rule removes the requirement that covered entities provide

4    patients and beneficiaries with taglines in 15 common languages. *Id*. at 37,175. HHS admits that

5    "[r]epealing the notice and tagline requirements may impose costs, such as decreasing access to,

6    and utilization of, healthcare for non-English speakers by reducing their awareness of available

7    translation services." *Id*. at 37,232. Yet, HHS argued that it was simply unaware of "a way to

8    quantify those potential effects." *Id*. at 37,234. Still, "[t]he Department acknowledge[d] the

9    potential of reduced awareness of the availability of language services by LEP individuals by

10   the changes made in this rule, or downstream effects on malpractice claims due to less

11   awareness," *id*. at 37,235, but valued the costs of these harms at zero.

12   **The Final Rule Will Harm Washington and Its Residents**

13        66.    Washington has quasi-sovereign interests in protecting the health, safety, and

14   physical and economic well-being of its residents from the harm caused by the Final Rule. The

15   Final Rule erects undue barriers to timely and appropriate healthcare and will result in poorer

16   health outcomes for a significant number of Washington's most vulnerable residents.

17        67.    The Final Rule will jeopardize the health, safety, physical and economic well-

18   being of Washington residents by inviting discrimination against LGBTQ and LEP individuals

19   when they seek healthcare or insurance as well as all Washingtonians by narrowing the scope of

20   entities subject to Section 1557 in the first place. Washington has a particular interest in

21   protecting its residents from the universal sting of unlawful, government-sanctioned

22   discrimination.

23        68.    Historically, LGBTQ individuals have faced widespread discrimination in

24   healthcare settings. The Final Rule puts at risk the 300,000 Washington residents who identify

25   as LGBTQ. *Washington's Equality Profile*, Movement Advancement Project,

26   http://lgbtmap.org/equality_maps/profile_state/WA (last visited July 7, 2020).

COMPLAINT FOR DECLARATORY           21          **ATTORNEY GENERAL OF WASHINGTON**
AND INJUNCTIVE RELIEF                         Civil Rights Division
                                            800 Fifth Avenue, Suite 2000
                                              Seattle, WA 98104
                                              (206) 464-7744

69.     According to the 2015 U.S. Transgender Survey, "One in four (25%) respondents experienced a problem with their insurance in the past year related to being transgender, such as being denied coverage for care related to gender transition." Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 Transgender Survey* 93 (2016), https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF.

70.     Furthermore, "[o]ne-third (33%) of respondents who had seen a healthcare provider in the past year reported having at least one negative experience related to being transgender, such as verbal harassment, refusal of treatment, or having to teach the healthcare provider about transgender people to receive appropriate care." *Id.*

71.     In Washington, 29% of respondents experienced a problem in the past year with health insurance due to being transgender and 38% reported at least one negative experience with a healthcare provider related to their being transgender. Nat'l Ctr. for Transgender Equal., *2015 U.S. Transgender Survey: Washington State Report* 3 (2017), https://transequality.org/sites/default/files/docs/usts/USTS-WA-State-Report.pdf.

72.     Transgender individuals are less likely to seek healthcare due to fear of discrimination. There is a "significant association between delaying healthcare because of fear of discrimination and worse general and mental health among transgender adults." Kristie L. Seelman et al., *Transgender Noninclusive Healthcare and Delaying Care Because of Fear: Connections to General Health and Mental Health Among Transgender Adults* (Transgender Health 2017), https://doi.org/10.1089/trgh.2016.0024. In the 2016 Rule, HHS recognized this fear, observing that "a major barrier to receiving care is a concern over being refused medical treatment based on bias against them." 81 Fed. Reg. at 31,460.

73.     In Washington, some transgender or gender non-conforming people who have coverage cannot access it because there are not enough providers who will provide the services. One member of the Washington State LGBTQ Commission had to travel a distance of over three

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

22

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1   and a half hours one-way by car to secure gender affirming healthcare services from a provider

2   he was comfortable with.

3        74.     And fear of discrimination discourages transgender individuals from receiving

4   healthcare—nearly 21% of respondents to a Needs Assessment in Walla Walla reported that they

5   avoided healthcare, and three quarters of those did so because of fear of disrespect or

6   discrimination, because they could not afford it, or because of the distance or a lack of

7   transportation.

8        75.     Forty-five percent of respondents to the Walla Walla Needs Assessment sought

9   mental health treatment and 44% sought out support groups, while 86% of respondents reported

10  suffering emotional difficulties including stress, anxiety, and/or depression, and 73% of these

11  reported that it was related to their sexual orientation and/or gender identity.

12       76.     LGBTQ Washingtonians experience healthcare discrimination, including one

13  respondent to the Walla Walla Needs Assessment who reported questions from their physician

14  about "choosing" to be gay. This patient was concerned about the physician's unfamiliarity with

15  screening for certain sexually transmitted diseases for which men who have sex with men are

16  more at risk.

17       77.     LGBTQ Washingtonians also suffer high rates of suicidality, demonstrated by

18  41% of the Walla Walla Needs Assessment respondents reporting that they had considered

19  suicide, 36% of them in the past twelve months, and 68% of the transgender individuals

20  considered suicide, with 24% considering it in the last twelve months and 32% actually

21  attempting suicide.

22       78.     The Final Rule will exacerbate the health picture for LGBTQ Washingtonians,

23  especially in rural areas. If healthcare coverage plans no longer prevented from discriminating

24  on the basis of transgender status, transgender or gender non-conforming Washingtonians in

25  these areas will be denied gender affirming healthcare services, which will be life-threatening

26  for some. Those who can obtain the coverage and services will likely be required to travel further

COMPLAINT FOR DECLARATORY          23          **ATTORNEY GENERAL OF WASHINGTON**
AND INJUNCTIVE RELIEF                                Civil Rights Division
                                                  800 Fifth Avenue, Suite 2000
                                                    Seattle, WA  98104
                                                       (206) 464-7744

1   at greater cost and inconvenience, and probably a significant number will postpone healthcare

2   services for that reason, if not for fear of discrimination, which will lead to negative health

3   outcomes.

4            79.    Transgender individuals in Washington already experience significant barriers to

5   healthcare access. A survey by the Ingersoll Gender Center, a Seattle-based nonprofit that works

6   to assist and advocate for transgender individuals who have had problems with healthcare

7   coverage for gender affirming healthcare services, indicates that 62% of respondents reported

8   difficulty paying for healthcare costs; 56% identified as disabled, sick, and/or chronically ill; and

9   52% reported making under $24,000 a year; 47% reported difficulty finding a gender affirming

10  surgeon that would work with their insurance; and 46.5% said that they could not access a mental

11  health provider on a regular basis.

12          80.    Transgender individuals in Washington have an overall distrust of the healthcare

13  system; 55% of respondents to the Ingersoll Gender Center survey reported having to lie to their

14  healthcare provider in order to get the care they needed, and 50% reported concealing part of

15  their medical history to providers to avoid outing themselves.

16          81.    Indeed, the 2015 U.S. Transgender Survey reported data that while 78% of

17  respondents wanted hormone therapy related to gender transition, only 49% had ever received

18  it. Moreover, 25% who sought coverage for it in the past year had been denied, while 55% of

19  those who sought coverage for surgical procedures for gender transition had been denied.

20          82.    As another example, the Ingersoll Gender Center was contacted by a transgender

21  person from Clark County who sought hormone therapy from their physician. The physician

22  refused to prescribe testosterone for this person, citing "personal reasons," and told them that

23  gender affirming healthcare services were the wrong choice and attempted to talk them out of

24  receiving this healthcare. This person was left in tears, was not able to find another health care

25  provider who would prescribe the hormones that they need, and has not been able to locate care

26  since February 2020. This person and individuals like them experience this kind of refusal of

COMPLAINT FOR DECLARATORY         24         **ATTORNEY GENERAL OF WASHINGTON**
AND INJUNCTIVE RELIEF                                 Civil Rights Division
                                                 800 Fifth Avenue, Suite 2000
                                                 Seattle, WA  98104
                                                 (206) 464-7744

1    care throughout Washington State and are at serious risk for depression, substance abuse, and

2    unfortunately, suicide.

3          83.    Unfortunately, this is not an isolated incident in Washington. Since the 1980s,

4    Lambert House has been dedicated to building community and support networks for LGBTQ

5    youth in Washington. In their role serving this community, staff at Lambert House have heard

6    many stories of discrimination against LGBTQ youth in healthcare. Many transgender youth of

7    Lambert House are uncomfortable in medical settings because they are often misgendered, not

8    addressed by their preferred pronouns, and not addressed by their chosen name (aligned with

9    their gender identity).

10         84.    Brandon Knox, the Program Director at Lambert House and a gay man, has

11   personally felt the sting of discrimination in healthcare. In 2013, Mr. Knox was living in

12   Ellensburg, WA, a town in eastern Washington of about 18,520 people at the time. Mr. Knox's

13   doctor, knowing Mr. Knox is gay, ordered tests for sexually transmitted diseases for Mr. Knox

14   without asking any questions about Mr. Knox's sexual history to determine if Mr. Knox was

15   likely to have an STD. The doctor also advised Mr. Knox "to stay away from the dirty nasties."

16         85.    Ken Schulman is the Executive Director of the Lambert House, and in that

17   position, he also has heard stories of discrimination against LGBTQ youth in healthcare. For

18   example, one youth who was identified as female at birth, but who does not self-identify as

19   female shared the following: "A few months before my top surgery, I noticed a lump in one of

20   my breasts. I have a family history of breast cancer so this was a significant concern. I sought

21   medical attention immediately. Despite the sensitivity and urgency of the situation, I had to go

22   to two different hospitals before I received the care I needed. The treatment I received at the first

23   hospital was hostile and inappropriate. The doctor did not follow proper protocol for a breast

24   exam and did not offer any advice regarding next steps, despite the obvious lump. When I asked

25   about next steps, he said he did not know, 'because I was trans.' I had to go to a second hospital

26   where I received the appropriate care and diagnosis. The doctor I saw at the second hospital gave

1  me a thorough examination and confirmed that the care I received at the prior hospital was

2  inadequate and did not follow appropriate protocols. I was referred for a biopsy the very next

3  day."

4    86.    In Ken Shulman's view, the Final Rule would increase barriers to appropriate and

5  lifesaving healthcare for LGBTQ communities and sends the message that LGBTQ individuals

6  are less worthy of health insurance and receiving life-saving healthcare.

7    87.    The Gender Justice League focuses on elevating the rights of transgender and

8  gender diverse Washingtonians by creating community through advocacy and shared leadership

9  programs. In her position as co-founder and co-Executive Director of the Gender Justice League,

10  Elayne Wylie hears from clients and community members who are confused by denials of care for

11  doctor's visits or prescriptions that should be covered by their insurance. For example, a transgender

12  person may be covered for the dosage that would align with the individual's gender at birth, but

13  not the prescribed dosage appropriate for gender affirming care. Transgender patients often

14  discover this issue when they go to pick up their prescription at the pharmacy. Often the

15  medications prescribed are not available in the dosage strength, brand, or medication type they

16  had expected, and/or what they are given was dispensed by the pharmacy but not covered by the

17  plan.

18    88.    In her position, Elayne Wylie has heard numerous stories of discrimination in the

19  healthcare setting against Washington's transgender and gender nonconforming individuals. The

20  discrimination in these stories take a variety of forms, including the outright denial of care, being

21  mis-gendered, being referred to by the wrong name, and being ridiculed. According to Elayne

22  Wylie, hostility to a person's identity within the healthcare setting is one reason transgender and

23  gender nonconforming Washingtonians often do not seek preventive and routine care when they

24  need it, which leads to poorer health outcomes.

25    89.    For example, a transgender woman who had badly cut her hand shared the

26  following experience when she arrived at a Washington hospital: "I was receiving a routine and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

26

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1     appropriate workup for the cut on my hand until they obtained my registration and insurance

2     information. At that point they identified me through my social security number as a patient who

3     had been born at that hospital under a different gender. From that moment on I was treated

4     differently. I was ignored by staff when I requested water and I was referred to as 'that thing,'

5     'it,' and 'shim' (a combination of she and him, presumably). It was clear to me during my visit

6     that the demeanor of the staff changed once they determined my transgender status." This

7     transgender woman developed post-traumatic stress disorder from this incident and anxiety that

8     took years of counseling to reduce.

9          90.     Another Gender Justice League client shared the following when she visited an

10    emergency room in Washington: "When the nurse called me in, they did not refer to me by my

11    chosen male identified name and repeatedly referred to me as female. At that time I was far

12    enough along in my transition that I did not present as female. Although I did not arrive at

13    Swedish for crisis support, I was put in a lock down room and treated with hostility, escalating

14    the situation to the point where I no longer felt safe. The nurses and doctor repeatedly

15    mis-gendered me, referred to me as female, and refused to call me by my chosen name; at one

16    point the doctor rolled his eyes at me. I eventually left the hospital, more upset than when I

17    arrived. Had I arrived at Swedish in an acute mental health crisis, my treatment there would have

18    endangered my life. I was so traumatized by my treatment at Swedish, I skipped follow up

19    appointments at Kaiser because I did not want to be in a healthcare facility."

20         91.     In Elayne Wylie's professional experience, discrimination against transgender

21    and gender non-conforming individuals threatens more than just the life of the person directly

22    suffering the discrimination. A family member of a Gender Justice League client relayed the

23    following: "Nine months ago our life as a family changed dramatically when our 12 year old

24    transgender daughter, "B", began to exhibit signs of mental health distress and suicidal ideation.

25    As B's behaviors became more dangerous, for them and the rest of the family, I sought support

26    from numerous treatment centers and crisis intervention programs in the Seattle area. We were

COMPLAINT FOR DECLARATORY                    27          **ATTORNEY GENERAL OF WASHINGTON**
AND INJUNCTIVE RELIEF                                             Civil Rights Division
                                                               800 Fifth Avenue, Suite 2000
                                                                   Seattle, WA  98104
                                                                    (206) 464-7744

repeatedly denied access to critical long-term inpatient care because 'beds were only available for straight males or females.' This denial of care has put "B" and my family at serious risk of physical, emotional and financial harm."

92.     Elayne Wylie believes that if the Final Rule takes effect, experiences like the ones described above will increase significantly. The Final Rule not only creates barriers to access to needed healthcare, but it also contributes to distrust of the healthcare system and adds to the stress and anxiety experienced by the LGBTQ community when seeking care.

93.     Discrimination in healthcare leads to greater disparities in both physical and mental health for transgender individuals. According to the American Medical Association, "individuals with gender dysphoria who have undergone no gender confirmation treatment are twice as likely to experience moderate to severe depression and four times more likely to experience anxiety than their surgically-affirmed peers." American Med. Ass'n, *Health insurance coverage for gender-affirming care of transgender patients* 4 (2019), https://www.ama-assn.org/system/files/2019-03/transgender-coverage-issue-brief.pdf.

94.     In Washington, there are at least 1,583,681 individuals who receive healthcare coverage under a plan that is "self-funded" by an employer under the Employee Retirement Income and Security Act of 1974, or which is part of the Federal Employees Health Benefits Program, such that the provisions of Washington State law that prohibit discrimination on the basis of pregnancy termination, sexual orientation, or gender identity and/or transgender status do not apply to these plans. And Washington's Health Care Authority (HCA), the largest purchaser of healthcare services in the state, reports that its data shows a continued and growing demand in Washington for transgender services and access to this important component of health care.

95.     Because of this, the Washington State Department of Health (DOH) expects that, if the Final Rule takes effect, between 5,271 and 16,266 transgender Washingtonians will lose

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

28

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

healthcare coverage for gender affirming transgender healthcare services like hormone therapy and surgical gender transition procedures.

96.    In addition, approximately 5.2% of the population in Washington is lesbian, gay, or bisexual, so that DOH estimates an additional 82,351 LGB individuals will lose protection from discrimination in healthcare on the basis of sexual orientation if the Final Rule takes effect.

97.    The Final Rule will result in lost and denied healthcare coverage. With respect to transgender individuals, DOH estimates that, of those who will lose healthcare coverage for gender affirming healthcare services, between 367 and 1,132 transgender individuals will be denied such services from a provider from year to year, and between 1,002 and 3,090 individuals will be denied coverage from year to year if the Final Rule takes effect.

98.    DOH also predicts denials of other kinds of healthcare services to transgender individuals. DOH estimates that, if the Final Rule takes effect, a denial of services and coverage for transgender healthcare services will result in between 670 and 2,069 new cases of moderate to severe depression for transgender individuals.

99.    DOH is also aware that lack of gender affirming healthcare services for transgender individuals is shown to increase suicidality among this population by approximately 20%, and expects that if the Final Rule takes effect, Washington can expect between 527 and 1,627 more attempted suicides over the next several decades, as well as more successful attempts.

100.   HCA confirms these harms. In 2014, HCA began considering making transgender services available through its Public Employees Benefits Board program (PEBB) that serves over 300,000 Washingtonians. During several meetings in 2014, the PEBB heard public comment on whether to offer transgender care. One commenter even told the Board about a young transgender person who had committed suicide just the month before the commenter's testimony. The Board concluded "not only that gender affirming healthcare services for transgender people is needed to save lives, it also reduces costs by making future spending on

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

29

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

depression, anxiety, substance abuse, and suicide unnecessary for people who would otherwise fall victim to those and other health problems." In January 2015, PEBB began offering coverage for surgical and non-surgical healthcare services and prescriptions for the treatment of gender dysphoria.

101.    Women also continue to face discrimination in healthcare and health insurance. The Final Rule authorizes poorer health outcomes for the 1.46 million women in Washington of child-bearing age.

102.    Women seeking reproductive healthcare may face refusal of service based on a religious exemption, which can harm patients' physical or mental health. Am. Coll. of Obstetricians & Gynecologists, *The Limits of Conscientious Refusal and Reproductive Medicine*, *Committee    Opinion    No.    385*    (Nov.    2007,    reaffirmed    2016), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2007/11/the-limits-of-conscientious-refusal-in-reproductive-medicine.

103.    The Final Rule's new religious exemption would also have a devastating impact on Washington and its residents, especially in rural communities. Thirty of Washington's 39 counties are rural with 100 or fewer people per square mile. Wash. Office of Fin. Mgmt., *Population    Density    by    County,    2010,*    https://www.ofm.wa.gov/washington-data-research/population-demographics/population-estimates/population-density/population-density-county#slideshow-11. Patients who are refused care on the basis of a religious exemption, even in cases of emergency, may have no other healthcare options in these rural areas.

104.    People with LEP also face significant barriers to accessing healthcare and health insurance. Over 60 million people in the United States speak a language other than English at home and approximately 25 million people speak English "less than very well." U.S. Census Bureau, *Detailed Languages Spoken at Home and Ability to Speak English for Population 5 Years    and    Over    for    United    States:    2003-2013*    (Oct.    2015),

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

30

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  http://www2.census.gov/library/data/tables/2008/demo/language-use/2009-2013-acs-lang-
2  tables-nation.xls?#.

3       105.    Washington has a significant LEP population, approximately 660,000 residents
4  as of 2016, who will be harmed by the removal of LEP protections. Wash. Office of Fin. Mgmt.,
5  *Estimate of Population with Limited English Proficiency (LEP) for the State and Counties, 2016*
6  (Oct.    10,    2016),    https://www.ofm.wa.gov/washington-data-research/population-
7  demographics/population-estimates/special-subject-estimates.  DOH reports that the Final Rule
8  will dramatically affect LEP individuals by decreasing access to health care, severely limiting
9  the ability of LEP individuals to communicate with the health care system and their providers,
10  and overall compounding the inequities already experienced by this population. DOH estimates
11  that, if the Final Rule takes effect, the removal of requirements to post notices and provide
12  taglines related to the availability of interpreters during healthcare visits will result in LEP
13  individuals missing appointments, delaying care, or engaging in "non-compliant" self-care,
14  resulting in lower utilization of healthcare for this population. Language access barriers
15  exacerbate healthcare disparities by making it difficult for patients to understand their healthcare
16  options, express their needs and choices, read medication instructions, and ask questions.

17       106.    Washington will bear the disproportionately higher costs of negative health
18  outcomes due to ineffective communication of important healthcare information. Washington's
19  Health Care Administration (HCA) alone experienced 47,150 patients make 149,826 claims for
20  spoken interpretation and American Sign Language services in 2013. Those numbers rose to 93,172
21  patients who made 385,295 claims in 2018, indicating a growing demand. Washington also has
22  significant demand for foreign language services to assist LEP residents with finding and
23  understanding health insurance. Washington Healthplanfinder, one of 14 health insurance
24  marketplaces nationwide created under the ACA, handled 36,422 foreign language calls in just the
25  five months from October 2018 to February 2019.

26

COMPLAINT FOR DECLARATORY                    31                **ATTORNEY GENERAL OF WASHINGTON**
AND INJUNCTIVE RELIEF                                            Civil Rights Division
                                                                800 Fifth Avenue, Suite 2000
                                                                Seattle, WA 98104
                                                                (206) 464-7744

107.     The Final Rule exacerbates existing discrimination in healthcare by reducing the numbers and types of entities covered by Section 1557. For example, an individual living with HIV would be protected from discrimination under Section 1557 when insured through Medicaid, but not when insured through employer-provided insurance. Sara Rosenbaum, *Rolling Back Civil Rights Protections in Health Insurance: The Proposed 1557 Rule*, Commonwealth Fund (June 12, 2019), https://www.commonwealthfund.org/blog/2019/rolling-back-civil-rights-protections-health-insurance-proposed-1557-rule. Americans frequently move across insurance markets depending on their circumstances, and they should expect to be protected from discrimination regardless of how they are insured. Also, the Proposed Rule would inexplicably prohibit a health insurer from discriminating when it receives direct funding from HHS, but will not prohibit discrimination when it receives indirect government funds in the form of favorable tax treatment for employer-sponsored plans.

108.     Additionally, many Washingtonians obtain their healthcare through programs or activities—such as Medicare Part B, self-funded group health plans, or the Federal Employees Health Benefits program—that would no longer be subject to Section 1557. Katie Keith, *HHS Proposes To Strip Gender Identity, Language Access Protections From ACA Anti-Discrimination Rule*, Health Affairs (May 25, 2019), https://www.healthaffairs.org/do/10.1377/hblog20190525.831858/full/. These individuals would not be protected against discrimination in healthcare. The health impact for these Washington residents would be devastating if they were denied timely healthcare for discriminatory reasons. Washington families would be left to bear the health consequences when necessary care is delayed or denied because of discrimination.

109.     The Final Rule's reduction in the scope of Section 1557 will harm Washington and its residents.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

32

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**The Final Rule will Cause Direct Injury to Washington**

110.     Washington will suffer direct injury to its proprietary interests as a result of the Final Rule.

111.     The weakening of protections for LEP individuals will result not only in poorer health outcomes for LEP individuals, but also in increased costs for DOH and DOH grant supported healthcare service providers, including participants in the Women, Infant, and Children services programs. Other DOH programs and public services will also be burdened because patients will come to them sicker due to inadequate care elsewhere.

112.     DOH will also incur increased administrative costs in having to refer LGBTQ individuals, and women with a history of pregnancy termination, to other healthcare providers because the Final Rule will permit more of their providers to refuse to provide care based on a religious exemption.

113.     As a result of the Final Rule, DOH will be forced to incur substantial work and mitigation costs, including analyzing the gaps in coverage and discrimination protections that affected Washingtonians will experience and determining the extent to which existing State-funded programs provide the coverage and services which the Final Rule will cause affected Washingtonians to lose. After evaluating the impact of the Final Rule, DOH will also incur costs in developing a comprehensive plan for communicating alternatives to affected Washingtonians; conducting the necessary outreach to and communication with advocacy and non-profit organizations, other agencies, and the public; creating, producing, and disseminating publications to these entities concerning the changes and the identified alternatives. DOH will additionally have to reevaluate its budget to identify cost-savings and funds from other programs that can be diverted to offset the increased demand for coverage and services previously provided by sources that will no longer provide them as a result of the Final Rule; and analyzing and recommending additional expenditures by the Legislature to address any remaining health disparities resulting from the Final Rule.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

33

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

114.    DOH's harm mitigation outreach costs are not optional; Washington will either pay for this harm mitigation, or pay for increased subsidized services for affected individuals later.

115.    DOH will incur increased administrative costs for referring people who have been denied care because of protected status or conscience objections to providers who can provide the services, which means DOH will refer people to its own programs, including primarily the Family Planning Program; the Breast, Cervical, and the Colon Health Program; and the Office of Infectious Disease.

116.    The costs to the Family Planning Program; the Breast, Cervical, and the Colon Health Program; and the Office of Infectious Disease are not optional. Because DOH staffing is already stretched to the limit, DOH will have to deny services to people already requiring those services or to the new individuals who will need those services as a result of the Final Rule, or need to request additional resources to support administrative costs for increased demands on these services by both groups.

117.    The Final Rule's religious or conscience exemptions permits discrimination and refusal to treat LGBTQ individuals and women who have had pregnancies terminated. As a result, DOH personnel expects that some women will come back into Washington's system for contraception and reproductive healthcare services at the cost of $579 per person on average for an estimated total cost to Washington of over $900,000.

118.    DOH also estimates that the Office of Infectious Diseases will have to spend significantly more on sexually transmitted disease testing and testing for medically-unmonitored hormone use, and at a total cost of at least $3,000,000 and probably closer to $10,000,000 over the next decade.

119.    Because of the lack of healthcare coverage for transgender individuals who would receive gender affirming healthcare services like hormone therapies and surgical procedures related to gender transition, the Washington State Department of Revenue expects that, from

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

34

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Fiscal Year 2021 through at least Fiscal Year 2025, Washington State will lose approximately $296,000 per year from business and occupation tax collections on the revenues that hospitals and physicians would otherwise receive for these healthcare services.

120.    Based on DOH's estimates of job losses as a result of the Final Rule, Washington's Employment Security Department estimates Washington would Paid Family Leave Benefit tax revenue, unemployment insurance tax revenue, and have to pay out more in benefits. Specifically, Washington would lose between $9,9769 and $30,905 in Paid Family Leave Benefit tax revenues over the next twenty years if every job lost paid $30,000 per year. If those lost jobs paid $45,000 annually, the tax revenue loss range would be $14,954 and $46,357 over twenty years, and $19,938 and $61,809 if the lost jobs paid $60,000 annually.

121.    Washington also would lose unemployment insurance tax revenue over the next twenty years of between $180,480 and $559,488 if every job lost paid $30,000 annually, between $270,720 and $839,232 if every job lost paid $45,000 annually, or between $339,904 and $1,053,702 if every job lost paid $60,000 annually.

122.    Over the next twenty years, Washington would have to pay out between $623,700 and $1,933,470 more in benefits if every job lost paid $30,000 annually, between $935,550 and 2,900,205 if every job lost paid $45,000 annually, or between $1,247,400 and $3,886,940 if every job lost paid $60,000 annually.

123.    Because DOH estimates greater incidence of moderate to severe depression, the Washington HCA estimates greater expenditures for urgent mental health and crisis stabilization care through regional Administrative Services Organizations, including between $15,743.43 and $4,661.47 per year of new crisis services costs, as well as between $180,364 and $557,255 in new costs for evaluations pursuant to Washington's Involuntary Treatment Act, between $650,000 and $2,006,130 in Involuntary Treatment Act detention costs, and between $728,061 and $2,246,865 in Involuntary Treatment Act commitment costs if the Final Rule takes effect. These costs do not include additional costs for crisis care services for individuals who require

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

them because they have suffered a crisis because of substance abuse or being a victim of violence.

124.    In addition, DOH expects that, because each hospitalization costs approximately $33,000 according to the Centers for Disease Control, Washington can expect to incur tens of millions of dollars in costs for this over the next decades if the Final Rule takes effect.

125.    If the Final Rule is allowed to take effect, it will require the Department of Social and Health Service (DSHS)'s Aging and Long-Term Services Administration to expend significant resources to revise and make changes to numerous materials, including websites, policies, applications, bulletins, notices, letters, and other costs, totaling over $78,168.16.

126.    In addition, the Final Rule would require DSHS's Developmental Disabilities Administration, to incur significant costs to review and make necessary changes to system-generated letters, posters, websites, policies and standard operating procedures, applications, client letters, contracts, bulletins, and notices, totaling over $100,000.

127.    In sum, the impact of the Final Rule will not be isolated. In significantly narrowing Section 1557's scope and protections, Washington will bear the financial and public health burdens of protecting its residents from discrimination, of responding to the poor health outcomes of residents who avoid or delay seeking treatment because of discrimination, and of educating its agencies, residents, and healthcare providers of Section 1557's new patchwork application in the healthcare context.

## V.    CAUSES OF ACTION

### FIRST CLAIM
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C)**
**Not in Accordance with Law/In Excess of Statutory Authority**

128.    Washington repeats and incorporates by reference each allegation of the prior paragraphs.

129.    Defendants are subject to the APA.

130.    The APA provides that courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

131.    By eliminating gender identity, sex stereotyping, and sexual orientation from the definition of "sex" and removing similar protections from ten unrelated CMS regulations, the Final Rule exceeds Defendants' statutory authority and is not in accordance with law. The Final Rule contravenes Sections 1554 and 1557 of the ACA; U.S. Supreme Court precedent; other controlling federal court precedent; and federal agency rules in other civil rights contexts that all define "sex" as including gender identity, sex stereotyping and sexual orientation.

132.    By narrowly construing Section 1557 to reduce the number and types of covered entities subject to Section 1557, the Final Rule exceeds Defendants' statutory authority and is not in accordance with law. The Final Rule contravenes both Sections 1554 and 1557 of the ACA.

133.    By incorporating Title IX's exemption from anti-discrimination provisions on the basis of sex for religious educational institutions into Section 1557 regulations, the Final Rule exceeds Defendants' statutory authority and is not in accordance with law. The Final Rule contravenes both Sections 1554 and 1557 of the ACA.

134.    By eliminating the requirement that covered entities provide beneficiaries with taglines in 15 common languages for all significant communications, the Final Rule exceeds Defendants' statutory authority and is not in accordance with law. The Final Rule contravenes both Sections 1554 and 1557 of the ACA.

135.    By removing the prohibition on discrimination on the basis of association with a member of a protected class, the Final Rule exceeds Defendants' statutory authority and is not in accordance with law. The Final Rule contravenes both Sections 1554 and 1557 of the ACA; controlling federal court precedent holding that anti-discrimination law protects individuals who,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

37

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

though not members of a protected class, are victims of discriminatory hostility toward associates of the individual.

136.    For these reasons and others, the Defendants lack statutory authority for their actions, which are not in accordance with law, violating 5 U.S.C. § 706(2)(A) and (C). The Final Rule must be held unlawful and set aside.

137.    Defendants' violations cause ongoing harm to Washington's proprietary and quasi-sovereign interests and its residents.

### SECOND CLAIM
### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary, Capricious, or an Abuse of Discretion

138.    Washington repeats and incorporates by reference each allegation of the prior paragraphs.

139.    Defendants are subject to the APA.

140.    The APA provides that courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

141.    By eliminating gender identity, sex stereotyping, and sexual orientation from the definition of "sex" in the 2016 Rule, and removing gender identity and sexual orientation from ten CMS regulations, HHS reversed its position without reasoned explanation. HHS acted arbitrarily, capriciously, and abused its discretion by, among other things, failing to distinguish contrary precedent, failing to provide a reasoned analysis for the change, offering an explanation that runs counter to the evidence before it, and failing to consider important aspects of the problem, including properly weighing the costs and benefits of the Final Rule.

142.    By narrowly construing Section 1557 to reduce the number and types of entities subject to Section 1557 under the Final Rule, HHS reversed position without reasoned explanation. HHS acted arbitrarily, capriciously, and abused its discretion by failing to provide

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

38

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

a reasoned analysis for the change, offering an explanation that runs counter to the evidence before it, and failing to consider important aspects of the problem, including properly weighing the costs and benefits of the Final Rule.

143. By incorporating Title IX's exemption from anti-discrimination provisions on the basis of sex for religious educational institutions into Section 1557's regulation, HHS reverses its position without reasoned explanation. HHS acted arbitrarily, capriciously, and abused its discretion by, among other things, failing to provide a reasoned analysis for the change, offering an explanation that runs counter to the evidence before it, and failing to consider important aspects of the problem, including properly weighing the costs and benefits of the Final Rule.

144. By eliminating the requirement contained in the 2016 Rule that covered entities provide beneficiaries with taglines in 15 common languages for all significant communications, HHS reversed its position without reasoned explanation. HHS acted arbitrarily, capriciously, and abused its discretion by, among other things, failing to provide a reasoned analysis for the change, offering an explanation that runs counter to the evidence before it, and failing to consider important aspects of the problem, including properly weighing the costs and benefits of the Final Rule.

145. By removing the prohibition on discrimination on the basis of association with a member of a protected class in the 2016 Rule, HHS reversed position without reasoned explanation. HHS acted arbitrarily, capriciously, and abused its discretion by, among other things, failing to distinguish contrary precedent, failing to provide a reasoned analysis for the change, offering an explanation that runs counter to the evidence before it, and failing to consider important aspects of the problem, including the costs and benefits of the Final Rule.

146. For these reasons above and others, HHS acted arbitrarily, capriciously, or abused its discretion in making the Final Rule, violating 5 U.S.C. § 706(2)(A). The 2020 Rule must be held unlawful and set aside.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

39

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

147.   Defendants' violation causes ongoing harm to Washington's proprietary and quasi-sovereign interests and its residents.

### THIRD CLAIM
**Contrary to Equal Protection, U.S. Const. amend. V.**

148.   Washington repeats and incorporates by reference each allegation of the prior paragraphs.

149.   The Fifth Amendment to the U.S. Constitution provides that no person shall be deprived of life, liberty, or property without due process of law. This Due Process Clause prohibits the federal government from denying any person equal protection under the law.

150.   Discrimination on the basis of sex, including gender identity, sex stereotyping, and sexual orientation, denies LGBTQ individuals their constitutional right to equal protection under the law.

151.   By eliminating gender identity, sex stereotyping, and sexual orientation from the definition of "sex" and removing sexual orientation and gender identity from ten CMS regulations, the Final Rule discriminates against LGBTQ individuals based on sex.

152.   By removing these categories from definition of "sex," HHS intended the Final Rule to have, and the Final Rule will have, the effect of stigmatizing LGBTQ individuals as second-class citizens in violation of equal protection guarantees.

153.   Discrimination on the basis of sex at a minimum requires courts to apply intermediate or heightened scrutiny in evaluating the constitutionality of the government's discrimination.

154.   HHS has no legitimate justification for such disparate treatment, let alone an important or compelling interest that is constitutionally justified.

155.   The Final Rule violates the equal protection component of the Fifth Amendment of the U.S. Constitution and must be vacated.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

40

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

156.   Defendants' violation causes ongoing harm to Washington's proprietary and quasi-sovereign interests and its residents.

## FOURTH CLAIM
### Contrary to Substantive Due Process, U.S. Const. amend. V.

157.   Washington repeats and incorporates by reference each allegation of the prior paragraphs.

158.   The Fifth Amendment to the United States Constitution provides that no person shall be deprived of life, liberty, or property without due process of law. The Due Process Clause guarantees to individuals the fundamental right to make certain decisions central to privacy, bodily autonomy, integrity, self-definition, intimacy, and personhood free from unjustified governmental intrusion.

159.   By eliminating gender identity, sex stereotyping, and sexual orientation from the definition of "sex" under Section 1557 and removing gender identity and sexual orientation from ten CMS regulations, HHS violates the Fifth Amendment's substantive due process guarantee. HHS invites healthcare providers and insurers to interfere with a patient's access to medical care and their ability to choose how to live and express themselves, consistent with their sex, sexual orientation, or gender identity.

160.   There is no constitutionally adequate justification for Defendants' infringing on a patient's fundamental rights in this way.

161.   The Final Rule violates the substantive due process guarantee of the Fifth Amendment of the U.S. Constitution and must be vacated.

162.   Defendants' violation causes ongoing harm to Washington's proprietary and quasi-sovereign interests and its residents.

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1

## VI.    PRAYER FOR RELIEF

2
Wherefore, Washington respectfully requests that this Court:

3
163.    Declare that the Final Rule exceeds Defendants'' statutory authority and is

4
unauthorized by and contrary to the Constitution and laws of the United States;

5
164.    Declare that the Final Rule violates the APA because it is contrary to the enacted

6
legislation and Congressional intent, is arbitrary and capricious, and an abuse of discretion;

7
165.    Vacate the Final Rule;

8
166.    Issue an injunction prohibiting Defendants from implementing or enforcing the

9
Final Rule;

10
167.    Award the State of Washington its costs and reasonable attorneys' fees; and

11
168.    Award such other and further relief as the interests of justice may require.

12

13
DATED this 16th day of July, 2020.

14
Respectfully Submitted,

15
ROBERT W. FERGUSON

16
Attorney General

17
*s/ Neal Luna*

18
NEAL LUNA, WSBA No. 34085
MARSHA CHIEN, WSBA No. 47020

19
BRIAN SUTHERLAND, WSBA No. 37969
Assistant Attorneys General

20
Attorneys for Plaintiff State of Washington
Wing Luke Civil Rights Division

21
Office of the Attorney General

22
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188

23
Phone: (206) 464-7744
Marsha.Chien@atg.wa.gov

24
Neal.Luna@atg.wa.gov

25
Brian.Sutherland@atg.wa.gov

26

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                    42              ATTORNEY GENERAL OF WASHINGTON
                                                          Civil Rights Division
                                                          800 Fifth Avenue, Suite 2000
                                                          Seattle, WA 98104
                                                          (206) 464-7744