1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9
10

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 2:20-cv-01105 |
| Plaintiff, | |
| v. | MOTION FOR PRELIMINARY INJUNCTION |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR, in his official capacity as the Secretary of the United States Department of Health and Human Services, | NOTE ON MOTION CALENDAR: AUGUST 7, 2020 |
| Defendants. | ORAL ARGUMENT REQUESTED |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

# TABLE OF CONTENTS

I.    INTRODUCTION............................................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND ....................................2

III.  ARGUMENT ...............................................................................................7

      A.  Washington Is Likely to Succeed on the Merits of Its Claims That the
          Final Rule Violates the APA...............................................................7

          1.  The Final Rule Exceeds HHS's Statutory Authority .....................8

              a.  Controlling Law Establishes That "Sex" Discrimination
                  Includes Discrimination Based on Gender Identity, Sex
                  Stereotyping, and Sexual Orientation......................................8

              b.  The Final Rule's Religious Exemption Is Contrary to Law....12

              c.  HHS Lacks Authority to Shrink the Set of Covered Entities.................13

          2.  The Final Rule Is Arbitrary and Capricious...............................15

              a.  *Franciscan Alliance* Cannot Support Deletion of Gender
                  Identity, Sex Stereotyping, and Sexual Orientation in Light
                  of *Bostock* ...........................................................................16

              b.  The Final Rule's Religious Exemption Reverses Prior Policy
                  Without Authority or Good Reason.........................................18

              c.  HHS Fails to Justify Its Elimination of Covered Entities .......19

      B.  HHS's Final Rule Will Irreparably Harm Washington and Its Residents..............20

          1.  Washington State's LGTBQ Residents Will Suffer Healthcare
              Discrimination and Poorer Health Outcomes as a Result of the
              Final Rule ...............................................................................20

          2.  The Final Rule Will Cost the State Millions in Poorer Health
              Outcomes.................................................................................21

      C.  The Balance of Equities and Public Interest Tip Sharply in Favor of
          Preliminary Injunctive Relief .............................................................23

IV.   CONCLUSION............................................................................................24

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105                                    i

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Arizona v. United States*,
   567 U.S. 387 (2012)..................................................................................................8

*Bailey v. United States*,
   516 U.S. 137 (1995)................................................................................................14

*Barnes v. City of Cincinnati*,
   401 F.3d 729 (6th Cir. 2005),
   *cert. denied*, 546 U.S. 1003 (2005) ...................................................................3, 8

*Batalla Vidal v. Nielson*,
   279 F. Supp. 3d 401 (E.D.N.Y. 2018),
   *aff'd in part and rev'd on other grounds*,
   140 S. Ct. 1891 (2020)...........................................................................................23

*Bostock v. Clayton Cty.*,
   590 U.S. ___, 140 S. Ct. 1731 (2020) ...........................................................passim

*Boyden v. Conlin*,
   341 F. Supp. 3d 979 (W.D. Wis. 2018) ..................................................................8

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ...........................................................................22, 24

*California v. U.S. Health and Human Servs.*,
   390 F. Supp. 3d 1061 (N.D. Cal. 2019)................................................................21

*City of Edmonds v. Wash. State Bldg. Code Council*,
   18 F.3d 802 (9th Cir. 1994) ...................................................................................12

*Dodds v. United States Dep't of Educ.*,
   845 F.3d 217 (6th Cir. 2016) .................................................................................10

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) ...............................................................................23

*East Bay Sanctuary Covenant v. Barr*,
   --- F.3d ----, No. 19-16487, 2020 WL 3637585 (9th Cir. July 6, 2020) . ...........23

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016)................................................................................16, 18, 19

*Fed. Commc'n Comm'n v. Fox Television Studios*,
   556 U.S. 502 (2009)................................................................................................16

*Flack v. Wis. Dept. of Health Servs.*,
   328 F. Supp. 3d 931 (W.D. Wis. 2018) ..................................................................8

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

ii

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

*Franciscan All., Inc. v. Burwell,*
227 F. Supp. 3d 660 (N.D. Tex. 2016) ...................................................5, 9, 10, 18

*Greater Boston Television Corp. v. Fed. Commc'n Comm'n,*
444 F.2d 841 (D.C. Cir. 1970),
*cert. denied,* 403 U.S. 923 (1971) ........................................................................19

*Grimm v. Gloucester Cty. Sch. Bd.,*
400 F.Supp.3d 444 (E.D. Va. 2019) .....................................................................10

*Hibbs v. Winn,*
542 U.S. 88 (2004) ................................................................................................14

*Humane Soc'y of U.S. v. Locke,*
626 F.3d 1040 (9th Cir. 2010) ..............................................................................18

*League of Women Voters v. Newby,*
838 F.3d 1 (D.C. Cir. 2016) ..................................................................................24

*Lopez v. Heckler,*
713 F.2d 1432 (9th Cir. 1983) ..............................................................................24

*M.R. v. Dreyfus,*
697 F.3d 706 (9th Cir. 2012) ................................................................................21

*Macy v. Holder,*
No. 0120120821, 2012 WL 1435995 (EEOC Apr. 20, 2012) ................................3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ................................................................................................15

*N.D. v. Haw. Dep't of Educ.,*
600 F.3d 1104 (9th Cir. 2010) ..............................................................................24

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) ................................................................................................2

*Newton-Nations v. Rogers,*
316 F. Supp. 2d 883 (D. Ariz. 2004) .....................................................................21

*Organized Vill. of Kake v. U.S. Dep't of Agric.,*
795 F.3d 956 (9th Cir. 2015) ...........................................................................15, 18

*Prescott v. Rady Children's Hospital-San Diego,*
265 F. Supp. 3d 1090 (S.D. Cal. 2017) ..................................................................9

*Price Waterhouse v. Hopkins,*
490 U.S. 228 (1989) ............................................................................................3, 8

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.,*
374 F.3d 1209 (D.C. Cir. 2004) ............................................................................17

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

*Rodde v. Bonta*,
  357 F.3d 988 (9th Cir. 2004) .......................................................................... 24

*Rosa v. Park West Bank & Trust Co.*,
  214 F.3d 213 (1st Cir. 2000) ............................................................................ 8

*Rumble* v. *Fairview Heath Servs.*,
  No. 14-cv-2037, 2015 WL 1197415 (D. Minn. Mar. 16, 2015) ........................... 3

*Schroer* v. *Billington*,
  577 F. Supp. 2d 293 (D.D.C. 2008) ................................................................... 3

*Schwenk v. Hartford*,
  204 F.3d 1187 (9th Cir. 2000) ........................................................................... 8

*Smith v. City of Salem*,
  378 F.3d 566 (6th Cir. 2004) ............................................................................. 8

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015),
  *aff'd*, 136 S. Ct. 2271 (2016) ......................................................................... 23

*Tooley* v. *Van Buren Pub. Sch.*,
  No. 2:14-cv-13466-AC-DRG (E.D. Mich. Feb. 24, 2015) ................................... 3

*U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) .................................................................................... 19

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) .......................................................................... 24

*Washington v. U.S. Dep't of Homeland Sec.*,
  408 F. Supp. 3d 1191 (E.D. Wash. 2019) ................................................... 7, 18

*Whitaker v. Kenosha Unified Sch. Dist.*,
  858 F.3d 1034 (7th Cir. 2017) .......................................................................... 10

*Winter v. Nat'l. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .............................................................................................. 7

*Yusuf v. Vassar Coll.*,
  35 F.3d 709 (2d Cir. 1994) ............................................................................... 10

*Zubik v. Burwell*,
  136 S. Ct. 1557 (2016) ..................................................................................... 24

### Statutes

5 U.S.C. § 705 ....................................................................................................... 7

5 U.S.C. § 706(2)(A) ....................................................................................... 7, 15

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

iv

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

5 U.S.C. § 706(2)(C) ..............................................................................................7

20 U.S.C. § 1681 ...................................................................................................3

20 U.S.C. § 1681(a)(3) ........................................................................................12

42 U.S.C. § 18023 ...............................................................................................13

42 U.S.C. § 18113 ...............................................................................................13

42 U.S.C. § 18114 ...........................................................................................2, 13

42 U.S.C. § 18114(1) ..........................................................................................19

42 U.S.C. § 18116 ........................................................................................1, 2, 8

42 U.S.C. § 18116(a) ...............................................................................4, 14, 15

**Other Authorities**

81 Fed. Reg. 31,375 ..............................................................................................2

81 Fed. Reg. 31,376 ..............................................................................................4

81 Fed. Reg. 31,378 ..............................................................................................4

81 Fed. Reg. 31,379 .......................................................................................13, 18

81 Fed. Reg. 31,379-80 .........................................................................................4

81 Fed. Reg. 31,380 .......................................................................................4, 18

81 Fed. Reg. 31,387 ..............................................................................................3

81 Fed. Reg. 31,429 ............................................................................................11

81 Fed. Reg. 31,433 ..............................................................................................2

81 Fed. Reg. 31,444 ............................................................................................17

81 Fed. Reg. 31,460 ..............................................................................................3

81 Fed. Reg. 31,465 ..............................................................................................2

81 Fed. Reg. 31,466 ..............................................................................................3

81 Fed. Reg. 34,467 ..............................................................................................3

84 Fed. Reg. 27,846 ..............................................................................................5

84 Fed. Reg. 27,850 ..............................................................................................5

v

84 Fed. Reg. 27,857 ........................................................................................5

84 Fed. Reg. 27,860 ........................................................................................5

84 Fed. Reg. 27,869 ........................................................................................5

84 Fed. Reg. 27,871 ........................................................................................5

84 Fed. Reg. 27,883 ........................................................................................5

84 Fed. Reg. 27,891 ........................................................................................5

85 Fed. Reg. 37,160 .....................................................................................1, 6

85 Fed. Reg. 37,162 ..................................................................................10, 12

85 Fed. Reg. 37,163 ..................................................................................19, 22

85 Fed. Reg. 37,167 ........................................................................................6

85 Fed. Reg. 37,168 .................................................................................7, 9, 10

85 Fed. Reg. 37,169 .....................................................................................6, 7

85 Fed. Reg. 37,169-70 ...................................................................................14

85 Fed. Reg. 37,170 ......................................................................................19

85 Fed. Reg. 37,170-71 ....................................................................................6

85 Fed. Reg. 37,171 ....................................................................................6, 13

85 Fed. Reg. 37,172-74 ....................................................................................6

85 Fed. Reg. 37,173-74 ...................................................................................15

85 Fed. Reg. 37,178 ......................................................................................10

85 Fed. Reg. 37,178-206 .................................................................................12

85 Fed. Reg. 37,178-79 ...................................................................................10

85 Fed. Reg. 37,184 ......................................................................................10

85 Fed. Reg. 37,187 ....................................................................................6, 11

85 Fed. Reg. 37,188 ......................................................................................11

85 Fed. Reg. 37,206-07 ...................................................................................18

85 Fed. Reg. 37,225 ......................................................................................16

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

85 Fed. Reg. 37,226 ..................................................................................14

85 Fed. Reg. 37,236 ....................................................................................6

85 Fed. Reg. 37,237 ...........................................................................11, 22

85 Fed. Reg. 37,244 ..................................................................................14

85 Fed. Reg. 37,244-45 .............................................................................14

85 Fed. Reg. 37,245 ..................................................................................12

Directive 2014-02, U.S. Dep't of Labor, Office of Fed. Contract Compliance
    Programs, (Aug. 19, 2014),
    http://www.dol.gov/ofccp/regs/compliance/directives/dir2014_02.html ............................3

Out2Enroll, *Summary of Findings: 2020 Marketplace Plan Compliance with
    Section 1557*, https://out2enroll.org/out2enroll/wp-content/uploads/2019/
    11/Report-on-Trans-Exclusions-in-2020-Marketplace-Plans-2.pdf
    (last visited July 16, 2020)..........................................................................11

S. Gage, *The Transgender Eligibility Gap: How the ACA Fails to Cover
    Medically Necessary Treatment for Transgender Individuals and How
    HHS Can Fix It*, 49 New Eng. L. Rev. 499, 529 n.214 (2015)............................11

U.S. Dep't of Educ., Questions and Answers on Title IX and Sexual Violence,
    p. B-2 (Apr. 29, 2014),
    http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf ...............................3

## Regulations

5 C.F.R. § 300.102(c) ..................................................................................3

5 C.F.R. § 300.103(c) ..................................................................................3

5 C.F.R. § 315.806(d) ..................................................................................3

5 C.F.R. § 335.103(b)(1) ..............................................................................3

5 C.F.R. § 537.105(d) ..................................................................................3

5 C.F.R. § 900.603(e) ..................................................................................3

45 C.F.R. Part 92..........................................................................................2

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

vii

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

# I.     INTRODUCTION

Section 1557 of the Patient Protection and Affordable Care Act (ACA) is the landmark federal civil rights statute that, for the first time, extended broad civil rights protections in the healthcare context. 42 U.S.C. § 18116. The ACA's non-discrimination provisions apply to a comprehensive set of healthcare providers, insurers, federal agencies, and federal grantees, all in furtherance of the ACA's promise to increase healthcare coverage by removing barriers to timely, affordable care.

Section 1557 prohibits discrimination on the basis of sex. *Id*. In 2019, despite considerable consensus by regulators and courts nationwide that discrimination based on gender identity, sexual orientation, and sex stereotyping are all forms of sex discrimination, the U.S. Department of Health and Human Services (HHS) proposed to "implement" Section 1557 by eliminating protections for LGBTQ patients, granting new religious exemptions to providers, and shrinking the scope of Section 1557's coverage. HHS hinged its proposal on one federal district court ruling and HHS's prediction that the U.S. Supreme Court would strip LGBTQ protections when it decided *Bostock v. Clayton Cty.*, a pending case considering sex discrimination in the employment context.

*Bostock* did not go HHS's way. *See* 140 S. Ct. 1731, 1754 (2020) (holding that "sex" discrimination includes sexual orientation and gender identity discrimination). Four days later, and in the midst of a global health pandemic, HHS published its Final Rule anyway, narrowing anti-discrimination coverage in ways that will impair public health. *See* Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020) (Final Rule). Washington now moves preliminarily to enjoin three aspects of the Final Rule: (1) the interpretation of "sex" discrimination to exclude LGBTQ patients, (2) a new, blanket exemption for religious entities, and (3) the exclusion of many healthcare entities—including many insurance companies and HHS itself—from Section 1557's scope. Under the Administrative Procedure Act (APA), each of these provisions exceeds HHS's

1

statutory authority, is contrary to law, and is arbitrary and capricious. These provisions will also irreparably harm Washington's public health system, cost the state millions of dollars, and reduce healthcare access for state residents. The Court should enjoin or stay the Final Rule.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

In March 2010, Congress passed the ACA "to increase the number of Americans covered by health insurance and decrease the cost of healthcare," *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012), and "help uninsured and underserved populations gain access to care," Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,433 (May 18, 2016) (codified at 45 C.F.R. Part 92). Congress emphasized its goals by specifically prohibiting any regulation which creates unreasonable barriers to "obtain[ing] appropriate medical care," limits "the availability of heath care treatment for the full duration of a patient's needs," or interferes with "communications regarding the full range of treatment options between [a] patient and [a] provider." 42 U.S.C. § 18114 (1), (3), (6).

The ACA has resulted in increased insurance coverage for millions of Americans. In 2010, 49.9 million people were uninsured. Compl. ¶ 15, ECF No. 1. By 2018, that number had dropped to 27.5 million. *Id.* A key part of the ACA's success in facilitating access to healthcare is Section 1557, the nondiscrimination provision. 42 U.S.C. § 18116(a). Section 1557 prohibits federally funded entities from discriminating "on the ground prohibited under" four existing civil rights statutes, including discrimination on the bases of race, color, national origin, age, disability, or sex. *Id.* Section 1557 imports the enforcement mechanisms of the four civil rights statutes to remedy discrimination in healthcare. *Id.* HHS may promulgate regulations to implement Section 1557. *Id.* § 18116(c).

In August 2013, HHS initiated an information-gathering and rulemaking process to implement Section 1557. 81 Fed. Reg. 31,375 (May 18, 2016). In May 2016, after a nearly three-year process that twice solicited public input and resulted in 24,875 public comments, HHS published a final rule (2016 Rule). *Id.* at 31,465. The 2016 Rule applied "to every health program

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1   or activity, any part of which receives Federal financial assistance," and all programs

2   administered by HHS. *Id.* at 31,466. The 2016 Rule included a definition of discrimination "on

3   the basis of sex," *Id.* at 34,467 because Title IX, the federal statute that prohibits sex

4   discrimination by educational recipients of federal funds, is one of the statutes that Section 1557

5   incorporates. *See* 20 U.S.C. § 1681(a). The 2016 Rule defined prohibited sex discrimination to

6   include sex stereotyping, to "reflect[] the Supreme Court's holding in *Price Waterhouse* v.

7   *Hopkins.*" 81 Fed. Reg. at 31,387 (citing 490 U.S. 228, 251 (1989)). The 2016 Rule also

8   prohibited gender identity discrimination, in keeping with other federal agencies and courts

9   nationwide that recognized that discrimination on the basis of gender identity constitutes

10  discrimination on the basis of sex. *Id.*[1]

11       The 2016 Rule cited evidence for its conclusion that clear prohibitions on gender identity

12  discrimination are required to increase accessibility of healthcare for transgender individuals.

13  81 Fed. Reg. at 31,460. HHS noted that before the ACA became law, 26.7% of transgender

14  respondents reported that they were refused needed healthcare, 25% of transgender individuals

15  reported being subject to harassment in medical settings, and 50% reported having to teach their

16  medical providers about transgender care. *Id.* at 31,460 (citations omitted).

17

---

18       [1] The 2016 Rule cited the following agency rulings and federal court precedents for its determination that gender identity discrimination constitutes sex discrimination: **Agency rulings:** 5 C.F.R. § 300.102(c), 300.103(c),

19  315.806(d), 335.103(b)(1), 537.105(d), 900.603(e) (U.S. Office of Personnel Management regulations providing that discrimination on the basis of sex includes discrimination on the basis of gender identity); Directive 2014-02,

20  U.S. Dep't of Labor, Office of Fed. Contract Compliance Programs, § 5 (Aug. 19, 2014), http://www.dol.gov/ofccp/regs/compliance/directives/dir2014_02.html; Statement of Interest of the United States, *Jamal* v. *SAKS & Co.*,

21  No. 4:14-CV-2782 (S.D. Tex. Jan. 26, 2015), https://www.justice.gov/sites/default/files/crt/legacy/2015/02/27/jamalsoi.pdf; Statement of Interest of the United States, *Tooley* v. *Van Buren Pub. Sch.*, No. 2:14-cv-13466-AC-

22  DRG (E.D. Mich. Feb. 24, 2015) https://www.justice.gov/sites/default/files/crt/legacy/2015/02/27/tooleysoi.pdf; Memo from Eric Holder, Att'y Gen., to U.S. Att'ys & Heads of Dep't Components (Dec. 18, 2014),

23  https://www.justice.gov/opa/pr/attorney-general-holder-directs-department-include-gender-identity-under-sex-discrimination; U.S. Dep't of Educ., Questions and Answers on Title IX and Sexual Violence, p. B-2 (Apr. 29, 2014)

24  http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf; *Macy* v. *Holder*, No. 0120120821, 2012 WL 1435995, at *11 (EEOC Apr. 20, 2012); **Federal court precedents:** *Rumble* v. *Fairview Heath Servs.*, No. 14-cv-

25  2037, 2015 WL 1197415, at *10 (D. Minn. Mar. 16, 2015) (Section 1557) (order denying motion to dismiss); *Barnes* v. *City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005), *cert. denied,* 546 U.S. 1003 (2005) (Title VII); *Smith* v.

26  *City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004) (Title VII); *Schroer* v. *Billington,* 577 F. Supp. 2d 293, 304 (D.D.C. 2008) (Title VII).

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Section 1557 and the 2016 Rule resulted in dramatic improvements in coverage for transgender individuals. In just the first year the 2016 Rule was in effect, "the vast majority of insurers (95.1%) removed transgender-specific exclusions" from their insurance plans. Compl. ¶ 36. Since 2017, the percentage of insurers that did not have transgender-specific exclusions in their plans but excluded a transition-related procedure has also dropped significantly from 55.5% to 12% in 2020 *Id.*

While the 2016 Rule adopted the "ground[s] [of] prohibited" sex discrimination from Title IX, 42 U.S.C. § 18116(a), HHS did not import into the healthcare context Title IX's blanket exemption allowing religiously controlled institutions to discriminate on the basis of sex. 81 Fed. Reg. at 31,380; *see also* 20 U.S.C. § 1681(a)(3). HHS explained that Section 1557 contains no religious exemption, and "noted that many of Title IX's limitations and exceptions do not readily apply in a context that is grounded in healthcare, rather than education." 81 Fed. Reg. at 31,378. Individuals may choose whether to attend a religious educational institution, but they often lack such choice in healthcare providers, particularly in rural areas or in emergencies, which "could result in a denial or delay in the provision of healthcare to individuals and in discouraging individuals from seeking necessary care, with serious and, in some cases, life threatening results." *Id.* at 31,380 In order to affirm providers' religious rights while maximizing patients' access to care, the 2016 Rule incorporated the existing, robust set of federal laws and regulations in the healthcare context guaranteeing religious and conscience freedoms. *Id.* at 31,379-80 nn.12-15. Specifically, the 2016 Rule provided "that insofar as application of any requirement under the rule would violate applicable Federal statutory protections for religious freedom and conscience, such application would not be required." *Id.* at 31,376.

Private healthcare providers and eight states sued to enjoin portions of the 2016 Rule, arguing that gender identity discrimination should not be considered sex discrimination, and that religious organizations should enjoy greater exemptions from Section 1557. *Franciscan All.,*

4

*Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016). The court agreed, and enjoined HHS from enforcing portions of the 2016 Rule. *Id.* at 696. Following a change in presidential administrations, the federal government elected not to appeal the district court's ruling.

In June 2019, HHS proposed a replacement for the 2016 Rule. Nondiscrimination in Health and Health Education Programs and Activities, 84 Fed. Reg. 27,846 (proposed June 14, 2019). Among other things, the proposed rule reduced the grounds for discrimination prohibited under Section 1557, including by declining to cover gender identity, sex stereotyping, or sexual orientation as prohibited bases for discrimination. *See id.* at 27,857. In addition, the proposed rule eliminated protections from discrimination on the bases of sexual orientation and gender identity from ten unrelated regulations under the Centers for Medicare and Medicaid Services (CMS). *Id.* at 27,871. The proposed rule also narrowed Section 1557's scope by reducing the number of covered entities, eliminated critical civil rights protections for Limited English Proficient (LEP) patients, people with hearing-related disabilities, and individuals associated with protected groups. *Id.* at 27,865, 27,891. The proposed rule also eliminated a host of procedural and enforcement provisions from the 2016 Rule, including notice and grievance procedures, anti-retaliation protections, and specific private and public enforcement mechanisms and remedies. *Id.* at 27,850, 27,860, 27,865, 27,869, 27,883.[2]

HHS received 198,845 comments on the proposed rule. Washington alone submitted three, including one from Governor Jay Inslee, Att`orney General Bob Ferguson, and Insurance Commissioner Mike Kreidler, one from the Washington Health Benefit Exchange, and one from Insurance Commissioner Kreidler. Compl. ¶¶ 36, 38, 41, 43.[3] Washington's commenters cited

---

[2] Although not the basis for the instant motion, several of these changes are challenged in Washington's Complaint. Compl. at ¶¶ 122-25, 134-36 (alleging that the incorporation of the conscience objection rule from Title IX, the changes to the LEP provisions, and the removal of protection from discrimination based on association violate the APA), ¶¶ 140-59 (alleging that challenged changes violate the APA as contrary to the Equal Protection and Substantive Due Process clauses of the Constitution).

[3] Washington also joined a comment submitted by 20 other states and the District of Columbia, Compl. ¶ 35, and Insurance Commissioner Kreidler joined a comment submitted by the insurance commissioners of 17 other states, Comp. ¶ 42.

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-01105

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

evidence that the proposed rule would: (1) harm access to health insurance and healthcare, leading to poorer health outcomes for women, LGBTQ, and LEP patients; (2) increase state administrative and enforcement costs; (3) harm Washington tax revenues; and (4) cause confusion or uncertainty for healthcare providers and insurers. *Id.* ¶¶ 36-43.

Notwithstanding these comments and hundreds of thousands of others, HHS finalized the rule ten months later, making only "minor and primarily technical corrections." 85 Fed. Reg. at 37,160. The Final Rule follows through on HHS's proposal to eliminate protections from discrimination based on gender identity, sex stereotyping and sexual orientation. These protections are deleted. *Id.* at 37,167, 37,236. The Final Rule also significantly reduces and narrows Section 1557's scope. It excuses health insurers from non-discrimination obligations on the view that providing health insurance is not a "health program or activity." *Id.* at 37,171. Only a subset of an insurer's plans—ACA marketplace plans and plans that receive federal financial assistance—would be subject to Section 1557. For other plans, insurance companies may categorically exclude coverage of transgender-related care. *Id.* at 37,187. A large swath of additional plans and programs, including Medicare Part B, self-funded group health plans under the Employee Retirement Income Security Act of 1974 (ERISA), Federal Employees Health Benefits (FEHB) Program plans, and short-term limited duration insurance plans, would likewise be exempt. *Id.* at 37,172-74. And, the proposed rule interprets Section 1557's language as limited to only those HHS programs administered *under the ACA, id.* at 37,169, excluding from Section 1557's scope numerous HHS health programs and activities, like those administered by the Centers for Medicare and Medicaid Services, the Centers for Disease Control and Prevention, the National Institutes of Health, and the Substance Abuse and Mental Health Services Administration, *id.* at 37,170-71. Finally, at the same time as it narrows Section 1557's anti-discrimination coverage, the Final Rule expands religious exemptions, making them broadly applicable to all religious healthcare providers—like hospitals and their employees— thereby exempting them from complying with Section 1557.

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

HHS publicly announced the Final Rule on June 12, 2020, despite acknowledging that the imminent U.S. Supreme Court decision in *Bostock v. Clayton County* would "likely have ramifications for the definition of 'on the basis of sex' under Title IX," as "Title VII case law has often informed Title IX case law with respect to the meaning of discrimination 'on the basis of sex.'" 85 Fed. Reg. at 37,168. One business day later, the Supreme Court decided *Bostock*, holding that "sex discrimination" under Title VII encompasses discrimination because of sexual orientation or gender identity. *Bostock*, 140 S. Ct. at 1754 (2020). Undeterred, HHS published the Final Rule later that week, unchanged, and with an effective date of August 18, 2020. 85 Fed. Reg. at 37,169. Washington now seeks a preliminary injunction or stay to prevent certain illegal and harmful portions of the Final Rule from taking effect.

## III. ARGUMENT

A preliminary injunction is appropriate where the moving party establishes that (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. Winter v. Nat'l. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The standard for a stay of the Rule under 5 U.S.C. § 705 is "closely similar," with the third factor instead asking "whether issuance of the stay will substantially injure other parties.'" Washington v. U.S. Dep't of Homeland Sec., 408 F. Supp. 3d 1191, 1211 (E.D. Wash. 2019) (quoting Nken v. Holder, 556 U.S. 418, 419 (2009)). Framed either way, all factors strongly favor Washington here.

**A.    Washington Is Likely to Succeed on the Merits of Its Claims That the Final Rule Violates the APA**

Washington is highly likely to prevail on the merits of its claims that the Final Rule violates the APA in two ways: (1) it exceeds HHS's statutory authority and ignores applicable limitations on its regulatory power in violation of 5 U.S.C. § 706(2)(A) and (C), and (2) it is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A). Either basis fully supports injunctive relief here.

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1.  **The Final Rule Exceeds HHS's Statutory Authority**

HHS's authority to issue rules is subject to constitutional and statutory limits. *See Arizona v. United States*, 567 U.S. 387, 413 (2012) (where an agency is "entirely a creature of Congress," the "determinative question is not what the [agency] thinks it should do but what Congress has said it can do"). Here, Congress clearly intended Section 1557 to prohibit discrimination based on sex—which includes gender identity, sex stereotyping, and sexual orientation—and to broadly cover all health programs and activities administered by executive agencies and federal grantees. By rewriting and narrowing Section 1557's protections, the Final Rule exceeds HHS's statutory authority in violation of the APA.

a.  **Controlling Law Establishes That "Sex" Discrimination Includes Discrimination Based on Gender Identity, Sex Stereotyping, and Sexual Orientation**

The Final Rule's elimination of protections for members of the LGBTQ community contravenes the plain text of Section 1557 and is not in accordance with law. Section 1557 prohibits discrimination on the basis of sex. *See* 42 U.S.C. § 18116. At the time Congress enacted Section 1557, the overwhelming weight of authority recognized that the definition of "sex" in federal civil rights statutes includes sex stereotyping and gender identity. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-51 (1989) (plurality); *Schwenk v. Hartford*, 204 F.3d 1187, 1199-1201 (9th Cir. 2000); *Smith v. City of Salem*, 378 F.3d 566, 571-75 (6th Cir. 2004); *Rosa v. Park West Bank & Trust Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000); *Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005). In excluding these grounds from Section 1557's nondiscrimination protections, the Final Rule ignores this authority as well as a host of federal cases specific to Section 1557 holding that "sex" includes gender identity. *See Boyden v. Conlin*, 341 F. Supp. 3d 979, 996-97 (W.D. Wis. 2018) (holding Wisconsin's use of transgender exclusions in its state employee health insurance plan violated of Section 1557); *Flack v. Wis. Dept. of Health Servs.*, 328 F. Supp. 3d 931, 951 (W.D. Wis. 2018) (sex discrimination includes discrimination on the basis of "transgender status"); *Prescott v. Rady Children's Hospital-San*

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  *Diego*, 265 F. Supp. 3d 1090, 1098–100 (S.D. Cal. 2017) (Section 1557 bars gender identity

2  discrimination); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 957 (D. Minn. 2018) (same).

3        Although the Final Rule cites 40 times to a single district court case to justify its

4  exclusions, *see Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016),[4] HHS

5  also acknowledged that the Supreme Court's decision in *Bostock* would "likely have

6  ramifications for the definition of 'on the basis of sex' under Title IX" because "Title VII case

7  law has often informed Title IX case law." 85 Fed. Reg. at 37,168. And indeed, immediately

8  after HHS announced the Final Rule, the *Bostock* Court conclusively held that "sex"

9  discrimination covers LGBTQ persons because "[i]t is impossible to discriminate against a

10  person for being homosexual or transgender without discriminating against that individual based

11  on sex." *Bostock*, 140 S. Ct. at 1741. For example, a person who is discriminated against for

12  being a man attracted to another man is necessarily being discriminated against based on sex,

13  because he would not have been so treated if he were a woman attracted to a man. *Id.* at 1741.

14  Likewise, a person who is discriminated against for identifying as female when she was

15  identified as male at birth is necessarily being discriminated against based on sex, because she

16  would not have been treated if she identified as male. *Id.* In reaching its conclusion, the

17  Supreme Court acknowledged that "homosexuality and transgender status" are distinct concepts

18  from "sex," but observed that sexual harassment and motherhood are also distinct concepts that,

19  unquestionably, still qualify as sex discrimination. *Id.* at 1742, 1746.

20        Despite *Bostock*, HHS published the Final Rule without change, claiming that the holding

21  might be distinguishable because Section 1557's definition of "sex" comes from Title IX, not

22  Title VII, *see* 85 Fed. Reg. at 37,168. On this point, HHS argued that the healthcare context may

23  permit sex discrimination that would be prohibited in any other context. *Id.* ("the binary

24  biological character of sex . . . takes on special importance in the health context"). Yet, HHS's

25        [4] HHS also cites once to the following cases in North Dakota that were consolidated and relied on

26  *Franciscan All.*: *Religious Sisters of Mercy* v. *Burwell*, No. 3:16-cv-386 (D.N.D. filed Nov. 7, 2016); *Catholic Benefits Ass'n v. Burwell*, No.3:16-cv-432 (D.N.D. filed Dec. 28, 2016).

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

9

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

halfhearted attempted to distinguish Title VII conflicts with its own admission that Title VII case law often informs the interpretation of Title IX. *Id.*; *see also Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) (citations omitted).

Even if the logic of *Bostock* were somehow distinguishable—and there can be no credible argument that it is—Title IX case law independently confirms Washington's position. While Title IX does permit sex-segregated education, Title IX's protections also prohibit discrimination on the basis of gender identity, sex stereotyping, and sexual orientation. *See, e.g., Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034, 1039 (7th Cir. 2017) (holding unanimously that transgender students are protected under Title IX's prohibition against sex discrimination); *Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 221-22 (6th Cir. 2016) (noting that it was "settled law" that gender nonconformity discrimination violates Title IX); *Grimm v. Gloucester Cty. Sch. Bd.*, 400 F.Supp.3d 444, 456-57 (E.D. Va. 2019) (same). Although HHS dismisses these published, well-reasoned decisions as "novel legal theor[ies]," its basis for doing so is, again, only *Franciscan All.*, 85 Fed. Reg. at 37,184.

HHS's lengthy discussion of whether the public meaning of "sex" refers exclusively to the biological binary of male and female is both irrelevant and misplaced. *See id.* at 37,178-79. Affirming that "sex" discrimination also refers to discrimination based on gender identity, sex stereotyping, and sexual orientation in no way "obscures the reality that 'physical differences between men and women . . . are enduring,'" as HHS suggests. *Id.* at 37,178 Indeed, in *Bostock*, the Supreme Court specifically observed that "nothing in [the Court's] approach to these cases turn[ed] on the parties' debate [over whether 'sex' refers only to 'biological distinctions between male and female]." 140 S. Ct. at 1739. Likewise, a prohibition against sex discrimination does not mean healthcare providers must ignore a patient's sex when dispensing medical advice, as HHS suggests. 85 Fed. Reg. at 37,162 (asserting that including gender identity as a prohibited basis of discrimination on the basis of sex would "require[] and prevent[] covered entities from drawing reasonable and/or medically indicated distinctions on the basis of sex"). Critically, the

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

10

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    *Bostock* Court rejected this exact argument, noting that to "discriminate against" means drawing

2    "distinctions or differences in treatment that *injure* protected individuals." 140 S. Ct. at 1754

3    (citation omitted). Ultimately, while there may be a myriad of ways a patient's sex may be

4    relevant in the health context, i.e., gynecological exams or lactation consultations, Section 1557

5    does not prohibit reasonable distinctions based on sex, but only harmful *discrimination* based on

6    sex. HHS's misunderstanding of the role that gender identity plays in both healthcare and sex

7    discrimination does not give it license to deny gender non-conforming protection from

8    discrimination in violation of a Supreme Court decision.

9    　　　　Relatedly, the Final Rule's affirmative authorization of discrimination by insurance

10   providers against transgender plan holders directly violates Section 1557. The Final Rule grants

11   permission for insurance plans to categorically exclude gender-transition care from coverage—

12   even for treatments or services otherwise covered by the plan. 85 Fed. Reg. at 37,187 (confirming

13   the Final Rule eliminates the prohibition on "categorical coverage exclusion[s]" for health

14   services "related to gender transition"). This revision, which is a 180-degree reversal from the

15   2016 Rule, *see* 81 Fed. Reg. at 31,429, means that insurance companies may now explicitly

16   refuse to cover services like counseling, hormone therapy, and surgery, simply because those

17   services are needed by a patient undergoing gender transition. 85 Fed. Reg. at 37,188.[5] The Final

18   Rule concedes, as it must, that many issuers are likely to accept HHS's invitation to narrow

19   coverage and buoy their bottom lines. *See id.* at 37,237 (estimating that half of all covered entities

20   will "choose to revise their policies" in response to the Final Rule). By authorizing insurers to

21   single out a category of treatments that are specific to transgender patients, the Final Rule runs

22

23   　　　　[5] As recently as 2015, categorical exclusions of transgender care were commonplace *See, e.g.*, S. Gage,
     *The Transgender Eligibility Gap: How the ACA Fails to Cover Medically Necessary Treatment for Transgender
24   Individuals and How HHS Can Fix It*, 49 New Eng. L. Rev. 499, 529 n.214 (2015) ("Most private insurance plans
     incorporate plain language that specifically targets transgender individuals through exclusions"). By 2020, due in
25   large part to the 2016 Rule, categorical exclusions were nearly extinct. *See* Out2Enroll, *Summary of Findings: 2020
     Marketplace Plan Compliance with Section 1557* (97% of insurers did not include transgender-specific exclusions
26   in their 2020 marketplace plans), https://out2enroll.org/out2enroll/wp-content/uploads/2019/11/Report-on-Trans-
     Exclusions-in-2020-Marketplace-Plans-2.pdf.

MOTION FOR PRELIMINARY
INJUNCTION                                            11
No. 2:20-cv-01105

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  squarely afoul of Section 1557. *Accord Bostock*, 140 S. Ct. at 1741 (conduct that "intentionally
2  singles out" transgender people for worse treatment is prohibited sex discrimination).

3       Put simply, HHS not only deletes the language explicitly covering gender identity, sex
4  stereotyping, and sexual orientation when based on sex stereotypes, but also allows covered
5  entities to "draw . . . distinctions on the basis of sex," including categorically excluding coverage
6  for LGBTQ medical care. *See* 85 Fed. Reg. 37,162. That is more than silence; it is permission to
7  discriminate. HHS lacks authority to rewrite the plain meaning of the term "sex" based on its
8  preference (indeed, its single-minded insistence) that "sex" be narrowed to "biological" sex.
9  85 Fed. Reg. at 37,178-206 (referring to "biological" sex over 80 times). Courts nationwide,
10  including the Supreme Court, have held otherwise. In ignoring the law, HHS violates the APA.

11                 **b.**     **The Final Rule's Religious Exemption Is Contrary to Law**

12       Despite opting for a restrictive review of Title IX's protections based on sex, the Final
13  Rule inexplicably embraces a broad view of Title IX's exemption for religiously controlled
14  entities and imports it into Section 1557. The Final Rule allows healthcare providers and
15  insurers, including religiously affiliated hospitals and healthcare systems that occupy a large and
16  growing percentage of healthcare markets, to categorically opt out of treating patients—
17  including LGBTQ patients and those seeking abortions—if they believe doing so would
18  compromise their faith. 85 Fed. Reg. at 37,245. That, too, is in excess of statutory authority.

19       To reach this result, HHS incorporates the inapplicable religious exemptions from Title
20  IX. 85 Fed. Reg. at 37,245. This is error, because Title IX's exemption comes from language
21  that Congress chose to omit from the later-adopted Section 1557. Specifically, unlike Title IX,
22  which by its express terms exempts institutions "controlled by a religious organization" from its
23  nondiscrimination provision, 20 U.S.C. § 1681(a)(3), Section 1557 contains no religious
24  exemption at all. *See City of Edmonds v. Wash. State Bldg. Code Council*, 18 F.3d 802, 804
25  (9th Cir. 1994) (exemptions to federal civil rights statute "must be read narrowly") (citing *A.H.*
26  *Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) ("Any exemption from such humanitarian

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

12

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

and remedial legislation must . . . be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress."). As HHS itself concedes, Section 1557 incorporates the federal civil rights statutes' "prohibited grounds of discrimination," not its "scope" of coverage or exemptions. *See* 85 Fed. Reg. at 37,171 (declining to adopt Section 504's scope of "health program or activity" in favor of a narrower view).

Of course, the ACA is by no means silent on religious and conscience rights. With regard to abortion, specifically, Congress carefully balanced the interests of religious objectors and women patients. For example, Section 1553 prohibits government entities that receive federal financial assistance from discriminating against an individual or healthcare entity because of an objection to providing abortion services, 42 U.S.C. § 18113, and Section 1303 makes clear that health plans are not required to cover abortion services at all, 42 U.S.C. § 18023. And, in addition to its attentive treatment regarding abortion, the ACA incorporates the broad set of "provider conscience laws," including the Religious Freedom Restoration Act, that protect sincerely held religious beliefs. *See* 81 Fed. Reg. at 31,379 (citing additional conscience laws and regulations).

As such, there is no basis for the Final Rule's imposition of an additional, broad, and extra-textual exemption to the ACA's nondiscrimination mandate. Instead, Section 1554 expressly bars HHS from adopting any regulation that impedes patient access to medical information and quality care, including by exempting large portions of the healthcare industry from anti-discrimination law. *See* 42 U.S.C. § 18114. Understandably, in the healthcare context, where denial of healthcare can be life-threatening, Congress was careful and explicit as to where to permit religiously based refusals of care. By cutting a sweeping religious exemption from whole cloth, the Final Rule exceeds HHS's statutory authority in violation of the APA.

### c. HHS Lacks Authority to Shrink the Set of Covered Entities

Next, the Final Rule's attempt to limit the scope of health programs or activities subject to Section 1557 also contradicts Congress's explicit instruction. Section 1557 prohibits discrimination under "any health program or activity . . . that is administered by an Executive

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

13

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1   Agency or any entity established under this title (or amendments)." 42 U.S.C. § 18116(a). In

2   limiting Section 1557 coverage to health programs administered by the HHS under the ACA

3   only, *see* 85 Fed. Reg. at 37,244, the Final Rule ignores the "or's" in the statute and incorrectly

4   applies "under this title" to modify both programs "administered by an Executive agency" and

5   "any entity." As a matter of statutory interpretation, this approach makes little sense. If "under

6   this title" applied to "Executive Agency," there would have been no need for Section 1557 to

7   reference programs administered by Executive agencies at all. *See Hibbs v. Winn*, 542 U.S. 88,

8   101 (2004) (statutes must be construed "so that no part is rendered superfluous"); *Bailey v.*

9   *United States*, 516 U.S. 137, 146 (1995) ("We assume that Congress used two terms because it

10  intended each term to have a particular, nonsuperfluous meaning.").

11      By improperly narrowing Section 1557's reach, the Final Rule excludes numerous,

12  critical health programs and activities, even including HHS's own programs where they are not

13  established under the ACA. These include programs by the Centers for Medicare and Medicaid

14  Services, the Centers for Disease Control and Prevention, the National Institutes of Health, and

15  the Substance Abuse and Mental Health Services Administration. *See* 85 Fed. Reg. at 37,169-

16  70, at 37,226. In other words, the Final Rule conflicts with the plain language of the statute,

17  which prohibits discrimination under any health program or activity receiving Federal financial

18  assistance, whether from HHS or any other federal agency, or in any federal program, whether

19  or not established under the ACA. The Final Rule flatly violates the APA.

20      Additionally, the Final Rule impermissibly narrows the scope of Section 1557 by

21  excluding health insurers from the definition of "health program or activity." *See* 85 Fed.

22  Reg. at 37,244-45. The Final Rule excludes health insurance providers from the requirements of

23  Section 1557 except for ACA marketplace plans and federally funded plans. For non-ACA

24  health insurers that receive Federal financial assistance, the Final Rule further limits the

25  application of Section 1557 to only those operations that receive Federal dollars—all other

26  operations of the insurer are excluded. 85 Fed. Reg. at 37,244. As a result, the Final Rule exempts

MOTION FOR PRELIMINARY
INJUNCTION                                    14
No. 2:20-cv-01105

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

from Section 1557's coverage self-funded group health plans, the Federal Employees Health Benefits (FEHB) Program, and short-term limited duration insurance plans, the last of which commenters specifically warned are known to engage in discriminatory practices based on disability, age, and sex. 85 Fed. Reg. at 37,173-74.

Although HHS contends that providing "health insurance" is different than providing "healthcare," HHS ignores the fact that Section 1557 is not limited to "healthcare" at all. Section 1557's plain language covers all "any health program or activity," a much broader term than just "direct healthcare services." *See* 42 U.S.C. § 18116(a). Setting aside the obvious confusion created by applying Section 1557 to a health insurer when its plans are sold on the ACA marketplace, but exempting the same health insurer when its plans are sold off the marketplace, health insurance clearly is a health-related program or activity. It is how the overwhelming majority of Americans access healthcare. *See* Compl. ¶ 14. And it often dictates the availability of services for its enrollees—determining which providers a patient may see, what hospitals they may visit, and what treatments or medications they may receive. By severely curtailing the health programs and activities subject to coverage, HHS again exceeds its statutory authority and violates the APA.

## 2.     The Final Rule Is Arbitrary and Capricious

A court "shall" set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency policy may be arbitrary and capricious for many reasons, including when the record contradicts the agency's conclusion, the agency's rationale is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," or the agency has inexplicably acted inconsistently with its prior decisions. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc).

Additionally, an agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fed. Commc'n Comm'n v. Fox Television Studios*, 556 U.S. 502, 515 (2009). Where an agency changes its previous position, the agency must (1) "display awareness that it is changing position," (2) "show that there are good reasons for the new policy," and (3) balance those good reasons against "engendered serious reliance interests." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126-27 (2016). *See also Fox*, 556 U.S. at 515 (alteration to prior agency position requires "more detailed justification than what would suffice for a new policy created on a blank slate"). The Final Rule's elimination of definitions for "on the basis of sex," narrowing of the scope of covered entities, and addition of a sweeping religious exemption fail all of these requirements.

### a. *Franciscan Alliance* Cannot Support Deletion of Gender Identity, Sex Stereotyping, and Sexual Orientation in Light of *Bostock*

The Final Rule's elimination of sex stereotyping and gender identity from Section 1557's protections—as well as ten unrelated CMS regulations that prohibited sexual orientation and gender identity discrimination—represents a marked change from the 2016 Rule, as well as its own history of enforcement actions to protect LGBTQ patients. *See* Compl. ¶ 20. Yet, HHS provides no "good reasons for the new policy." *Encino Motorcars*, 136 S. Ct. at 2126. HHS relied solely on *Franciscan Alliance*—a district court case that HHS itself chose not to appeal— which cannot justify the Final Rule given the Supreme Court's intervening decision in *Bostock*.

HHS's purported cost-benefit analysis does not save the Final Rule. *See, e.g.,* 85 Fed. Reg. at 37,225 (touting the "net cost savings" when covered entities no longer have to process grievances based on gender identity discrimination). HHS claims it lacks data showing how the Final Rule will affect LGBTQ individuals, how many people currently benefit from the 2016 Rule's prohibition against discrimination based on sex stereotyping and gender identity, or the public health costs of removing nondiscrimination rules. 85 Fed. Reg. at 37,225. HHS, therefore, values at zero the harms stemming from discrimination and disregards them. Ignoring

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

16

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

the public health impacts of discrimination is both arbitrary and capricious. *See Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1219 (D.C. Cir. 2004) (finding that the "mere fact" that the effect of a rule "is *uncertain* is not justification for *disregarding* the effect entirely") (emphasis in original).

Further, HHS's conclusions as to "lack of data," willfully ignore nearly 200,000 comments to the proposed regulation. As Washington and other commenters observed, without protection from discrimination, LGBTQ residents' access to medically necessary and potentially life-saving healthcare will be threatened. *See* Compl. ¶¶ 44-51, 78, 81 (citing data that 55% of transgender nationwide patients sought coverage for transition-related surgery in the past year were denied). LGBTQ residents in Washington will delay seeking treatment out of fear of discrimination, be flatly denied healthcare or adequate healthcare by providers and insurers, or risk harassment or abuse due to their LGBTQ status. *Id.* at ¶ 70 (33% of transgender persons had at least one negative experience with a health provider in the prior year, including verbal harassment and refusal of treatment); *id.* at ¶ 72 (21% of LGBTQ respondents in a Walla Walla survey reported avoiding healthcare and three quarters did so because of fear of discrimination, they could not afford it, or because of the distance or a lack of transportation). Indeed, HHS itself recognized in 2016 that "individuals who have experienced discrimination in the healthcare context often postpone or do not seek healthcare" which "can lead to poor and ineffective distribution of healthcare resources" and may "result in a marketplace comprised of higher medical costs due to delayed treatment, lost wages, lost productivity, and the misuse of people's talents and energy." 81 Fed. Reg. at 31,444. In reversing its policy, HHS acts in willful disregard of the public health consequences that the Final Rule will impose, including but not limited to the significant costs to state healthcare systems and their LGBTQ residents' health and safety. *See* Decl. Roberts ¶¶ 16-23; Decl. Maroon ¶ 12; Decl. Knox ¶¶ 8-24; Decl. Booher ¶ 11; Decl. Todorovich ¶ 39; Decl. Reed ¶¶ 11-13; Decl. Oline ¶¶ 6-8; Decl. Krehibel ¶¶ 14-16; Decl. Zeitlin ¶¶ 8-11;; Decl. Moss ¶¶ 12-18; Decl. Reed ¶¶ 8-14; Decl. Dr. Unruh ¶¶ 14-16;

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

17

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Decl. McGill ¶¶ 6-18; Decl. Iseminger ¶¶ 15-24; Decl. Wylie ¶¶ 7-16 (describing harassment and discrimination).

Since HHS provides no reason for disregarding the evidence of harm caused by LGBTQ discrimination in healthcare—including the evidence HHS previously compiled and relied upon—the Final Rule is arbitrary and capricious. *See, e.g., Organized Vill. Of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 969 (9th Cir. 2015) (finding an APA violation where the agency failed to provide a reasoned explanation for disregarding its previous factual findings); *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1049 (9th Cir. 2010) (same).

### b. The Final Rule's Religious Exemption Reverses Prior Policy Without Authority or Good Reason

HHS fails to state any good reason why the Final Rule creates a broad, new religious exemption from the prohibition against healthcare discrimination. The 2016 Rule declined to incorporate Title IX's religious exemption, observing that such an exemption was not supported by the text of Section 1557, and could result in denials or delays of healthcare with life-threatening results. *See* 81 Fed. Reg. at 31,380. Instead, the 2016 Rule balanced religious and conscience interests and concluded that Section 1557 applied to the extent it "would not displace" coexisting federal statutory protections for religious freedom. *Id*. at 31,379. Now, the Final Rule not only incorporates Title IX's exemptions, but does so with little more than a citation to *Franciscan All. Cf. Encino Motorcars*, 136 S. Ct. at 2126; *Washington v. U.S. Dep't of State*, No. C18-1115RSL, 2019 WL 5892505, at *8 (W.D. Wash. Nov. 12, 2019) ("[G]iven the agency's prior position . . . it must do more than simply announce a contrary position."). Although HHS suggests the change is necessary to protect providers' "medical judgment," HHS nowhere addressed commenters who pointed out that HHS's expansion of a religious exemption makes little sense given that HHS had only received 50 complaints regarding religious infringements in over a decade, while receiving 30,000 complaints of civil rights discrimination in 2017 alone. *See* 85 Fed. Reg. at 37,206-07; *see also* Compl. ¶ 38.

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

18

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Again, Section 1554 expressly prohibits HHS from "creat[ing] an unreasonable barrier to the ability of individuals to obtain appropriate medical care." 42 U.S.C. § 18114(1). Yet, the Final Rule's expansive religious exemption will do just that. It will limit patients' ability to get health treatment that may be medically necessary since providers could deny care solely on the basis of gender identity, sexual orientation, or sex stereotypes. In cutting large holes into Section 1557's nondiscrimination protections without due regard to the serious and predictable harms to patients, the Final Rule's religious exemption is arbitrary and capricious. *See U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* 140 S. Ct. 1891, 1910-15 (2020) (holding that the rescission of an immigration policy program violated the APA where the agency acted based on a single court decision while ignoring reliance interests and alternatives).

### c. HHS Fails to Justify Its Elimination of Covered Entities

In significantly narrowing the scope of covered entities, the Final Rule again departs from the 2016 Rule without good reason. HHS's only explanation for applying Section 1557 to just those programs and activities established under the ACA, instead of all HHS programs, is that Section 1557 is "ambiguous" and that HHS's new "technical reading of the text is at least as reasonable as the 2016 Rule[]." 85 Fed. Reg. at 37,170. Equivocation is hardly a "good policy reason" for changing its position. *See Encino Motorcars,* 136 S. Ct. at 2126-27. Indeed, even though HHS administers the exact programs it proposes to exclude from Section 1557's ambit, and is in the perfect position to quantify any savings or costs that may justify its change, HHS failed to do any cost analysis at all. *See* 85 Fed. Reg. at 37,163 (indicating vaguely that the "savings and benefit" from its new interpretation "improves the rule of law," but that actual costs are "not calculable based on available data"). An agency changing regulatory course "must supply a reasoned analysis indicating that its prior policies and standards are being deliberately changed, not casually ignored." *Greater Boston Television Corp. v. Fed. Commc'n Comm'n,* 444 F.2d 841, 852 (D.C. Cir. 1970), *cert. denied,* 403 U.S. 923 (1971). HHS fails that test here.

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

19

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

**B.      HHS's Final Rule Will Irreparably Harm Washington and Its Residents**

Washington's healthcare system must be free of discrimination in order to function effectively. By legalizing and inviting healthcare discrimination across the industry, the Final Rule threatens Washington's interests in the physical health and economic well-being of its residents, and also directly harms the proprietary interests of the State.

**1.      Washington State's LGTBQ Residents Will Suffer Healthcare Discrimination and Poorer Health Outcomes as a Result of the Final Rule**

There are over 300,000 LGBTQ individuals in Washington State, Compl. ¶¶ 66, and they experience significant healthcare discrimination and barriers to healthcare access as it is. Compl. ¶¶ 70-72; Decl. Maroon ¶¶ 7-9; Decl. Todorovich ¶¶ 20, 32. In a recent survey conducted by Washington's Ingersoll Gender Center, 62% of respondents reported difficulty paying for healthcare costs, and 47% reported difficulty finding a gender affirming surgeon that would work with their insurance. Decl. Booher ¶ 11. In February of this year, for example, one transgender individual in Clark County was denied hormone therapy from a physician for "personal reasons," and told that gender affirming healthcare services were the "wrong choice." *Id.* at ¶ 15. The patient was left in tears and has still not received this healthcare. *Id.* And discrimination in healthcare costs lives—studies show the lack of gender affirming healthcare services increases suicidality among transgender individuals by 20%. Decl. Roberts ¶ 22; Compl. ¶ 80 (citing an American Medical Association study that shows individuals with gender dysphoria who do not receive gender confirmation treatment are "twice as likely to experience moderate to severe depression and four times more likely to experience anxiety").

The Final Rule will exacerbate these health risks. Washington estimates that the Final Rule will cause some 82,351 lesbian, gay, or bisexual individuals, and between 5,271 and 16,266 transgender individuals, to lose protection from healthcare discrimination. Decl. Roberts ¶¶ 14-15. This is because these individuals currently receive healthcare coverage under types of health plans that cannot be regulated by Washington State's anti-discrimination

laws. *Id.* at ¶¶ 10-15; Decl. Mounts ¶¶ 7, 9; Decl. Kreidler ¶¶ 10-14.

Transgender individuals in particular are threatened quite seriously. The data demonstrate that, as a result of loss in healthcare coverage, as many as over 4,000 transgender Washingtonians per year will be denied gender affirming healthcare services like hormone therapies and surgical procedures related to gender transition. Decl. Roberts ¶¶ 16. This will lead to somewhere between 670 and 2,069 new cases of moderate to severe depression, loss of income, and hundreds more attempted suicides, to say nothing of increased rates of substance abuse, violent victimization, and delays in healthcare. *Id.* at ¶¶ 17-23. These preventable health harms are, alone, irreparable. *See M.R. v. Dreyfus*, 697 F.3d 706, 733 (9th Cir. 2012) (loss of medically necessary services constitutes irreparable injury meriting preliminary injunction); *Newton-Nations v. Rogers*, 316 F. Supp. 2d 883, 888 (D. Ariz. 2004) ("Because Plaintiffs may be denied medical care, Plaintiffs have demonstrated irreparable injury.").

### 2.    The Final Rule Will Cost the State Millions in Poorer Health Outcomes

The discrimination authorized by the Final Rule will cost Washington millions to respond to and remedy. For example, in order to prevent increased transmission rates for sexually transmitted infections and adverse health consequences for medically unsupervised hormone use by transgender individuals, the State will be forced to spend at least $3,000,000 and probably closer to $10,000,000 for testing over the next decade that would otherwise be covered but for the Final Rule. Decl. Todorovich ¶ 39. Washington shows irreparable harm on this basis alone. *See California v. U.S. Health and Human Servs.*, 390 F. Supp. 3d 1061, 1065 (N.D. Cal. 2019) (concluding HHS rule would "inflict irreparable harm" on Oregon by forcing patients to turn to "state [run] programs, imposing unrecoverable costs on the state").

Similarly, as a result of the increase in depression and other mental health conditions, Washington will have to spend millions in urgent mental healthcare and crisis-stabilization services. Decl. Reed ¶¶ 7-8, 10-14. The Washington Healthcare Authority estimates that it will spend between $1,574,158.43 and $4,854,900.47 in evaluations, short-term commitments, and

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

21

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  other emergency response interventions if the Final Rule takes effect. *Id.* at ¶¶ 11-13. These

2  figures do not even account for additional costs based on the need to provide crisis care services

3  and interventions for LGTBQ individuals who need them because of expected increases in

4  substance abuse and other crises triggered by the denial of healthcare. *Id.* at ¶ 14. Because

5  Washington will not be able to recover monetary damages from to compensate for these costs,

6  this harm is also irreparable. *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

7      Washington will also incur increased administrative costs in having to refer LGBTQ

8  individuals to other healthcare providers because the Final Rule has permitted their original

9  provider to turn them away. Todorovich Decl. ¶ 37. And two administrations within

10  Washington's Department of Social and Health Services will be required to expend upward of

11  $78,000 and $100,000, respectively, to change and revise websites, policies, bulletins, letters,

12  and other documents for contractors. Decl. Moss ¶¶ 17-19; Decl. Krehibel ¶¶ 15-16. HHS

13  admitted in the Final Rule there would be costs of this kind. 85 Fed. Reg. at 37,163, 37,237.

14      And Washington will be forced to incur substantial harm mitigation costs. Todorovich

15  Decl. ¶ 36. These include, but are not limited to, analyzing the gaps in coverage and

16  discrimination protections that affected Washingtonians will experience; determining the extent

17  to which existing State-funded programs provide the coverage and services which the Final Rule

18  will cause affected Washingtonians to lose, determining a comprehensive plan for

19  communicating these alternatives to affected Washingtonians; conducting the necessary

20  outreach to and communication with advocacy and non-profit organizations, other agencies, and

21  the public; and creating, producing, and disseminating publications to these entities concerning

22  the changes and the identified alternatives. *Id.* These costs are not optional. They are a result of

23  HHS's forced choice to states under the Final Rule: pay for harm mitigation now, or pay for

24  increased, emergency services for affected individuals later. *Id.* Such a "forced choice" is an

25  irreparable harm warranting injunctive relief. *See Texas v. United States*, 809 F.3d 134, 186 (5th

26  Cir. 2015) (upholding a preliminary injunction against the Deferred Action for Parents of Lawful

Permanent Residents program because the State would have to change its laws or incur administrative costs), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016).

As a final form of economic harm, Washington State will lose substantial tax revenues as a result of the Final Rule. Because the Final Rule will result in thousands of transgender individuals losing healthcare coverage for gender affirming healthcare services, Washington will lose business and occupation tax revenues from hospitals and physicians who would otherwise perform these services, but now will not because they are no longer covered. Decl. Oline ¶¶ 6-8. Washington's Department of Revenue estimates that it will lose approximately $296,000 per year in such tax revenues each year the Final Rule is in effect. *Id.* at ¶¶ 9-10. Washington will likewise lose millions of dollars where delayed or denied healthcare results in the collateral outcomes of job loss, extended job leave, and use of state benefits to cover that lost time. Decl. Zeitlin ¶¶ 7-12 (describing a minimum of between $814,149 and $2,253,863 in lost Paid Family and Medical Leave and unemployment insurance taxes and losses from paying unemployment benefit). A preliminary injunction is appropriate to prevent such irreparable harm. *Batalla Vidal v. Nielson*, 279 F. Supp. 3d 401, 434-37 (E.D.N.Y. 2018) (finding lost tax revenues to demonstrate irreparable harm and granting injunction against DHS's rescission of an immigration program program), *aff'd in part and rev'd on other grounds*, 140 S. Ct. 1891 (2020).

## C. The Balance of Equities and Public Interest Tip Sharply in Favor of Preliminary Injunctive Relief

The final two injunction factors require Washington to show "the balance of the equities tips in [its] favor," and that "an injunction is in the public interest." *East Bay Sanctuary Covenant v. Barr*, --- F.3d ----, No. 19-16487, 2020 WL 3637585, at *9 (9th Cir. July 6, 2020). "Where the government is a party, these last two factors merge." *Id.* (quoting *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Washington makes this showing easily.

Taking the public interest first, "[t]here is generally no public interest in the perpetuation

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

23

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). On the contrary, "[t]he public interest is served by compliance with the APA." *Azar*, 911 F.3d at 581; *see also N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010) ("[I]t is obvious that compliance with the law is in the public interest."). As the Ninth Circuit has recognized, APA compliance is of special importance where "states face potentially dire public health and fiscal consequences" as a result of unlawful action by federal health agencies. *Azar*, 911 F.3d at 582 (internal quotation marks omitted); *see also Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016) (describing "full and equal health coverage" in federally regulated health plans as an issue of "gravity"). And, of course, "the public also has an interest" in "freedom from discrimination." *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017). Given the undeniable public benefits that flow from access to necessary health care on a non-discriminatory basis—an obvious public good with which HHS agrees—a stay or injunction of the Rule is appropriate here.

Turning to the balance of the equities, the Court must balance Washington's interest in fair and equal access to health care against HHS's interest in cost control. Both interests are strong. *See Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004). As the Ninth Circuit has held, however, a governmental interest in controlling health care costs is ordinarily outweighed by the interest in avoiding "delayed and/or complete lack of necessary treatment, and increased pain and medical complications." *Id*. Put simply, faced with a conflict between "the possibility of some administrative inconvenience or monetary loss," and "further illness" including "physical and emotional suffering," courts "have little difficulty concluding that the balance of hardships tips decidedly in . . . favor" of preliminary relief. *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983). Equity favors enjoining the Rule.

## IV.    CONCLUSION

For all the reasons set forth above, the Court should grant a preliminary injunction and stay the Final Rule.

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-01105

24

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1      DATED this 16th day of July, 2020

2

3                         *s/ Marsha Chien*
                         MARSHA CHIEN, WSBA No. 47020

4                         NEAL LUNA, WSBA No. 34085
                         BRIAN SUTHERLAND, WSBA No. 37969

5                         Assistant Attorneys General
                         Attorneys for Plaintiff State of Washington

6                         Wing Luke Civil Rights Division
                         Office of the Attorney General

7                         800 Fifth Avenue, Suite 2000

8                         Seattle, WA 98104-3188
                         Phone: (206) 464-7744

9                         Marsha.Chien@atg.wa.gov

10                       Neal.Luna@atg.wa.gov
                         Brian.Sutherland

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26