# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Plaintiff,<br><br> v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR, in his official capacity as the Secretary of the United States Department of Health and Human Services,<br><br>     Defendants. | NO. 2:20-cv-01105<br><br>DECLARATION OF BETH KREHBIEL |

I, Beth Krehbiel, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct:

1. I am over the age of 18, have personal knowledge of the facts and circumstances in this Declaration, and competent testify in this matter.

2. I am the Office Chief of Medicaid & Eligibility for the Washington State Department of Social and Health Services (DSHS), Developmental Disabilities Administration (DDA). I have held this position since 2018. Prior to that, I was the

1  Eligibility and Payment Systems Unit Manager at DDA for five years. I have been employed by DSHS since 2006.

3. I have a bachelor of arts from The Evergreen State College in Olympia, Washington. I also have a Masters of Public Administration from The University of Texas at Austin located in Austin Texas.

4. The Revised Code of Washington defines a developmental disability as: "a disability attributable to intellectual disability, cerebral palsy, epilepsy, autism, or any other neurological or other condition of an individual found by the secretary to be closely related to an intellectual disability or to require treatment similar to that required for individuals with intellectual disabilities, which originates before the individual attains age eighteen, which as continued or can be expected to continue indefinitely, and which constitutes a substantial limitation to the individual." Wash. Rev. Code. 71A.10.020(5).

5. DDA serves approximately 34,000 Washingtonians by providing services and supports to eligible individuals with developmental and intellectual disabilities. DDA administers programs designed to assist individuals and their families to obtain services in their homes and communities. DDA also provides services in Intermediate Care Facilities for Individuals with Intellectual Disabilities (ICF/IID) and State Operated Nursing Facilities that offer 24-hour housing support and training in daily living skills for clients with disabilities.

6. The mission of DDA is to transform lives by providing support and fostering partnerships that empower people to live the lives they want. We strive to development and implement public policies that promote individual worth, self-respect, and dignity such that each individual is valued as a contributing member of the community.

7. Like other administrations within DSHS, DDA convened workgroups of DDA leaders representing a breadth of program areas, vetted drafts through varied stakeholder groups, and published a vision statement and set of core values tailored to DDA's commitment to the clients and families we support.

8. DDA's vision is to:
   a. support individuals to live in, contribute, and participate in their communities;
   b. continually improve supports to families of both children and adults;
   c. individualize supports that will empower individuals with developmental disabilities to realize their greatest potential;
   d. build support plans based on the needs and the strengths of the individual and the family; and
   e. engage individuals, families, local service providers, communities, governmental partners, and other stakeholders to continually improve our system of supports.
9. DDA's core values are:
   a. Respect gained through positive recognition of the importance of all individuals;
   b. Person-centered planning to support each person to reach their full potential;
   c. Partnerships between DDA and clients, families, and providers in order to develop and sustain supports and services that are needed and desired;
   d. Community participation by empowering individuals with developmental disabilities to be part of the workforce.
10. DDA supports clients through Medicaid state plans.
11. DDA's 2019-2021 operating budget is $3.66 billion.[1]

---

[1] https://www.dshs.wa.gov/sites/default/files/DDA/dda/documents/2019%20Caseload%20and%20Cost%20Report.pdf (last visited July 11, 2020).

12. DDA provides in-home, residential, employment, and facility-based services. These services include respite care, companion home services, skills acquisition training, nursing, community transition assistance from institutional care, adult day care, child development services, medical and dental care, counseling, occupational and physical therapy, behavioral support, among others.

13. I am familiar with the rule of the Department of Health and Human Services entitled "Nondiscrimination in Health and Education Programs or Activities, Delegation of Authority," 85 Fed. Reg. 37160-248 (the "Final Rule"), which was published in the Federal Register on June 19, 2020.

14. I understand that the Final Rule, among other provisions, removes antidiscrimination protections in health care and health insurance for LGBTQ people and women who have terminated a pregnancy. I also understand that the Final Rule limits the number and type of health care entities that must comply with the antidiscrimination provisions of the Patient Protection and Affordable Care Act ("ACA"), removes the requirements of providing notices and taglines to individuals with Limited English Proficiency (LEP), and expands the numbers of institutions that may invoke a conscience-based objection to providing healthcare services. The Final Rule would also make it more difficult for individuals living with disabilities to obtain care.

15. DDA will incur increased costs as a result of the Final Rule. Specifically, DDA will be required to use staff time to undertake a comprehensive review of and make necessary changes to:

    a. System-generated form letters (this will require reprogramming the system to correct the letters);

    b. Posters where non-discrimination notices exist;

    c. Websites where non-discrimination notices exist;

      d.    Policies and standard operating procedures related to non-discrimination and language access;

      e.    Applications for providers (contractors) that include the non-discrimination notices;

      f.    Client letters that include non-discrimination notices;

      g.    Provider (contractor) contracts that include non-discrimination requirements;

      h.    Management bulletins to staff;

      i.    Notices to Area Agencies on Aging;

      j.    Notices to Individual Providers;

      k.    Letters to all licensed and certified community residential providers;

      l.    Notices to employees;

      m.    Training materials for employees, contractors, recipients, and other stakeholders.

16. The most expensive part of these necessary changes will be the reprogramming of the ACES and IP1 systems to correct system-generated letters that go to tens of thousands of recipients. Based on past change requests, DDA estimates that the cost of these system changes, in combination with the other changes described above, will exceed $100,000.

I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and accurate.

DATED this Fourteenth day of July, 2020, in Lacey, Washington.

*/s/ Beth Krehbiel*
BETH KREHBIEL
Washington Dept. of Social & Health Services
Developmental Disabilities Administration