The Honorable James L. Robart

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR, in his official capacity as the Secretary of the United States Department of Health and Human Services,<br><br>Defendants. | NO. 2:20-cv-01105-JLR<br><br>REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION<br><br>NOTED ON MOTION CALENDAR: AUGUST 14, 2020<br><br>ORAL ARGUMENT REQUESTED |

## I. INTRODUCTION

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020), clearly forecloses HHS's attempt to strip LGTBQ people of protection from healthcare discrimination under Section 1557 of the Affordable Care Act (ACA). As such, HHS is left to argue that the Final Rule has no real effect because the 2016 Rule was vacated and the Final Rule simply refers to the text of Section 1557. Defs.' Resp., ECF No. 56, at 8-10, 12-13. But HHS ignores its own regulatory action. While the agency need not have issued regulations, it must comply with the Administrative Procedure Act when it does. Since the Final Rule avowedly asserts that sexual orientation and gender identity do not constitute discrimination because of "sex," makes several unlawful changes to the scope of Section 1557, and since Washington will suffer irreparable harm and has standing, the Court should grant a preliminary injunction and stay of the challenged provisions.

REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:20-cv-01105-JLR

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

## II. ARGUMENT

**A.   Washington has Standing to Challenge the Final Rule**

HHS cites *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) to suggest Washington lacks standing to bring an action against the Federal government. Yet, while *Sierra Forest* may have limited when a state may sue as *parens patriae*,[1] it also explicitly recognized that states are "not normal litigants" and a state may "uniquely 'sue to protect its own proprietary interests' that might be 'congruent' with those of its citizens." *Id.* (quoting *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004). *See also Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017). Here, Washington has shown concrete harms to its proprietary interests that are fairly traceable to HHS and redressable. *See* Pl.'s Mot., ECF No. 4, at 28-31.

HHS argues that the harms to Washington's proprietary interests are "wholly conjectural" and based upon actions that third parties "may" take as a result of the Final Rule. Defs.' Resp., at 5-6. The Supreme Court has rejected this argument. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (holding that harm resulting from individuals not answering the citizenship question on the Census was not speculative but based "on the predictable effect of Government action on the decisions of third parties"). Indeed, without protection under Section 1557, healthcare discrimination against LGBTQ patients in Washington is inevitable considering the rampant discrimination already documented in recent years. Decl. Maroon ¶¶ 8-14; Decl. Booher ¶¶ 14-23; Decl. Wylie ¶¶ 7-14. Regardless, Washington has asserted direct economic injuries that do not depend on the actions of third parties, beginning with increased administrative costs totaling over $178,168.16 to revise agency policies, websites, and materials. Decl. Krehbiel ¶¶ 15-16; Decl. Moss ¶¶ 17-18. And despite Washington's laws that prohibit

---

[1] Yet, the limitation on *parens patriae* standing for states is prudential and does not apply where the state asserts a cause of action conferred by statute. *See, e.g., Territory of Am. Samoa v. Nat'l Marine Fisheries Serv.*, No. CV 16-00095 LEK-KJM, 2017 WL 8316931, at *4 (D. Haw. Aug. 10, 2017); *Challenge v. Moniz*, 218 F. Supp. 3d 1171, 1177-79 (E.D. Wash. 2016). Since Washington asserts injury to its quasi-sovereign interests in protecting the health, safety, and physical and economic well-being of its residents, *see* Compl. ¶¶ 9, 66 ECF 1, and brings this lawsuit under the APA, *id.* at ¶ 5, Washington has *parens patriae* standing for its APA claims.

REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:20-cv-01105-JLR

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

healthcare discrimination on the basis of gender identity, approximately 1,583,681 Washingtonians get healthcare coverage from a plan governed by Federal laws that preempt state law. *See* Decl. Kreidler, ¶¶ 7-15. As such, the Final Rule will cause between 5,271 and 16,266 transgender Washingtonians to lose healthcare coverage, Decl. Roberts ¶¶ 9-15, which will lead to costs of between $3,000,000 and $10,000,000 over the next decade for testing by the Washington's Department of Health (DOH) Office of Infection Diseases, Decl. Todorovich, ¶ 39, and over $900,000 for other services by DOH's Family Planning Program, *id.* at ¶ 41.

Other proprietary harms will follow, and "[j]ust because a causal chain links the states to the harm does not foreclose standing," so long as the links are not hypothetical or tenuous. *California v. Azar*, 911 F.3d 558, 571-73 (9th Cir. 2018) (holding that States adequately alleged economic loss resulting from women losing healthcare coverage). HHS argues that Washington has not alleged facts about the particular government programs impacted, Defs.' Resp., at 7, but this is not true. In addition to the above, Washington's Department of Revenue explains that when thousands of transgender Washingtonians lose coverage, the State will lose $296,000 a year in business and occupation tax revenue on medical services, and DOH explains that lost coverage will cause thousands more cases of depression, which will in turn cost the Washington Healthcare Authority between $1,574,158.43 to $4,854,900.47 in mental health crisis care. *See* Pl.'s. Mot., at 21-23 (citing declarations). The Employment Security Department explains that the hundreds of lost jobs will lead to between $814,149 and $2,253,863 in losses to the Unemployment Insurance and Paid Family and Medical Leave program funds. *Id.* at 23 (citing declarations). HHS says nothing about any of these harms, some of which it effectively admitted in the Final Rule. *See* Compl. ¶¶ 59-60, 62, 65. These harms confer standing. *See, e.g., Azar*, 911 F.3d at 571-73 (lost tax revenue due to lost jobs establishes direct injury to states); *Washington v. Trump*, 441 F. Supp. 3d 1101, 1113-15 (W.D. Wash. 2020) (same); *New York v. Scalia*, --- F. Supp. 3d ---, 2020 WL 2857207, at *9-11 (S.D.N.Y. June 1, 2020) (lost tax revenue and administrative costs); *New York v. Mnuchin*, 408 F. Supp. 3d 399, 410 (S.D.N.Y. 2019).

REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:20-cv-01105-JLR

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

HHS also argues that Washington's harms are not redressable because the gender identity provision of the 2016 rule was vacated and the Final Rule does no more than rely upon the text of Section 1557. Defs.' Resp., at 8-9.[2] HHS misunderstands Washington's argument, which does not depend upon the 2016 rule. Washington does not argue that HHS "should have included additional language in the 2020 Rule that might dissuade healthcare providers from discriminating" against Washingtonians. *Id.* at 9.[3] As explained below, Washington argues that the Final Rule's explicit and erroneous interpretation of Section 1557 makes concrete changes to administrative enforcement and the regulation of healthcare entities which are contrary to law, in excess of HHS's authority, and arbitrary and capricious, and which will cause substantial harm to Washington and its residents. Any suggestion that HHS did nothing to redress is meritless.

B.  **The Final Rule Violates the Administrative Procedure Act**

   1.  **Exclusion of Sexual Orientation and Gender Identity from the Definition of "Sex" is Contrary to Section 1557 and Exceeds HHS's Authority**

Just as it failed to do in promulgating the Final Rule, HHS's response never reckons with *Bostock*, which squarely held that discrimination against a person on the basis of sexual orientation or gender identity is discrimination "on the basis of sex." 140 S. Ct. at 1747 ("discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second.") Since HHS never deals with this fact, among many others, it cannot rebut Washington's showing that the Final Rule violates the APA.

---

[2] Notably, HHS fails to mention that *Franciscan Alliance, Inc. v. Burwell* only vacated that the 2016 Rule definitions for gender identity and pregnancy termination. *See* Order of Nov. 21, 2016, No. 7:16-cv-00108-O (N.D. Tex.), at 1-2 (citing 45 C.F.R. § 92.4). The court did not vacate the provision that defined "sex" to include sex stereotyping, nor did it disturb the provisions at 45 C.F.R. § 92.207(4)-(5) which prohibit covered entities from denying coverage for healthcare services related to gender transition. *See id.*

[3] HHS reliance on *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976), to argue that what healthcare entities do as a result of the Final Rule is not traceable to HHS, and therefore not redressable, is misplaced. Defs.' Resp., at 9. Not only has *Simon* been undermined, if not abrogated, by *Dep't of Commerce*, courts have long distinguished *Simon* where the harm is not speculative, *see Nat'l Coal Ass'n v. Lujan*, 979 F.2d 1548, 1552 (D.C. Cir. 1992), nor, as here, where the harm is caused not by an independent actor but an entity regulated by the agency, *see Nat'l Parks Conserv. Ass'n v. Manson*, 414 F.3d 1, 6 (D.C. Cir. 2005).

REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:20-cv-01105-JLR

4

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

HHS makes two meritless arguments to avoid the conclusion that it acted contrary to law when it excluded sexual orientation and gender identity from Section 1557. First, HHS pretends that it did not do anything at all—it merely "declin[ed] to include a definition" of "sex" and relied upon the "plain meaning of the term in the statute." Defs.' Resp., at 12 (citing 85 Fed. Reg. 37,178). This is simply not true. In stripping LGBTQ individuals of discrimination protection under Section 1557, HHS explicitly set forth its own erroneous interpretation of the "ordinary public meaning" of "sex" and concluded that "discrimination on the basis of sex means discrimination on the basis of the fact that an individual is biologically male or female." 85 Fed. Reg. 37,178. Throughout pages of analysis in which it simply recycles the losing arguments from *Bostock*, *see id.* at 37,183-86, 37,193-95, HHS could not have been more clear that it "disagrees . . . that Section 1557 or Title IX encompasses gender identity discrimination," *id.* at 37,183, and maintains that "[t]he plain meaning of 'sex'" includes "neither sexual orientation nor gender identity," *id.* at 37,194. In fact, HHS specifically states that covered entities will now no longer be prevented from "drawing … distinctions on the basis of sex." *See* 85 Fed. Reg. 37,162.

HHS asks the Court to ignore these unequivocal declarations because they appear in the preamble to the Final Rule, which "lacks the force and effect of law." Defs.' Resp., at 13 (citations omitted). But courts routinely look to the preamble as evidence of agency intent. *See Halo v. Yale Health Plan, Dir. Of Benefits & Records Yale Univ.*, 819 F.3d 42, 52 (2d Cir. 2016); *CHW West Bay v. Thompson*, 246 F.3d 1218, 1226-27 (9th Cir. 2001). And where, as here, "there is every reason to believe that the agency intended to bind itself" with an interpretation of the statute in the preamble that is "sufficiently clear to be reviewable," the preamble is binding. *Safer Chem., Healthy Families v. U.S. Envtl. Prot. Agency*, 943 F.3d 397, 422-25 (9th Cir. 2019) (invalidating an Environmental Protection Act regulation because the agency's statement in a preamble that it would exclude certain chemicals violated the statute). In the proposed rule, HHS suspended all its prior guidance which had interpreted Section 1557 to prohibit discrimination based on sexual orientation or gender identity "as a matter of enforcement discretion," 84 Fed.

REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:20-cv-01105-JLR

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Reg. 27,872, and stated that covered entities will save over a hundred million dollars from no longer processing gender identity discrimination complaints, 85 Fed. Reg. 37,235-36. HHS cannot now claim that the preamble language has no effect when it explicitly adopts a new interpretation of Section 1557 that is contrary to law, and which HHS intends and expects to change the operations of itself and covered entities.

Second, HHS argues that nothing in the Final Rule prevents courts from applying *Bostock* in the future, but in the same breath, asserts that *Bostock* is not controlling because it interpreted Title VII, not Title IX. Defs. Resp., at 14-15. Yet, HHS does not offer any reason why Title IX could provide an excuse for ignoring *Bostock*. In fact, HHS cannot possibly offer any reason why Section 1557 does not encompass discrimination based on sexual orientation and gender identity after *Bostock*. *See, e.g., Adams by and through Kasper v. Sch. Bd. of St. Johns Cty.*, --- F.3d ---, 2020 WL 4561817, at *12 (11th Cir. Aug. 7, 2020) ("[w]ith *Bostock*'s guidance, we conclude that Title IX, like Title VII, prohibits discrimination against a person because he is transgender"); *Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005, 1023 (9th Cir. 2018) (noting that federal courts generally evaluate claims under Title IX and Title VII "identically"); *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 897 (1st Cir. 1988).

Further, HHS's reversal of its prior interpretation after *Bostock* is also arbitrary and capricious. HHS now argues "*Bostock*'s holding was limited to Title VII." Defs.' Resp., at 14. But HHS said the opposite in its proposed rule, when it noted that "[b]ecause Title IX adopts the substantive and legal standards of Title VII, a holding by the U.S. Supreme Court on the definition of 'sex' under Title VII will likely have ramifications for the definition of 'sex' under Title IX, and . . . sexual orientation and gender identity claims under Section 1557[.]" 84 Fed. Reg. 28,855. Only in the Final Rule did HHS suggest that "the binary biological character of sex . . . might not be fully addressed by future Title VII rulings even if courts were to deem the categories of sexual orientation or gender identity" protected. 85 Fed. Reg. 37,168. However, HHS never addressed the dozens of federal cases holding that discrimination based on sexual

REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01105-JLR

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

orientation and gender identity are discrimination because of sex under Title VII, Title IX, and Section 1557. Instead, it dismissed this raft of federal judicial authority as having "caused confusion as to the meaning of sex in civil rights laws," 85 Fed. Reg. 37,180, and begged the question of how to properly interpret the statute, *see id.* at 37,183-84. If nothing else, the Supreme Court's agreement with the argument that discrimination based on sexual orientation or gender identity is discrimination based on "sex" means this was at least an "important aspect" of how Section 1557 should be interpreted. HHS's refusal to consider *Bostock*, when it was issued *before* the Final Rule took effect, renders the Final Rule arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).[4]

The Final Rule is also arbitrary and capricious because HHS reversed its prior policy without any "good reasons for the new policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). While an agency's change of policy is not normally subjected to "more searching review," *Fox*, 556 U.S. at 514,[5] "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy," and "[u]nexplained inconsistency in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change." *Organized Vill. Of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966, 969 (9th Cir. 2015). Here, HHS previously found that discrimination against LGBTQ people resulted in postponement of healthcare which could cause numerous adverse market-based and economic losses, 81 Fed. Reg. 31,444, harassment and denial of healthcare for transgender people, *id.* at 31,460-61, and that prohibiting such discrimination would reduce violence, depression, suicide, and substance abuse, *id.* (citation omitted). HHS now disregards all of this,

---

[4] Commenters actually urged HHS to postpone publication because the Court's decision was expected, *see* 85 Fed. Reg. 37,168, and HHS could have done so, 5 U.S.C. § 705, but did not.

[5] However, after *Bostock* was decided on July 15, 2020, HHS's decision to go forward with publication of the Final Rule on July 19, 2020 effectively amounts to arriving "at an identical result on remand under circumstances that throw into question the regularity of its proceedings," which triggers heightened scrutiny. *Chamber of Commerce of U.S. v. S.E.C.*, 443 F.3d 890, 899 (D.C. Cir. 2006).

REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01105-JLR

7

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

claiming it lacks data to show how LGBTQ people will be affected, 85 Fed. Reg. 37,225. HHS never explains why it now discounts these harms, which renders the Final Rule arbitrary and capricious. *See Kake*, 795 F.3d at 968-69 (invalidating the Department of Agriculture's reversal of its forest protection rule without explaining why it discounted the factual basis of the prior rule).

### 2. HHS's Incorporation of the Title IX Religious Exemption is Contrary to Law, in Excess of Statutory Authority, and Arbitrary and Capricious

HHS argues that it was proper to incorporate the Title IX religious exemption because Section 1557 "expressly incorporates" that provision. Defs.' Resp., at 16. This is untrue. As HHS found in the 2016 rule, Section 1557 does not contain any religious exemption. *See* 81 Fed. Reg. 31,380. Instead, Section 1557 incorporates only the "ground" of discrimination prohibited by Title IX, which is sex, and the "enforcement mechanisms." 42 U.S.C. § 18116(a). As the Ninth Circuit explained, the "ground" of discrimination referred to in Section 1557 is simply the protected classification at issue, and "enforcement mechanisms" might at most include the claims available under the incorporated statute and the standards for evaluating them. *Schmitt v. Kaiser Found. Health Plan of Washington*, 965 F.3d 945, 5 (9th Cir. 2020). A statutory exemption is an entirely different matter, and HHS provides no authority for creating one in Section 1557 where Congress decided not to do so. This provision of the Final Rule is therefore invalid. *See Pub. Citizen v. F.T.C.*, 869 F.2d 1541, 1557 (D.C. Cir. 1989) (rejecting the Federal Trade Commission's argument that it had authority to create a regulatory exception to tobacco product labeling legislation); *Shays v. F.E.C.*, 337 F. Supp. 2d 28, 110 (D.D.C. 2004), *aff'd sub nom. Shays v. Fed. Election Comm'n*, 414 F.3d 76 (D.C. Cir. 2005).

HHS knows it has no authority to incorporate into Section 1557 anything other than the grounds prohibited and the enforcement mechanisms of the referenced statutes; that is why it refused in the Final Rule to incorporate the broad definition of "health program or activity" from another referenced statute, Section 504 of the Rehabilitation Act, reasoning that "Section 1557 incorporates Section 504's prohibited grounds of discrimination but not its scope." 85 Fed. Reg.

REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:20-cv-01105-JLR

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

37,171. HHS makes zero effort to explain why it adhered rigorously to the text of Section 1557 to limit the entities that the statute covers, but not as to incorporating a new religious exemption. HHS thus not only disregarded a central fact underlying its prior decision not to incorporate the Title IX religious exemption, it also offered internally inconsistent reasoning for doing so. This also renders the Final Rule arbitrary and capricious. *See, e.g., Gulf Power Co. v. F.E.R.C.*, 983 F.2d 1095, 1101 (D.C. Cir. 1993) ("when an agency takes inconsistent positions ... it must explain its reasoning"); *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987) (rule was arbitrary and capricious because it was "internally inconsistent and inadequately explained").

### 3. HHS Cannot Justify Exempting Itself and Insurers from Section 1557

HHS argues that the decision to limit Section 1557 to apply only to those health programs or activities HHS administers under the ACA is entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Defs.' Resp., at 20. But *Chevron* does not apply here where the statute is unambiguous. *See* 467 U.S. at 842-43. The text of Section 1557 provides that an individual shall not be subjected to discrimination:

> under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title [I] (or amendments).

2 U.S.C. § 18116(a) (emphasis supplied). The term "or" when used in a statute is "almost always disjunctive, that is, the words it connects are to be given separate meanings." *Loughrin v. United States*, 573 U.S. 351, 357 (2014) (quotation omitted). And basic rules of statutory construction hold that a qualifying phrase (i.e., "under this title") modifies only the last item in a series unless there is a comma preceding it. *See Stepnowski v. Comm'r*, 456 F.3d 320, 324 (3d Cir. 2006). This means the nondiscrimination provision applies to health programs or activities receiving federal financial assistance, programs or activities administered by an executive agency, and entities established under Title I of the ACA. Section 1557 is clear.

REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:20-cv-01105-JLR

9

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Despite the basic rules of statutory construction, HHS insists that the phrase "under this title" also modifies its programs, *see* Defs.' Resp., at 19, so that programs it administers under statutes other than the ACA are no longer covered.[6] HHS attempts to justify exempting its other programs by claiming that the Section 1557 is ambiguous, pointing to the prior rule's decision not to make it applicable to the grantees and programs of other agencies in 2016. *Id.* at 20. But HHS never interpreted Section 1557 not to apply to those other grantees and programs. In fact, it recognized that "Section 1557 itself applies to . . . other Departments," and "sent a memorandum encouraging coordination of enforcement responsibilities under Section 1557 to all Federal agencies in November 2015." 81 Fed. Reg. 31,379. It only declined to apply its regulation to other agencies without further collaboration with those agencies. *Id.* By contrast, HHS now seeks improperly to "rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regulatory Grp. v. E.P.A.*, 134 S. Ct. 2427, 2446 (2014).

HHS also fails to justify its decision exempt insurers from Section 1557 on the ground that they do not provide direct healthcare. Defs.' Resp., at 21. HHS says this is consistent with the Civil Rights Restoration Act (CRRA), which provided that certain civil rights statutes—but not the ACA—apply to entities "principally engaged in the business of providing . . . health care." 20 U.S.C. § 1687(3)(A)(ii). But HHS not only elsewhere pays the CRRA short-shrift by limiting Section 1557's reach to only programs or activities that receive federal funds,[7] no court has interpreted Section 1557 to exclude health insurers, *see* Amicus Br. of Nw. Health Law Advocates, at 12-14. HHS also does not explain why the CRRA justifies creating an exception to the plain language of the ACA, a statutory scheme that repeatedly regulates all health insurers. *Cf. supra*, at 8-9; *see also* Br. of Nw. Health Law Advocates, at 4-9. HHS also ignores relevant

---

[6] HHS misrepresents the text of Section 1557 to make this argument at page 19 of its brief, where it quotes the statute as providing that it prohibits discrimination under "any health program or activity, any part of which is receiving Federal financial assistance, …, *[and]* any program or activity that is administered by an Executive Agency or any entity established under this title[.]" The emphasized word is "or," not "and."

[7] The CRRA made clear that entities covered under the various amended statutes must comply with civil rights laws if "any part of [the entity] is extended Federal financial assistance." *See generally* Pub. L. 100-259.

1  definitions set forth in 42 U.S.C. § 300gg-91, which the ACA explicitly incorporated, 42 U.S.C.
2  § 18111. "Medical care" is defined broadly to include ". . . treatment . . . *or amounts paid* for
3  the purpose of affecting any structure or function of the body." 42 U.S.C. § 300gg-91(a)(2)
4  (emphasis supplied). HHS has no statutory authority to exempt insurers from this definition.

5  Finally, HHS's decision to reverse itself and narrow the definition of "covered entities"
6  is also arbitrary and capricious because the agency does not offer any good reasons for doing so.
7  HHS argues that it explained why the new policy is more consistent with the statutory language
8  than the old policy, and this is enough. Defs.' Resp., at 22. But HHS did not actually do this; it
9  only said that the new limitation was "at least as reasonable as the 2016 Rule's addition of a
10 word not present in the text of the statute." 85 Fed. Reg. 37,170. While an explanation of why a
11 policy is more consistent with statutory language may be a good reason, the agency must actually
12 analyze and explain *why* it is more consistent, especially when reliance interests exist. *See*
13 *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016). HHS provided only a
14 "summary discussion" that does not suffice, *id.*, especially when the effect is to exempt from the
15 ACA one of the primary healthcare sector participants Congress sought to regulate, *see* Br. of
16 Northwest Health Law Advocates, at 6-9 (citing and discussing cases).

**C.    Washington Shows Irreparable Harm and Nationwide Relief is Necessary**

HHS argues that Washington has not shown irreparable harm, Defs. Resp., at 22-23, but does not respond to *any* of the cases cited by Washington to establish that costs it will incur and cannot recover under the APA are irreparable harms, *see* Pl's. Mot., ECF No. 4, at 21-23. HHS also ignores the cases Washington cites which confirms that "potentially dire health and fiscal consequences" like those threatened here tip the balance of equities in favor of Washington. *Id.*

Instead, HHS argues that if the Court grants Washington's motion, it should only enjoin the Final Rule in Washington. Defs.' Resp., at 23-24. But while injunctions should be narrowly tailored to remedy the specific harm alleged, *Azar*, 911 F.3d at 584, a nationwide injunction is appropriate where necessary for complete relief, *see, e.g., Regents of the Univ. of California v.*

REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:20-cv-01105-JLR

11

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

*U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018) (granting nationwide injunction), *aff'd in part and rev'd in part on other grounds*, 140 S. Ct. 1891 (2020); *Texas v. U.S.*, 809 F.3d 134, 187-88 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016). Indeed, under the APA, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Regents*, 908 F.3d at 511 (citation omitted).[8]

A nationwide injunction is appropriate here because some of Washington's harms, namely those involving future state healthcare expenditures and tax losses, *see supra*, at 3, will not be prevented by an injunction limited to Washington. These harms are expected over several decades, *id.*, and during this time, hundreds of thousands of Americans will move to Washington, many from states that have no protection from healthcare discrimination against LGBTQ people. *See* U.S. Census Bureau, State-to-State Migration Flows, 2018 (showing that in 2018 alone, approximately 260,906 Washingtonians lived in a different state the previous year), *available at* https://www.census.gov/data/tables/time-series/demo/geographic-mobility/state-to-state-migration.html (last visited Aug. 11, 2020). Washington will bear the healthcare costs of new LGBTQ residents who experienced healthcare discrimination wherever they lived before. There is thus "a substantial likelihood that a geographically-limited injunction would be ineffective" because affected individuals "would be free to move among states." *Texas*, 809 F.3d at 188. In any event, if the Court is unpersuaded, Washington requests the Court enter an injunction as to Washington and allow further submission and briefing to develop the record for a nationwide injunction. *See E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1030–31 (9th Cir. 2019).

### III.   CONCLUSION

For all these reasons, Washington respectfully requests that the Court enjoin and stay the challenged provisions of the Final Rule.

---

[8] HHS also argues a nationwide would injunction would preclude other courts from testing similar challenges, Defs.' Resp., at 24, but that is obviously not true given that other parallel litigation is already pending, as was true in *Regents*, *see* 140 S. Ct. at 1904-05.

REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:20-cv-01105-JLR

12

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

DATED this 13th day of August, 2020.

Respectfully Submitted,

ROBERT W. FERGUSON
Attorney General

*/s/ Brian J. Sutherland*
BRIAN SUTHERLAND, WSBA No. 37969
NEAL LUNA, WSBA No. 34085
MARSHA CHIEN, WSBA No. 47020
Assistant Attorneys General
Attorneys for Plaintiff State of Washington
Wing Luke Civil Rights Division
Office of the Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Phone: (206) 464-7744
Brian.Sutherland@atg.wa.gov
Neal.Luna@atg.wa.gov
Marsha.Chien@atg.wa.gov

REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01105-JLR

13

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed with the United States District Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

DATED this 13th day of August, 2020.

*s/ Anna Alfonso*
ANNA ALFONSO
Legal Assistant

REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01105-JLR

14

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744