The Honorable James L. Robart

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 2:20-cv-01105-JLR |
| Plaintiff, | |
| v. | PLAINTIFF STATE OF WASHINGTON'S SUPPLEMENTAL BRIEF |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR, in his official capacity as the Secretary of the United States Department of Health and Human Services, | |
| Defendants. | |

A.      **Washington Has Standing to Challenge All Three Provisions**

A state may sue the federal government if it shows that it is "reasonably probable" to suffer economic harm from an agency rule. *California v. Azar*, 911 F.3d 558, 571 (9th Cir. 2018);[1] *See also Pennsylvania v. President*, 930 F.3d 543, 562 (3d Cir. 2019) (same), *rev'd on other grounds*, *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020). States have standing not only for direct economic harms incurred, but also administrative costs*, see, e.g., Chamber of Commerce of United States v. Becerra*, 438 F. Supp. 3d 1078, 1104 (E.D. Cal. 2020) (redrafting contracts); *D.C. v. U.S. Dep't of Agric.*, CV 20-119 (BAH), 2020 WL 1236657, at *22 (D.D.C. Mar. 13, 2020) (costs for staffing and training and notification); *Ligon v. City of New York*, 08 CIV. 1034 SAS, 2013 WL 227654, at *3 (S.D.N.Y. Jan. 22, 2013) (administrative costs), as well as costs incurred to mitigate harms, *see, e.g., State v. U.S. Envtl. Prot. Agency*, --- F. Supp. 3d ---, 2020 WL 3402325, at *1 (D. Colo. June 19, 2020); *State v. Ross*, 358 F. Supp. 3d 965, 1004 (N.D. Cal. 2019). In evaluating what is "reasonably probable," "what matters is not the length of the chain, but rather the plausibility of the links that comprise the chain," *Ross*, 358 F. Supp. 3d at 1006.

1.      **Standing as to HHS's Elimination of LGBTQ Protections**

The Final Rule's exclusion of sexual orientation, sex stereotyping, and gender identity from the definition of "sex" in Section 1557 and elimination of related protections significantly harms Washington, and that harm is traceable to the Final Rule, and redressable. As an initial matter*,* HHS's elimination of LGBTQ protections under Section 1557 will leave tens of thousands of LGTBQ people in Washington without healthcare coverage. In fact, HHS itself acknowledged this harm is traceable to the Final Rule. *See* 85 Fed. Reg. 37,180-81 (noting that "some insurers will maintain coverage consistent with the 2016 Rule's requirements" which prohibited healthcare discrimination on the basis of gender identity "and some will not"). *See*

---

[1] HHS suggested at oral argument that *Azar* is distinguishable because of intervenors in that case, but nothing in *Azar* suggests its analysis of the states' standing was influenced by the presence of intervenors.

PLAINTIFF STATE OF WASHINGTON'S
SUPPLEMENTAL BRIEF
NO. 2:20-cv-01105-JLR

1

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

*also Azar*, 911 F.3d 558, 571 (9th Cir. 2018) (holding it was "reasonably probable that women" would lose contraceptive coverage in part because HHS's own analysis assumed it). Separate from HHS's own admission, Washington's public health experts expect loss of coverage due to the Final Rule. *See Azar*, 911 F.3d at 570-71. DOH compared data from before and after HHS's 2016 Rule took effect, and estimated that between 5,271 and 16,266 transgender Washingtonians will lose coverage for gender affirming healthcare services like hormone therapy and surgical gender transition procedures if the Final Rule takes effect, resulting in the year-to-year denial of transition-related healthcare services for between 367 and 1,132 Washingtonians, and the denial of coverage for such services for between 1,002 and 3,090 individuals.[2] Decl. Roberts ¶¶ 15-16. All of this loss of coverage results in economic costs to Washington sufficient to confer standing.

*First,* gender affirming healthcare services in Washington will decrease if the Final Rule takes effect, resulting in direct annual losses of $296,000 in business and occupation (B&O) taxes. Decl. Oline ¶¶ 4-10; *See also Washington v. Trump*, 441 F. Supp. 3d 1101, 1113 (W.D. Wash. 2020) (concluding state had standing based on lost B&O taxes on construction activity).

*Second*, HHS's Final Rule will create negative public health impacts, the economic costs of which will be borne by Washington. *See Washington v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 1191, 1221 (E.D. Wash. 2019) (concluding Washington had standing because DHS's public charge rule reduced child access to medical care, food assistance, and housing support, and required Washington to reallocate state resources), *aff'd in part and rev'd on other grounds*, *City and County of San Francisco v. United States Citizenship and Immigration Servs.*, 944 F.3d

---

[2] Although HHS argues state laws will protect LGBTQ patients from discrimination in the absence of Section 1557, over a million Washingtonians do not benefit from state law protections because they are on Employment Retirement Income Security Act (ERISA) or Federal Employee Health Benefits Program plans. *See* Decl. Kreidler ¶¶ 10-14 (citations omitted). *See also Azar*, 911 F.3d at 573 (finding states had standing even though their respective state laws would have required the contraceptive care they sought because "[t]hose state laws d[id] not apply to [ERISA] plans.") (citing 29 U.S.C. § 1144(a)). In other words, approximately 1,583,380 Washingtonians who receive healthcare coverage through one of these two channels will be left unprotected from discrimination when HHS's Final Rule goes into effect, including approximately 5,543 and 17,104 transgender people and 82,531 lesbian, gay, and bisexual people. *Id.* at ¶¶ 8, 14. *See also* Decl. Roberts, ¶¶ 13-14.

PLAINTIFF STATE OF WASHINGTON'S
SUPPLEMENTAL BRIEF
NO. 2:20-cv-01105-JLR

2

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

773, 786-87 (9th Cir. 2019). HHS itself previously found that greater healthcare coverage for transgender individuals would result in reduced violence against them and would decrease depression, suicide, substance abuse, smoking, alcohol abuse, and other health disparities. 81 Fed. Reg. 31,460 (citing California Economic Impact Assessment, Gender Discrimination in Health Insurance, at 10–12). Based on this data, DOH estimates that the Final Rule will cause a predictable increase in the number of transgender Washingtonians who will suffer from depression (about 670 to 2,069 more cases annually of moderate to severe depression) and suicidality (about 527-1,627 more attempted suicides), costing millions of dollars.[3] Decl. Roberts ¶¶ 18-19, 22-24. Similarly, costs for providing urgent mental health and crisis stabilization services will rise. Decl. Reed ¶¶ 9-14. The Final Rule will cause more individuals to utilize crisis stabilization services at a cost of between $15,743.43 and $44,661.47 annually, *id.* at ¶ 11, as well as increase detentions and commitments to psychiatric facilities for a cost of between $1,378,061 and $4,252,995, *id.* at ¶ 13. Washington's increased costs to provide services establish standing. *See Azar*, 911 F.3d at 572; *Pennsylvania*, 930 F.3d at 562.

*Third*, Washington's payroll taxes will be impacted by HHS's Final Rule. DOH estimates 320 to 992 jobs will be lost over the next two decades because of the denial of gender affirming healthcare services, not including job loss resulting from increased violence against transgender persons or substance abuse, both of which are likely to occur. Decl. Roberts at ¶ 20. Based on that figure, Washington's Employment Security Department estimates that the Unemployment Insurance (UI) benefits program and the Paid Family and Medical Leave (PFML) Program, both of which are funded through payroll taxes, will lose between $14,954 and $46,357 in PFML funds, and between $180,480 and $559,488 in UI tax revenues. *See* Decl. Zeitlin ¶¶ 8, 9-11. Such tax revenue losses suffice for standing. *See, e.g., New York v. Scalia*, --- F. Supp. 3d ---, 2020

---

[3] Importantly, these estimates are limited to transgender individuals who are denied gender affirming healthcare services; they do not include the increases expected as a result of other healthcare discrimination against LGBTQ Washingtonians. *See* Decl. Roberts ¶¶ 15-16, 20.

WL 2857207, at *9-11 (S.D.N.Y. 2020) (lost tax revenue and administrative costs); *New York v. Mnuchin*, 408 F. Supp. 3d 399, 410 (S.D.N.Y. 2019) (lost taxes and costs).

HHS relies on *Clapper v. Amnesty Intern. USA*, 568 U.S. 398 (2013) to suggest that Washington's harms are too hypothetical or speculative. Defs.' Resp., ECF No. 56, at 14. But *Clapper* is not on point. That case involved a claim that the Foreign Intelligence Surveillance Act was unconstitutional because the federal government was likely to use it to intercept their future communications with suspected terrorist organizations. 568 U.S. at 406. But the plaintiffs there had no evidence that the government had targeted their communications before. *Id.* at 411. This is completely different than this case and the many others where a causal chain established injury. *See, e.g., Azar*, 911 F.3d at 558. *See also City and County of San Francisco*, 944 F.3d at 786-87 (affirming state standing and refusing to apply *Clapper*).

In a further attempt to cast doubt on Washington's causal chain, HHS suggests that Washington has not pointed to any particular healthcare provider who is likely to discriminate against someone if the Final Rule takes effect. HHS's argument, however, has already been rejected by the Ninth Circuit. *See Azar*, 911 F.3d at 572 ("[a]ppellants fault the states for failing to identify a specific woman likely to lose coverage[,]" but "[s]uch identification is not necessary to establish standing"). To the extent HHS also argues Washington's causal chain relies on speculation about the acts of third parties, this, too, has been rejected roundly, including the Supreme Court of the United States. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (holding that harm resulting from individuals not answering the citizenship question on the Census was not speculative but based "on the predictable effect of Government action on the decisions of third parties"); *City and County of San Francisco*, 944 F.3d at 787 (rejecting DHS's argument that the states' theory of economic harms relied on speculation that immigrants would disenroll from public benefits because disenrollemnt was predictable). Especially here, where what Washington asserts are harms that HHS originally recognized as flowing from LGBTQ

PLAINTIFF STATE OF WASHINGTON'S
SUPPLEMENTAL BRIEF
NO. 2:20-cv-01105-JLR

4

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

people not having healthcare coverage, *See* 81 Fed. Reg. 31,460, HHS simply cannot defeat Washington's showing that its harm is traceable to HHS's Final Rule.[4]

**2.    Standing as to HHS's Incorporation of the Title IX Religious Exemption**

*First*, the administrative burdens Washington will bear if healthcare providers refuse to provide services on the basis of a religious or conscious belief is sufficient for standing. *See, e.g., Pennsylvania*, 930 F.3d at 564 (HHS's contraceptive mandate exemptions caused traceable injury-in-fact for states that would have to provide services to individuals refused care due to exemption); *New Mexico and City of Albuquerque v. McAleenan, et al.*, --- F. Supp. 3d ---, 2020 WL 1536640, *30 (D.N.M. March 31, 2020) ("[F]ederal administrative action that creates a void in public services predictably leads to increased demand for State resources"). Here, as a result of individuals being denied healthcare services on religious grounds, DOH's Family Planning Program expects to spend more than $900,000 to provide contraception and sexual health services that will be denied by religiously-affiliated institutions. Decl. Todorovich ¶ 41. In addition, DOH expects demand for its Office of Infectious Diseases to increase as stigma and fear of LGBTQ discrimination increases as a result of the Final Rule. *Id.* at ¶ 39. DOH also expects its resources to be strained as it will be required to provide more costly care for acute and chronic conditions that could have been prevented if treated sooner. *Id.* ¶ 42. And DOH will incur costs to connect LGBTQ people with needed healthcare services when denied such servicers by providers who claim the religious exemption, *see* Decl. *Id.* ¶ 37, a task that may be close to impossible in rural areas. *See* Decl. Maroon ¶¶ 7, 15.

*Second*, Washington will also incur harm mitigation costs because of HHS's incorporation of the Title IX religious exemption (as well as the new definition of "sex" and narrower definition of "covered entities"). *See* Decl. Todorovich ¶¶ 36-37. DOH must analyze

---

[4] To the extent HHS argues these harms are not redressable, HHS is also wrong. Although *Franciscan Alliance* vacated the portions of the 2016 Rule, HHS acknowledged that there will be losses in coverage as a result of the new Final Rule. 85 Fed. Reg. 37,180-81. Vacating the Final Rule may not bring back the 2016 Rule, but it will allow covered entities to correctly interpret Section 1557 in compliance with *Bostock*, as HHS should have done, and will avoid the losses in coverage that HHS admitts will happen.

PLAINTIFF STATE OF WASHINGTON'S
SUPPLEMENTAL BRIEF
NO. 2:20-cv-01105-JLR

5

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    the gaps in coverage produced by the Final Rule, determine which State-funded programs are

2    impacted, conduct necessary outreach to advocacy organizations, and create and disseminate

3    publications to these entities concerning the changes and the identified alternatives. *Id.* at ¶ 36.

4    Such reasonable expenditures to mitigate harm caused by the agency's rule confer standing. *See,*

5    *e.g., New Mexico*, 2020 WL 1536640 at *29-30 (state decision to provide emergency grants to

6    municipalities to "avoid potential humanitarian, public safety, and public health crises" caused

7    by DHS's actions was not "self-inflicted" and conferred standing); *Colorado*, 2020 WL

8    3402325, at *1 (state decision to divert funds to enforce its own laws due to EPA's refusal to

9    enforce the Clean Water Act conferred  standing as it was "not arbitrary"); *Ross*, 358 F. Supp.

10   3d at 1004 (state decision to increase its census outreach after the federal government included

11   a citizenship question that discouraged responses was direct injury sufficient to confer standing).

12       **3.       Standing as to HHS's Covered  Entities Provisions**

13       *First*, Washington will suffer significant administrative costs and enforcement costs if

14   the Final Rule is allowed to exempt non-ACA health programs or activities from Section 1557's

15   ambit. The Department of Social and Health Services (DSHS)'s Aging and Long Term Services

16   Administration (ALTSA), for example, provides home-based and community-based health

17   services for over 100,000 Washingtonians. Decl. Moss ¶¶ 2, 7, 12, 14. If the Final Rule takes

18   effect, ALTSA "will have to spend additional time and resources in the effort to . . .  offer

19   individuals options with services providers who do not discriminate." *Id.* at ¶ 12. ALTSA also

20   will have to make changes to policies and applications for employees, subcontractors and

21   funding recipients, issue notices to individual providers and employees, and revise training

22   programs and modules for employees, subcontractors, and funding recipients, at a total cost of

23   at least $78,168.16.[5] Decl. Moss ¶ 18. Further, since state law and DSHS policy prohibits

24   LGBTQ discrimination, HHS's decision to exempt its programs and insurers shifts enforcement

25   ───────────────

26   [5] The Developmental Disabilities Administration (DDA) of DSHS similarly estimates at least $100,000 in costs to revise agency training materials and other materials, including reprogramming a computer system that prepares system-generated letters for tens of thousands of recipients. Decl. Krehibel ¶¶ 15-16.

PLAINTIFF STATE OF WASHINGTON'S
SUPPLEMENTAL BRIEF
NO. 2:20-cv-01105-JLR

6

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1   of nondiscrimination protections to Washington, and confers standing to Washington. *See*

2   *Colorado*, 2020 WL 3402325, at *1; *Scalia*, 2020 WL 2857207, at *11 (state decision to rewrite

3   wage and hour guidance and spend more on enforcing state law as a result of the DOL's new

4   rule provided standing because these actions were a "reasonable response to the challenged

5   action by the Federal government").

6      *Second*, all the administrative costs and public health costs Washington discussed is also

7   attributable to HHS's decision to exempt insurers from Section 1557. *See supra* at n.2 In fact,

8   the harm will be broader as insurers will not only be exempt from Section 1557's prohibition on

9   sex discrimination but also other protected bases, including race, color, national origin, age, and

10  disability. 42 U.S.C. § 18116(a). *See generally* Amicus Br. of the Nw. Health Law Advocates et

11  al. at 11. If the Final Rule takes effect, health insurers could exclude all coverage not only for

12  gender affirming healthcare services, as they did before the 2016 Rule, but also medications to

13  treat HIV/AIDS, or developmental disabilities. *Id.* In fact, the individuals joining the Northwest

14  Health Law Advocates are examples of the harm posed to Washington. *See id.* at 3. If 1.5 million

15  Washingtonians are no longer protected by Section 1557 at all and unprotected by state law's

16  protections, Washington will certainly bear the public health costs as described above.

17  **B.**  ***Chevron* Deference Does Not Apply To Any Of the Provisions Challenged**

18     *Chevron* deference applies only if a statute is ambiguous. *Chevron, U.S.A., Inc. v. Nat.*

19  *Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Even then, *Chevron* deference will not

20  apply if the regulation at issue is arbitrary and capricious. *Encino Motorcars v. Navarro*, 136

21  S.Ct. 2117, 2125-26 (2016). A regulation is arbitrary and capricious if the agency changes

22  existing policies, yet fails to show that there are good reasons for the new policy. *F.C.C. v. Fox*

23  *Television Stations*, 556 U.S. 502, 515 (2009). Where an agency's policies have "engendered

24  serious reliance interests," "a reasoned explanation is needed for disregarding facts and

25  circumstances that underlay or were engendered by the prior policy." *Id.* An "unexplained

26  inconsistency" in agency policy is a "reason for holding an interpretation to be an arbitrary and

PLAINTIFF STATE OF WASHINGTON'S
SUPPLEMENTAL BRIEF
NO. 2:20-cv-01105-JLR
7
**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    capricious change from agency practice." *Nat'l Cable & Telecomm. Ass'n. v. Brand X Internet*

2    *Servs.,* 545 U.S. 967, 981–982, (2005). Here, none of the three provisions requires *Chevron*

3    deference.

4        *First*, *Chevron* deference does not apply to HHS's elimination of LGBTQ protections.

5    Congress intended Section 1557 to prohibit sex discrimination, including gender identity and

6    sexual orientation, in the healthcare context. *See* Mot., ECF 4 at 16-17. The Supreme Court held

7    that discrimination because of "sex" was not ambiguous and clearly encompassed sexual

8    orientation and gender identity. *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020). But even if

9    Section 1557 were ambiguous, *Chevron* deference would still not apply. HHS issued the Final

10   Rule *after* the Supreme Court's decision in *Bostock*, where the Court considered and rejected

11   every reason HHS presents for erroneously concluding that sex discrimination did not

12   encompass gender identity and sexual orientation discrimination. *Id.* Yet, HHS still published

13   the Final Rule with 30 pages of justification for its position that it need not enforce Section 1557

14   with respect to LGBTQ patients. HHS fails to provide a "reasoned explanation" for why it

15   changed its position based on *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 689 (N.D.

16   Tex. 2016), a case nullified by *Bostock*. *See Fox*, 556 U.S. at 515. Eliminating Section 1557's

17   protections for LGBTQ patients—even beyond that required in *Franciscan Alliance*,[6] flies in the

18   face of law and is arbitrary and capricious.

19       *Second*, in incorporating the Title IX exemption,[7] HHS also fails at the first step of the

20   *Chevron* analysis because Section 1557 is unambiguous: it does not incorporate any religious

21   exemption, let alone a sweeping one that would exempt all healthcare institutions controlled by

22

23            [6] Moreover, while *Franciscan Alliance* vacated the definitions of "gender identity" and "termination of
24   pregnancy" from the 2016 Rule, it did not vacate the prohibition against categorical exclusions for gender affirming
care nor the definition of "sex stereotyping" that HHS seeks to eliminate now. *Franciscan All., Inc. v. Burwell*, 227
25   F. Supp. 3d 660, 689 (N.D. Tex. 2016).
         [7] In its response brief, HHS argues it is a legitimate government objective to accommodate religion given
26   the First Amendment, the RFRA and RLUIPA. But Washington is not challenging the Final Rule's references to
RFRA or RLUIPA, Washington only challenges HHS's incorporation of Title IX's religious exemption.

PLAINTIFF STATE OF WASHINGTON'S       8       **ATTORNEY GENERAL OF WASHINGTON**
SUPPLEMENTAL BRIEF                         Civil Rights Division
NO. 2:20-cv-01105-JLR                     800 Fifth Avenue, Suite 2000
                                 Seattle, WA  98164
                                 (206) 464-7744

a religious organization, which represents nearly half of all hospital beds in Washington.[8] *See* 20 U.S.C. § 1681(a)(2); Danny Westneat, "Is Catholic Church Taking Over Healthcare in Washington?" Seattle Times (2013) *available at* https://www.seattletimes.com/seattle-news/is-catholic-church-taking-over-health-care-in-washington/. Even if the Court deemed Section 1557 ambiguous, *Chevron* deference would not apply. The 2016 Rule explicitly considered Title IX's exemption and declined to incorporate it, reasoning that there is less choice of providers in the healthcare context, especially in rural areas and in emergencies, such that a blanket religious exemption may discourage individuals from seeking care with serious and in some cases life-threatening results. *See* 81 Fed. Reg. 31,380; Maroon Declaration, ¶¶ 7 and 15. HHS must provide a "reasoned explanation" for disregarding these facts that underlay the previous policy if it wants to change course, *Fox*, 556 U.S. at 515, yet it has not done so here—HHS fails to even acknowledge the facts underlying the 2016 Rule. *See* 85 Fed. Reg. 37,207.

Additionally, HHS's reasoning is internally inconsistent. HHS points only to *Franciscan Alliance* as the reason why it now adds the Title IX exemption. But, *Franciscan Alliance*'s analysis of the Title IX exemption erroneously concluded that Section 1557 "clearly adopted Title IX's existing legal structure for prohibited sex discrimination." 227 F. Supp. 3d at 687. Not even HHS agrees with that reasoning—as HHS refused to adopt Section 504's definition of "health program or activity" into Section 1557, stating: "Section 1557's scope differs from that of the underlying statutes." *See* 85 Fed. Reg. 37171. *See also Schmitt v. Kaiser Foundation Health Plan*, 965 F.3d 945, 953 (9th Cir. 2020) (observing Section 1557's reference to "grounds prohibited" under Title IX only refers to the "protected classification at issue"). It is arbitrary and capricious for HHS to apply Section 1557's express language and incorporate only the prohibited ground of discrimination of Section 504, but disregard that same language and

---

[8] This is in stark contrast to the numerous areas where Congress balanced religious and conscience rights in the ACA. *See* 42 U.S.C § 18113, 42 U.S.C § 18023 (prohibiting government entities that receive federal financial assistance from discriminating against an individual or healthcare entity because of an objection to providing abortion services and exempt health plans from being required to cover abortion services at all).

PLAINTIFF STATE OF WASHINGTON'S
SUPPLEMENTAL BRIEF
NO. 2:20-cv-01105-JLR

9

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

incorporate the entire scope of Title IX, including its exemptions. As such, HHS's adoption of the Title IX exemption is arbitrary and capricious.[9]

*Third,* neither of HHS's attempts to narrow the "covered entities" subject to Section 1557 requires *Chevron* deference. As to HHS's provision to exempt from Section 1557 its own non-ACA programs or activities, again, the Court need not look beyond the clear language of the statute. Section 1557 applies to "any program or activity that is administered by an Executive Agency or any entity established under this title." 42 U.S.C. 18116(a). Since Congress used the disjunctive "or," the only phrase that is modified by "under this title" is the last one. Even if the Court agreed with HHS's argument that Section 1557 is ambiguous as to whether it covers all of HHS's programs or activities or just those under the ACA, *Chevron* deference would still not apply because the Final Rule is arbitrary and capricious. In applying "under this title" to modify the second clause and limiting Section 1557's application to only HHS programs administered under Title I, HHS changed its position and must provide a reasoned explanation for doing so. *See Fox*, 556 U.S. at 515. Here, an agency may justify its policy choice by simply explaining why that policy "is *more* consistent with statutory language" than alternative policies, *see Encino Motorcars*, 136 S.Ct. at 2127, but HHS's explanation fails to do even that. Instead, HHS observes that the 2016 Rule applied "health" as a limiting qualifier that is not consistent with the statute and concludes that the Final Rule's interpretation "is at least as reasonable as the 2016 Rule[]." 85 Fed. Reg. 371370. But HHS nowhere explains any reason why HHS programs, all of which presumably already came into compliance with Section 1557 after the 2016 Rule, should now no longer fall within Section 1557's ambit. *Greater Boston Television Corp. v. Fed. Commc'n*

---

[9] HHS offers an additional reason for including the Title IX exemption in its response brief that nowhere appears in the regulation—that Title IX's "presence in healthcare settings was expressly anticipated." Def's Resp. ECF 56 at 24. However, that argument implicitly recognizes that Title IX has never applied in the pure healthcare context. *Cf. Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 558 (3d. Cir. 2017) (observing that Title IX applies to "*education* programs or activities," *see* 20 U.S.C. 1687, and grappling with whether a medical residency program was sufficiently educational to fall within Title IX's ambit).

PLAINTIFF STATE OF WASHINGTON'S
SUPPLEMENTAL BRIEF
NO. 2:20-cv-01105-JLR

10

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    *Comm'n*, 444 F.2d 841, 852 (D.C. Cir. 1970) (requiring agencies to do more to indicate that "its

2    prior policies and standards are being deliberately changed, not casually ignored.").

3         Section 1557 is also not ambiguous as to whether health insurers are covered entities.

4    Section 1557 refers, not to "healthcare providers," but to "any health program or activity, any

5    part of which is receiving Federal financial assistance, including credits, subsidies, or *contracts*

6    *of insurance*." 42 U.S.C. 18116(a). Not only does it explicitly refer to "contracts of insurance,"

7    the ACA relies on definitions that show health insurance is one way of providing medical care,

8    *see* 42 U.S.C. §300gg-91 (defining "medical care" to include "the amounts paid"), and the

9    purpose of the ACA is to increase the number of people who have healthcare insurance. *See Nat'l*

10   *Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 596 (2012) ("[a] central aim of the ACA is to

11   reduce the number of uninsured U.S. residents.") (citing 42 U.S.C. § 18091(2)(C) and (I) (2006

12   ed., Supp. IV). In this context, "any health program or activity" clearly encompasses health

13   insurers. *See* Amicus Br. of Northwest Health Law Advocates, ECF 30-1 at 14-16.

14        Regardless, even if the Court considers Section 1557 ambiguous, *Chevron* deference

15   does not apply. The 2016 Rule defined "health program or activity" to include any entity

16   "principally engaged in providing or administering . . . *health insurance coverage*." *See* 45

17   C.F.R. § 92.4 (emphasis added). HHS must provide a reasoned explanation for changing its

18   position. *See* 85 Fed. Reg. 37244 (proposing 45 C.F.R. § 92.3(c)). Unilaterally asserting that the

19   Final Rule is "closer to the plain meaning of the 1557 statute" does not make it so. *See* 85 Fed.

20   Reg. 37173. HHS suggests the Civil Rights Restoration Act's definition of "program or activity"

21   requires the exclusion of health insurers, yet the 2016 Rule relied on the exact same CRRA

22   provision to come to the opposite conclusion. *See* 81 Fed. Reg. 31385. Indeed, a word-for-word

23   adoption of the CRRA, as the Final Rule proposes, makes little sense given that the CRRA[10]

24        [10] Even more, HHS's reliance on CRRA at all to narrow the covered entities is specious. Despite the

25   CRRA's mandate that the entire entity should be subject to the underlying civil rights statutes if any part of the
     entity receives federal financial assistance,[10] *see* 20 U.S.C. 1687, the Final Rule attempts to do the opposite and

26   limit Section 1557's scope only to the parts of the entity's operations that receives Federal financial assistance, *see*
     85 Fed. Reg. 37244 (proposing 45 C.F.R. § 92.3(b)).

PLAINTIFF STATE OF WASHINGTON'S
SUPPLEMENTAL BRIEF
NO. 2:20-cv-01105-JLR                              11              **ATTORNEY GENERAL OF WASHINGTON**
                                                                          Civil Rights Division
                                                                       800 Fifth Avenue, Suite 2000
                                                                          Seattle, WA  98104
                                                                            (206) 464-7744

1  defines only "program or activity," whereas Section 1557 refers to "any *health* program or

2  activity." *Compare* 20 U.S.C. 1687(3)(A)(ii) *with* 42 U.S.C. 18116. To the extent HHS argues

3  may make decisions to reduce regulatory burden, HHS's argument still fails. While HHS may

4  reduce regulatory burden, it must do so while considering any reliance interests there may be in

5  making that change. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S.Ct.

6  1891, 1915 (2020) (concluding DHS was "required to assess whether there were reliance

7  interests, determine whether they were significant, and weigh any such interests against

8  competing policy concerns"). Here, health insurers and patients alike have relied on Section

9  1557 applying to health insurers. *See, e.g., Schmitt*, 965 F.3d at 945 (considering deaf plaintiff's

10  disability discrimination claims and recognizing Section 1557 claims exist against a non-ACA

11  insurer). Since HHS did not consider these interests, and its explanation for changing positions

12  is far from reasoned, *Chevron* deference does not apply.

13  **C.    HHS's Narrowing of Covered Entities will Irreparably Harm Washington**

14       Not only narrowing the scope of covered entities "frustrate[] [Washington's] efforts to

15  advance its public health objectives," which constitutes an irreparable harm, *see California v.

16  Azar*, 385 F. Supp. 3d 960, 978 (N.D. Cal. 2019); *California v. Bureau of Land Mgmt.*, 286 F.

17  Supp. 3d 1054, 1074 (N.D. Cal. 2018), it will result in administrative costs to Washington, as

18  discussed above. It is well-established that administrative costs are sufficient to show irreparable

19  harm as states are unable to recover monetary damages under the APA. *See Azar*, 911 F.3d 558,

20  581 (9th Cir. 2018) (citing cases); *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir.

21  2015). Although HHS cited *Doe #1 v. Trump*, 957 F.3d 1050, 1060 (9th Cir. 2020) at oral

22  argument to suggest otherwise, *Doe* involved the federal government seeking a stay of an

23  injunction. No irreparable harm existed because the monetary injury incurred by the injunction

24  would be borne by third parties. *Id.* at 1060. Since Washington shows the administrative costs

25  will be borne by Washington, *Doe #1* does nothing to contravene *Azar*.

26

1    DATED this 17th day of August, 2020.

2

3                                    Respectfully Submitted,

4                                    ROBERT W. FERGUSON
                                     Attorney General
5

6                                    s/ Marsha Chien
7                                    MARSHA CHIEN, WSBA No. 47020
                                     NEAL LUNA, WSBA No. 34085
8                                    BRIAN SUTHERLAND, WSBA No. 37969
                                     Assistant Attorneys General
9                                    Attorneys for Plaintiff State of Washington
                                     Wing Luke Civil Rights Division
10                                   Office of the Washington State Attorney General
                                     800 Fifth Avenue, Suite 2000
11                                   Seattle, WA 98104-3188
                                     Phone: (206) 464-7744
12                                   Marsha.Chien@atg.wa.gov
13                                   Neal.Luna@atg.wa.gov
                                     Brian.Sutherland@atg.wa.gov
14

15

16

17

18

19

20

21

22

23

24

25

26

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that the foregoing document was electronically filed with the United

3  States District Court using the CM/ECF system. I certify that all participants in the case are

4  registered CM/ECF users and that service will be accomplished by the CM/ECF system.

5

6      DATED this 17th day of August, 2020.

7

8                                    *s/ Anna Alfonso*
                                     ANNA ALFONSO
9                                    Legal Assistant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF STATE OF WASHINGTON'S                14            **ATTORNEY GENERAL OF WASHINGTON**
SUPPLEMENTAL BRIEF                                                Civil Rights Division
NO. 2:20-cv-01105-JLR                                          800 Fifth Avenue, Suite 2000
                                                                   Seattle, WA  98104
                                                                     (206) 464-7744