ETHAN P. DAVIS
Acting Assistant Attorney General
DAVID MORRELL
Deputy Assistant Attorney General
MICHELLE BENNETT
Assistant Director, Federal Programs Branch
WILLIAM LANE
Counsel to the Assistant Attorney General
JORDAN L. VON BOKERN
LIAM C. HOLLAND
Trial Attorneys, Federal Programs Branch

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | Case No. 2:20-cv-01105-JLR |
| Plaintiff, | **DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR, in his official capacity as the Secretary of the United States Department of Health and Human Services, | |
| Defendants. | |

## INTRODUCTION

While there is little doubt that plaintiff has strong opinions about the Department of Health and Human Services' (HHS) nondiscrimination rule (the "2020 Rule" or "Rule"), mere policy disagreement is not enough to justify a preliminary injunction, nor even to satisfy Article III. To establish standing, plaintiff must demonstrate "injury in fact" as to each provision it seeks to challenge—harm that is concrete, particularized, and "certainly impending." Plaintiff must also show that the Rule will actually cause the harm it alleges, and that a decision from this Court is likely to redress its asserted injuries. Moreover, because plaintiff seeks the extraordinary remedy of a preliminary injunction enjoining enforcement of the Rule, it must additionally show that its alleged injuries as to each provision are *irreparable*. Plaintiff has not satisfied these burdens. And even assuming plaintiff has demonstrated standing and irreparable injury, it certainty has not shown a substantial likelihood of success on the merits of its claims. To the contrary, HHS's construction of Section 1557 in the challenged portions of the 2020 Rule is reasonable and entitled to *Chevron* deference.

## ARGUMENT

### I. PLAINTIFF LACKS STANDING

Despite having two chances already (in its opening brief and reply), plaintiff has not carried its burden of "demonstrat[ing] standing for each claim it seeks to press and for each form of relief sought." Order on Suppl. Briefing at 2, ECF No. 62 (citation omitted). Plaintiff's decision to address standing in broad strokes instead of claim-by-claim, as required by binding precedent, makes it difficult for defendants to respond to the Court's first inquiry. It also highlights the lack of concreteness of plaintiff's alleged injuries and demonstrates that plaintiff's real disagreement with defendants is an abstract policy dispute, not an Article III case or controversy.

**A. Plaintiff lacks standing to challenge HHS's decision not to define the terms "sex" or "on the basis of sex."**

1

Plaintiff's primary challenge is to HHS's decision to defer to the text of Title IX rather than attempt to define the term "on the basis of sex." As HHS explained, omitting a definition would allow the agency to apply the 2020 Rule in conformity with current case law—whatever that may ultimately be following the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). *See* Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. at 37,160, 37,168 (June 19, 2020) ("the elimination of a regulatory definition of such term would not preclude application of the Court's construction"). Plaintiff fails to demonstrate how declining to include a definition for "on the basis of sex" causes any injury, let alone an imminent injury, traceable to HHS. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Indeed, Congress did not include a definition of "on the basis of sex" in either Section 1557 or Title IX, and plaintiff does not claim that it has been injured by Congress' failure to do so or that it would have standing to challenge those statutes based on the injuries it alleges here.

Plaintiff also cannot establish redressability as to this claim. The definition of "on the basis of sex" that plaintiff prefers, which included gender identity, was enjoined, then vacated, in *Franciscan Alliance, Inc. v. Azar*, 414 F. Supp. 3d 928, 947 (N.D. Tex. 2019). Because the government did not appeal that decision, the vacatur is final and the government cannot simply ignore it. The only path for plaintiff to resurrect the old language would be through a new rulemaking, which this Court lacks authority to require. *See* 42 U.S.C. § 18116(c) ("The Secretary *may* promulgate regulations to implement this section." (emphasis added)); *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011) ("APA explicitly excludes from judicial review those agency actions that are 'committed to agency discretion by law.'" (quoting 5 U.S.C. § 701(a))). Faced with this dilemma, plaintiff provides no clear answer as to what legal remedy it is seeking that would redress any purported injury. Reply in Supp. of Pl.'s Mot. for Prelim. Inj. at 4, ECF No. 59 ("Reply").

**B. Plaintiff lacks standing to challenge HHS's decision to incorporate Title IX's religious exemption and its definition of covered entities**

Because standing is not dispensed in gross, the Court instructed the parties to address plaintiff's standing claim by claim. Despite being given two prior opportunities to do so, plaintiff's papers are unclear as to which alleged injuries supposedly stem from which provision of the 2020 Rule, as is their burden. Defendants do their best below to address plaintiff's purported injuries as they presumably relate to plaintiff's claims regarding Title IX's religious exemption and the definition of covered entities.

*First*, plaintiff claims that the Final Rule will result in "increased administrative costs totaling over $178,168.16 to revise agency policies, websites, and materials." Reply at 2. As an initial matter, plaintiff never identifies the specific materials to which it is referring or explains *why* the Final Rule requires them to be updated. Accordingly, plaintiff has not met its burden to show that each of the provisions it challenges is somehow referenced in Washington State materials that must be revised. In any event, plaintiff's desire to notify residents in state materials about the requirements of federal law is not fairly traceable to the 2020 Final Rule, as opposed to the state's independent decisions to provide information to its citizens. *Cf. San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) (no standing where challenged law is "neither the only relevant piece of legislation nor the sole factor affecting the" purported economic injury). As the Court pointed out at argument, accepting plaintiff's theory of injury would allow any state to challenge any federal statute or regulation solely on the ground that the state wants to inform its residents about federal law. Article III is not so expansive. *See Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (no standing based on a "mere interest in a problem"); *Keep Chi. Livable v. City of Chi.*, 913 F.3d 618, 625 (7th Cir. 2019) ("contention of injury" that organization finds "it difficult to . . . educate on home-sharing in Chicago before a court rules on . . . [its] challenges to the constitutionality of [challenged] Ordinance" is "little more than a 'mere interest in a problem.'"); *cf. Stoianoff v. Montana*, 695 F.2d 1214, 1223 (9th Cir. 1983) ("The mere existence of a statute . . . is not sufficient to create a case or controversy within the meaning of Article III.").

3

*Second*, plaintiff relies on several declarations in an attempt to establish that the 2020 Rule will have ripple effects that ultimately harm the State of Washington. *See* Reply at 2–3. Again, plaintiff has not met its burden to show which provisions of the Final Rule trickle up to these purported injuries because all of the declarations are painted in broad strokes about the 2020 Final Rule.

Regardless, plaintiff's declarations are insufficient to establish standing. Plaintiff points out that "healthcare discrimination against LGBTQ patients in Washington is inevitable considering the rampant discrimination already documented in recent years." Reply at 2. But plaintiff's reliance on purported injuries from discrimination predating the 2020 Rule undermine any claim that these injuries are caused by the rule plaintiff challenges.

Plaintiff acknowledges that it cannot establish standing through links in a chain that are "hypothetical or tenuous." Reply at 3 (citation omitted). But plaintiff's alleged links are exactly that: hypothetical and tenuous. For example, plaintiff claims harm in the form of "los[ing] $296,000 a year in business and occupation tax revenue on medical services" and millions of dollars in "mental health crisis care." *Id*. at 3. That injury is based on the pure speculation that "between 5,271 and 16,266 transgender Washingtonians [will] lose healthcare coverage" as a result of the rule. *Id*. That speculation, however, is supported only by a declaration stating that this is the number of "Washingtonians [who will] have healthcare [insurance] coverage to which the Washington State law prohibitions on transgender discrimination will not apply." Decl. of Michele Roberts ¶ 13, ECF No. 17. None of plaintiff's declarations, however, indicates that any health plan will actually change its coverage in a way that leads to discrimination against insureds, and hence increased costs for the State of Washington—much less that these speculative links could be traced back to HHS's decision to incorporate into the Final Rule Title IX's religious exemption or the two aspects of its definition of covered entities that plaintiff challenges.

Plaintiff asserts that HHS admitted that the 2020 Rule "will result in at least some healthcare entities declining to provide coverage consistent with the previous version of the

regulation." Decl. Roberts ¶ 6 (citing 85 Fed. Reg. at 37,181). But HHS never found with any degree of certainty that this "will result." *Id*. To the contrary, HHS said "*[p]resumably* some insurers will maintain coverage consistent with the 2016 Rule's requirements and some will not." 85 Fed. Reg. at 37,181 (emphasis added). HHS's speculation about what might happen in response to the rule is exactly the type of conjecture that is insufficient to support standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (declining "to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"). Moreover, HHS's speculation was about the rule as a whole; it did not address any purported impact from the incorporation of Title IX's religious exemption or the two aspects of its definition of covered entities that plaintiff challenges. And HHS did not speculate about the response of insurers in the State of Washington, much less connect any such response to any injuries to the State. Plaintiff thus cannot rely on this statement to absolve it of its burden to establish a certainly impending injury to the state caused by the provisions of the 2020 Rule that it challenges.

This case is meaningfully different from *California v. Azar*, 911 F.3d 558 (9th Cir. 2018). In that case, the states argued that HHS's rules "expand[ing] the number of employers categorically exempt from the ACA's contraceptive coverage requirement" would result in "significant costs as a result of their residents' reduced access to contraceptive care." *Id*. at 571. But unlike the hypothetical discrimination in this case, employers who had every intention of not providing state residents with contraceptive coverage, like the Little Sisters of the Poor, were intervenors in that case. What is more, the Court relied on HHS's "estimat[ion] that between 31,700 and 120,000 women nationwide will lose some coverage" from the specific provisions— the expanded exemptions—that the states challenged. *Id*. at 572. In contrast, as discussed *supra*, plaintiff here relies only on general speculation—not tied to any specific provision plaintiff challenges. *See* Decl. Roberts ¶ 6 (citing 85 Fed. Reg. at 37,181). Such speculation cannot support standing.

Contrary to plaintiff's assertions, *Dep't of Commerce v. New York*, 139 S. Ct. 2551m(2019), also has no bearing on this case. In that case, the Court found that the federal government's plan to send undocumented aliens census forms with a citizenship question would predictably result in many of those individuals not completing the forms to avoid risk of removal. *See id*. at 2566. But it is not similarly predicable that health plans preempted from Washington's nondiscrimination laws—like those that are part of the Federal Employees Health Benefit Program or Washingtonian employer self-insured group health plans—will engage in discrimination against transgender individuals as a result of the provisions of the 2020 Rule that plaintiff challenges. Indeed, if the threat of *incarceration* is an insufficient guarantee of third-party action for purposes of standing, *see Linda R.S. v. Richard D.*, 410 U.S. 614, 617–18 (1973), modifications to a nondiscrimination rule like those at issue here similarly are not a guarantee of discrimination by third party healthcare providers or insurers. As defendants have explained, *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976), controls. *See* Def. Mem. at 9–10.

In sum, plaintiff has not shown that any transgender Washingtonians are exposed to certainly impending discrimination that stems from any of the three provisions of the 2020 Final Rule challenged by plaintiff. And even if plaintiff had alleged such an injury, it has not shown that such injury will lead to certainly impending harms to the state itself.

## II. THE 2020 RULE IS ENTITLED TO *CHEVRON* DEFERENCE TO THE EXTENT IT CONSTRUES SECTION 1557

*Chevron* establishes that "[s]tatutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency." *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013). The 2020 Rule was promulgated pursuant to Section 1557's explicit grant of rulemaking authority to HHS, *see* 42 U.S.C. § 18116(c), and such a "general conferral of rulemaking . . . authority" is sufficient "to support *Chevron* deference for an exercise of that authority within the agency's substantive field." *City of Arlington*, 569 U.S. at 306.

Accordingly, HHS's reasonable construction of Section 1557 in the 2020 Final Rule is entitled to deference.

> **A. Because HHS Declined to Define "On the Basis of Sex" in the 2020 Final Rule, This Court Need Not Determine How *Chevron* Deference Would Have Applied to Such Definition**

HHS declined to include a definition of "on the basis of sex" in the 2020 Rule. *See* 85 Fed. Reg. at 37,244 (to be codified at § 92.2). The Rule instead "relies upon . . . the plain meaning of the term in the statute," 85 Fed. Reg. at 37,178, consistent with Section 1557(c) and black letter law permitting federal agencies discretion to decline to proceed by rulemaking, *see NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) ("[T]he choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion."); *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947) ("[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency."). Because the 2020 Rule declines to define discrimination on the basis of sex with any more specificity than what is provided in the statute, there is no regulatory interpretation to which *Chevron* might apply, and this Court need not determine whether and how *Chevron* deference would apply if the agency had included any such definition. Instead, the relevant regulatory text merely hews to the language of statute and, as such, cannot be contrary to law. *See Rendleman v. Shalala*, 21 F.3d 957, 964 (9th Cir. 1994) (refusing to invalidate "regulation [that] mirrors the language of the statute").

> **B. The 2020 Rule Reasonably Interprets Section 1557 not to Prohibit Conduct Falling within Title IX's Religious Exemption**

Section 1557 unambiguously incorporates the "ground[s] . . . for discrimination" from the underlying statutes. *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 951 (9th Cir. 2020). Discrimination on the basis of sex by institutions "controlled by a religious organization if [that conduct] would not be consistent with the religious tenants of such organization" is *excepted* from the grounds for discrimination prohibited by Title IX, *see* 20 U.S.C. § 1681(a)(3). Because such conduct is not a ground for discrimination prohibited by Title

IX, it is unambiguously *not* incorporated into Section 1557.

Even assuming Section 1557's incorporation of Title IX by its terms does not clearly resolve this issue in favor of HHS, where a "statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, USA Inc. v. NRDC*, 467 U.S. 837, 843 (1984). HHS's construction is permissible for several reasons. First, as just explained, because Title IX does not prohibit any conduct by religious entities that is consistent with their religious tenants, 20 U.S.C. § 1681(a)(3), it was reasonable for HHS to conclude that Section 1557—which incorporates by reference Title IX's grounds of discrimination—also does not prohibit that conduct. *See* 85 Fed. Reg. at 37,207-208. Second, the Civil Rights Restoration Act of 1987 ("CRRA") excludes from the definition of "program or activity" "any operation of any entity which is controlled by a religious organization if the application of [Title IX's standards] to such operation would not be consistent with the religious tenants of such organization." 20 U.S.C. § 1687. And HHS reasonably construed the term "program or activity" in Section 1557 to be a term of art in the civil rights law context consistent with the CRRA. *See* 85 Fed. Reg. at 37,207. Accordingly, HHS's construction is reasonable at *Chevron* step two—which is "not a high bar for [HHS] to clear." *Ill. Pub. Telecomm'ns Ass'n v. FCC*, 752 F.3d 1018, 1025 (D.C. Cir. 2014); *see also Batteton v. Francis*, 432 U.S. 416, 428 (1977) (cited in *Chevron*, 467 U.S. at 844 n.12) (agencies fail step two if they "adopt a regulation that bears no relation to any recognized concept of" the statutory task).

### C. The 2020 Rule Reasonably Construes the Scope of Section 1557

As defendants explained in their Memorandum in Opposition, HHS reasonably interpreted two ambiguities in Section 1557—the scope of federal agencies covered by the section and the scope of "health program or activity." Defs. Mem. at 18–22. These interpretations are accordingly entitled to *Chevron* deference.

***Scope of federal agencies covered by Section 1557.*** In promulgating both the 2016 and the 2020 Rules, HHS reasonably found that construing Section 1557 absolutely literally to apply to all federal action regardless of its connection to healthcare would be unreasonable. *See* Defs. Mem. at 18–19; 85 Fed. Reg. at 37,170 ("In the 2016 Rule, the Department . . . recognized that Section 1557 was not intended to apply to every program or activity administered by every Executive Agency, whether or not it [was] related to health."); *see also Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ*. 550 U.S. 81, 94 (2007) (agency interpretation may depart from "absolute literalness" for good reason). Plaintiff ignores the fact that "[i]n the 2016 Rule," which plaintiff's motion for a preliminary injunction seeks to effectively resurrect,[1] "[HHS] limited [Section 1557's] application by adding 'health' to 'programs or activities'" to address the problems with an absolutely literal construction. 85 Fed. Reg. at 37,170. In the 2020 Rule, instead of inserting the word "health" where it did not exist in the statute, HHS recognized that "Congress had already placed a limitation in the text of Section 1557 by applying the statute to any program or activity administered by an [entity established] 'under such title' [i.e., Title I of the ACA]." *Id*. HHS determined the 2020 Rule's construction is more consistent with the statutory text than the prior construction. At the very least, HHS's construction in the 2020 Rule is a permissible construction of the statute and that is sufficient to satisfy *Chevron* step two. *See Barnhart v. Thomas*, 540 U.S. 20, 29 (2003) ("The proper *Cheron* inquiry is not whether the agency construction can give rise to undesirable results in some instances . . . , but rather whether, in light of the alternatives, the agency construction is reasonable"); *Diaz-Quirazco v. Barr*, 931 F.3d 830, 839 (9th Cir. 2019) ("*Chevron* requires a federal court to accept an agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.") (citation omitted).[2]

---

[1] To the extent Plaintiff argues its reading of Section 1557 is compelled under *Chevron* step one, the 2016 Rule is similarly unlawful because it also did not apply the clause literally.

[2] Plaintiff's reference to the fact that "Section 1557 itself applies to other Departments" is not relevant. Reply at 10 (quoting 81 Fed. Reg. at 31, 378). Plaintiff quotes text from the 2016 Rule's preamble addressing nondiscrimination under Section 1557 by "health programs and

***Scope of "health program or activity."*** Section 1557 does not define the term "program or activity," and its scope is not inherently clear. In light of that ambiguity, HHS reasonably construed it as a term of art in the civil rights law context: "The CRRA defined 'program or activity' in the underlying statutes to apply to all of an entities' operations when it is principally engaged in the business of providing 'healthcare.'" 85 Fed. Reg. at 37,172. And HHS reasonably explained that "the plain meaning of 'healthcare' differs from insurance." *Id.* at 37,172-73; *see* Def. Mem. at 21-22.

Plaintiff faults HHS's decision to define "program or activity" as a term of art consistent with the CRRA because elsewhere HHS "limit[s] Section 1557's reach to only programs or activities that receive federal funds." Reply at 10, n.7. But HHS simply brought meaning to Section 1557's distinction between its application to "any health program or activity, *any part of which* is receiving Federal financial assistance," and other programs or activities "administered by an Executive Agency or any entity established under [the ACA]" (without the "any part of which" language). *See* 42 U.S.C. § 18116(a); 85 Fed. Reg. at 37,244 (to be codified at § 92.3(b)). And while "no court has interpreted Section 1557 to exclude health insurers," Reply at 10, cases plaintiff cites either defer to HHS's prior interpretation, *see, e.g., Callum v. CVS Health Corp.*, 137 F. Supp. 3d 817, 849 (D.S.C. 2015); or were otherwise decided when the 2016 Rule was in effect, *see, e.g.*, *Schmitt*, 965 F.3d at 953. A judicial interpretation of a statute is binding on an agency only if the court concludes that "the statute unambiguously requires the court's construction." *Nat'l Cable and Telecomm. Ass'n v. Brand X*, 545 U.S. 967, 985 (2005). And plaintiff cites no case holding that Section 1557 unambiguously covers insurers. Plaintiff points out that the ACA defines "[m]edical care' to include "amounts paid" for healthcare, Reply at 11, but Congress did not use the term "medical care" anywhere in Section 1557. Finally, plaintiffs

---

activities receiving Federal financial assistance," not the statute's clause prohibiting nondiscrimination by Executive Agencies. *See id*. HHS does not dispute that other federal agencies administer Section 1557 with respect to federal funding that those agencies distribute to health programs or activities covered by Section 1557. But that question is distinct from the scope of federal agencies governed by Section 1557.

nitpick about the language HHS used in its preamble to convey its belief that its interpretation was more consistent with the statute than the prior interpretation. *See id*. But "even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned." *Crickon v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009) (citation omitted).

### III. PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM FROM THE 2020 RULE'S CONSTRUCTION OF THE SCOPE OF SECTION 1557

"[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction." *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). To establish a likelihood of irreparable harm, plaintiff "must do more than merely allege imminent harm sufficient to establish standing; [they] must *demonstrate* immediate threatened injury." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (citation omitted). Plaintiff has failed to carry this burden because its alleged injuries stemming from the scope of covered entities in the 2020 Rule are speculative: plaintiff has provided no evidence that such harms are imminent. Indeed, as explained above, Plaintiff has not even established standing. *See supra* I.

Plaintiff has primarily alleged that the anticipated effects of the Rule on individual state residents or on decisions individuals make in response to the Rule will harm it. *See* Mot. 20–21. Direct harm to individuals, however, does not support standing for states under Article III, let alone irreparable harm. *See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) (explaining that states cannot bring suit on behalf of their residents' interests because they "do[] not have standing as *parens patriae* to bring an action against the Federal Government" (citation omitted).

To the extent plaintiff is alleging that changes to the scope of Section 1557's covered entities will somehow cause it monetary harm, *see* Reply at 2-3, the Ninth Circuit has recently clarified that where "the harm asserted by [a] government is purely monetary" the harm cannot support irreparable injury because "monetary injury is not normally considered irreparable." *Doe*

*#1 v. Trump*, 957 F.3d 1050, 1060 (9th Cir. 2020) (citation omitted). Furthermore, "monetary injury to . . . the economy in general provides an even weaker justification for a finding of 'irreparable harm.'" *Id*. And, here, plaintiff's alleged injuries involve little more than speculation about the effect of the 2020 Rule on its tax revenue or program costs. *See* Reply at 3.

In addition, as discussed *supra*, plaintiff's alleged financial harms are speculative, founded on an attenuated chain of inferences, and contingent on the aggregate decisions of independent third parties to take action not required by the Rule. This falls far short of the showing necessary to obtain a preliminary injunction. *See Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("An injunction will not issue if the person or entity seeking injunctive relief shows a mere 'possibility of some remote future injury'" (quoting *Winter v. NRDC*, 555 U.S. 7, 22 (2008)); *Caribbean Marine Servs. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.").

## CONCLUSION

Plaintiff's motion should be denied.

Dated: August 17, 2020                Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

MICHELLE R. BENNETT
Assistant Director, Federal Programs Branch

WILLIAM K. LANE III
Counsel to the Assistant Attorney General

*/s/ Liam C. Holland*
LIAM C. HOLLAND
JORDAN L. VON BOKERN
Trial Attorneys, Federal Programs Branch
Liam.C.Holland@usdoj.gov
1100 L Street, NW
Washington, D.C. 20530
Telephone: (202) 514-4964
Facsimile: (202) 616-8470

*Attorneys for Defendants*