The Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR, in his official capacity as the Secretary of the United States Department of Health and Human Services,<br><br>　　　　　　Defendants. | NO. 2:20-cv-01105-JLR<br><br>PLAINTIFF STATE OF WASHINGTON'S RESPONSE TO ORDER TO SHOW CAUSE |

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW
CAUSE
NO. 2:20-cv-01105-JLR

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

# I. INTRODUCTION

In response to this Court's order to show cause and explain the impact of the stay and preliminary injunction in *Asapansa-Johnson Walker v. Azar*, Case No. 20-2834FB-SMG (E.D.N.Y. Aug. 17, 2020) (*Asapansa-Johnson* Decision), Washington makes three points: *First*, the *Asapansa-Johnson* Decision supports Washington's arguments regarding standing—and explicitly rejects Defendants' arguments to the contrary. *Second*, the *Asapansa-Johnson* Decision supports Washington's argument that HHS acted contrary to law and arbitrarily and capriciously when it eliminated the 2016 Rule's definition of "on the basis of sex" to include sex stereotyping and gender identity, removed the prohibition of categorical coverage exclusions for transgender people, and expressly excluded sexual orientation from the definition of "on the basis of sex" (LGBTQ protections). *Third*, a ruling from this Court on the elimination of LGBTQ protections is still necessary because the *Asapansa-Johnson* Decision may be lifted at any time or on appeal, leaving Washington vulnerable to irreparable harm, and the *Asapansa-Johnson* Decision did not address the Final Rule's provisions that severely undermine Section 1557's express scope. This Court should adopt the *Asapansa-Johnson* Decision's reasoning, issue an injunction prohibiting the Final Rule's elimination of LGBTQ protections. It should also determine that HHS acted contrary to law and arbitrarily and capriciously by undermining the plain language of Section 1557 to exempt religiously-affiliated health programs or activities and exclude health insurers and HHS's non-ACA programs or activities.

# II. ANALYSIS

A. **The *Asapansa-Johnson* Order Further Confirms Washington Has Standing**

Washington submitted substantial evidence that shows it has standing to challenge all three provisions of the Final Rule at issue here. Specifically, Washington's evidence shows that (1) healthcare discrimination will increase as a result of the Final Rule; (2) the discrimination will result in less gender affirming care, and more depression, job loss, and suicides; (3) less gender affirming care will result in lost tax revenues; and (4) more depression, job loss, and

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

suicides will result in Washington agencies and programs bearing the public health costs of the Final Rule, including the costs of offsetting reproductive health and sexual health services, providing acute care for those who were unable to access healthcare, and other administrative and harm mitigation costs. *See* Washington's Supp. Br., ECF 64 at 2-8. Defendants' main argument, in response and supplemental briefing, is that Washington fails to show the first link in the causal chain, i.e., that healthcare discrimination will occur as a result of the Final Rule. Def's Resp. Br, ECF 56 at 15-18; Def's Supp. Br. ECF 65 at 4-7.[1] By rejecting Defendants' main standing argument and recognizing that healthcare discrimination is an injury-in-fact, traceable to the Final Rule, and redressable, the *Asapansa-Johnson* Decision supports Washington's standing to challenge the three provisions of the Final Rule at issue in its motion.

### 1. Washington's Evidence Shows Standing as to All Three Provisions

Both the Court and Defendants asked Washington to identify the standing evidence it relies on to support standing for each specific provision challenged. Order, ECF 62 at 2; Def's Supp. Br., ECF 65 at 5.

Washington clarifies that the evidence it submitted showing the economic costs, administrative costs, harm mitigation costs, and lost tax revenue that will result from the Department's Final Rule all support its assertion of standing as to all three provisions at issue in its motion for preliminary injunction—not only the LGBTQ provisions. The *Asapansa-Johnson* Decision enjoined the Final Rule's exclusion of sex stereotyping and gender identity from the definition of "on the basis of sex" as contrary to *Bostock*. However, if HHS limits Section 1557's scope, either through Title IX's exemption of religiously-affiliated entities or the covered entities provisions, *Bostock* will still do nothing for those who seek care from one of the many hospitals controlled by a religious institution, or for those who access healthcare through an ERISA and/or Federal Employee Health Benefits Program (FEHBP) plan. Indeed, Section 1557 will not protect

---

[1] Washington's citations are to the page of each docket entry, and not the page number of the brief.

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

those on ERISA or FEHBP plans from healthcare discrimination on any protected basis at all. HHS never addresses this.

More specifically, the Final Rule's inclusion of a Title IX religious exemption leaves significant portions of Washington's population unprotected from sex discrimination, as nearly half of all hospital beds in Washington are religiously-affiliated. *See* Decl. Todorovich ¶¶ 34, 37, 41 (DOH's Chief of Staff describing the impact of the religious exemption on the agency); *see also* Br. of Amici Nat'l Health Law Program, et.al., ECF 63 at 12-14 (observing Washington state has the second highest proportion of short-term acute-care hospital beds under Catholic restrictions in the country at 40.9 percent). In some Washington counties, for example, the only hospital beds available are religiously-affiliated, including in Whatcom, Stevens, Walla Walla, and Franklin counties. *See* ACLU of Washington, Put Patients First (October 2015), *available at* https://aclu-wa.org/put-patients-first. As even HHS admits, it is reasonably foreseeable that these religiously-affiliated providers will rely on the Title IX exemption to refuse to provide gender-affirming care and sexual health services. *See* 85 Fed. Reg. at 37,181 (recognizing that some healthcare entities will decline to provide coverage if the regulations no longer prohibit healthcare discrimination).

As a result, LGBTQ Washingtonians will suffer more violence, depression, and suicide, and higher rates of substance abuse, smoking, and alcohol abuse, and many will postpone needed care or not seek it at all, leading to poorer health outcomes. Decl. Todorovich ¶¶ 11-12; Decl. Roberts ¶¶ 14-15, 22. Washington will bear the cost to mitigate and address these harms. Decl. Todorovich ¶ 36. For example, as a result of the increase in depression and other mental health conditions, Washington will have to spend millions in urgent mental healthcare and crisis-stabilization services. Decl. Reed ¶¶ 7-8, 10-14. DOH will have to reallocate staff and resources from its primary mission of providing services to assisting LGBTQ residents in finding healthcare providers who will not discriminate against them. Decl. Todorovich ¶ 41. This will increase demand for such providers and their cost to DOH. *Id.* Any of these harms confer

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

standing. *See, e.g., California v. Azar*, 911 F.3d 558, 571-73 (9th Cir. 2018) (lost tax revenue due to lost jobs establishes direct injury to states); *Washington v. Trump*, 441 F. Supp. 3d 1101, 1113-15 (W.D. Wash. 2020) (same); *New York v. Scalia*, --- F. Supp. 3d ---, 2020 WL 2857207, at *9-11 (S.D.N.Y. June 1, 2020) (lost tax revenue and administrative costs); *New York v. Mnuchin*, 408 F. Supp. 3d 399, 410 (S.D.N.Y. 2019).

Similarly, excluding health insurers from Section 1557 also has grave consequences for Washington, since more than 1.5 million Washingtonians access healthcare through now-excluded ERISA or FEHBP plans. *See* Decl. Kreidler ¶¶ 8-9. In these situations, health insurers often act as third party administrators of that self-funded coverage. *See* Br. of Amici Northwest Health Law Advocates, et al., ECF 52 at 10 (explaining how amici C.P. and M.D. must deal with health insurers acting as administrators under ERISA). As Washington explains, it is the approximately 82,351 LGBTQ individuals and hundreds of thousands of women on these plans who are threatened by the Final Rule's exemption of health insurers, *see* Decl. Roberts ¶¶ 9-15, who often act as third party administrators for those plans. Excluding insurers and permitting denial of services under a religious exemption will lead to costs of between $3,000,000 and $10,000,000 over the next decade for testing by DOH's Office of Infection Diseases, Decl. Todorovich, ¶ 39, and over $900,000 for other services by DOH's Family Planning Program, *id.* at ¶ 41. Children such as amici C.P., who is diagnosed with gender dysphoria, as well as M.D., who is severely disabled, would be excluded from Section 1557's protections completely. *See* Br. of Amici Northwest Health Law Advocates, et. al., ECF 52 at 10-11. In fact, an organization in another case illustrates the problem. Disability Rights Washington (DRW), the federally-designated organization with authority to pursue legal remedies to ensure the protection of individuals with disabilities in Washington. *See* 42 U.S.C. § 10805(a)(1); 42 U.S.C. § 15043(a)(2)(A), (B); 42 U.S.C. § 794e(f)(2). Employees of DRW, like so many others, would also be left unprotected because DRW, like many employers in Washington, purchases health insurance for its employees through an ERISA plan. *See K.M. v. Regence Blue Shield*, Case No.

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

4

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

13-1214-RAJ, 2014 U.S. Dist. LEXIS 27685 at *26-28 (W.D. Wash. Feb. 27, 2014) (recognizing DRW had standing under ERISA); *see also* Ex. 1, Decl. Stroh ¶ 7 (DRW Executive Director's declaration in *Regence*).

In other words, even though the *Asapansa-Johnson* Decision enjoined those provisions of the Final Rule which are contrary to *Bostock*, Washington will still suffer economic harm because gender affirming healthcare services will still decrease when religiously-affiliated hospitals and health insurers are exempted from Section 1557 and no longer required to provide nondiscriminatory healthcare or health coverage. *See* Decl. Oline ¶¶ 4-10 (estimating losses in B&O taxes from these procedures). Similarly, Washington will still bear the indirect economic costs associated with increased levels of depression, job loss, and suicidality when LGBTQ Washingtonians are unable to access nondiscriminatory healthcare at religiously-affiliated hospitals or nondiscriminatory health coverage through health insurers, Decl. Roberts ¶¶ 18-24, Decl. Reed ¶¶ 9-14, which will lead to job loss and decreased payroll tax revenues, Decl. Roberts ¶ 20, Decl. Zeitlin ¶¶ 8-11.

Likewise, even though the *Asapansa-Johnson* Decision enjoined the Finale Rule's elimination of sex stereotyping and gender identity from the definition of "on the basis of sex," the Final Rule's Title IX exemption and covered entities provisions will still require Washington to bear numerous administrative and harm mitigation costs, including costs associated with (1) analyzing the gaps in coverage, *see* Decl. Todorovich ¶¶ 36-37; (2) increasing state services to offset the services no longer provided by religiously-affiliated hospitals or health insurers, such as contraception and sexual health services, *see id.* at ¶ 39, 41; (3) addressing the downstream public health costs of Washingtonians who are denied or delay healthcare for fear of discrimination, *id.* at ¶ 37; (4) conducting necessary outreach regarding the changed rules, *see id.* at ¶ 36; and (5) identifying and referring patients to other healthcare providers, *see id.* at ¶ 37. Amicus M.D.'s case provides but one example of how these costs are likely to be borne by Washington: if M.D.'s private insurer is no longer required to cover the costly in-home skilled

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  nursing services M.D. requires, M.D. may resort to a state-administered Medicaid program,
2  Amici of Northwest Health Law Center, et al., ECF 52 at 11, since Washington provides this
3  kind of care, *see* Washington Health Care Authority, Medically Intensive Children's Program,
4  *available at* https://www.hca.wa.gov/health-care-services-supports/medically-intensive-
5  childrens-program-micp.

6      In sum, all of the evidence Washington submitted regarding its harm will result from all
7  three provisions challenged, including the Title IX religious exemption and covered entities
8  provisions. Any one of these impacts is enough to demonstrate Washington has standing to
9  challenge the Final Rule's Title IX exemption and covered entities provisions.
10 *See Azar*, 911 F.3d at 571; *Pennsylvania v. President United States*, 930 F.3d 543, 562
11 (3d Cir. 2019) (same), *rev'd on other grounds*, *Little Sisters of the Poor Saints Peter and Paul*
12 *Home v. Pennsylvania*, 140 S. Ct. 2367 (2020).

13
14     **2.  The *Asapansa-Johnson* Decision Explicitly Rejected Each of Defendants' Arguments for Undermining Washington's Standing**

15     Defendants' arguments for dismissing Washington's standing evidence fall into three
16 categories: (1) that Washington's harms are "conjectural" because "it is far from inevitable that
17 any of the alleged discrimination purportedly leading to these impacts will occur at all," (2) that
18 "a favorable judgment would not prevent third-party providers from engaging in
19 [discrimination]," and (3) that Washington's harms are not redressable because of the
20 *Franciscan Alliance* vacatur. *See* Def's Resp., ECF 56, at 14. In *Asapansa-Johnson*, Judge Block
21 explicitly rejected each of these arguments. *See Asapansa-Johnson* Decision, at 14-18.

22     *First*, the *Asapansa-Johnson* Decision rejected the Department's argument that the harms
23 are conjectural or speculative. The court explicitly observed that, "past wrongs are evidence
24 bearing on whether there is a real and immediate threat of repeated injury." *Aspansa-Johnson*
25 Decision at 15 (citing *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). Since the individual
26 plaintiffs had experienced healthcare discrimination and would likely be required to seek

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

healthcare in the future, which they may delay or avoid altogether, the court concluded the harm was sufficiently concrete to be an injury-in-fact. *Id.* at 14-16 (citing *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) (holding that discrimination "can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.")). *Second*, the *Asapansa-Johnson* Decision observed that an injury is traceable to government action if it results from the predictable effect of government action on the decisions of third parties—even if the third parties act unreasonably or unlawfully. *Id.* at 16 (citing *Dep't of Commerce v. N.Y.*, 139 S. Ct. 2551, 2566 (2019)). Since the Department itself "understood that some providers would refuse treatments to transgender patients following the repeal," Judge Block concluded the individuals' injury-in-fact was fairly traceable to the Final Rule. *Id.* at 17 (citing 85 Fed. Reg. at 37,162; 84 Fed. Reg. at 27,848 and 27,876). *Third*, the *Asapansa-Johnson* Decision concluded the individuals' harm is redressable since the vacatur in *Franciscan Alliance* did not eliminate the definition of "sex stereotyping."[2]

Here, regardless of the fact that Washington stands in different shoes than individual plaintiffs do, Judge Block's reasoning regarding *Franciscan Alliance* applies equally here. Additionally, Washington presented the same or similar evidence of healthcare discrimination as the *Asapansa-Johnson* plaintiffs. *See* Decl. Maroon ¶¶ 6-12; Decl. Knox ¶¶ 9-15; Decl. Wylie ¶¶ 7-11, Decl. Booher ¶¶ 10-12, 15, 16 (describing numerous instances of healthcare discrimination suffered by transgender patients in Washington and summarizing Washington surveys about the prevalence of LGBTQ discrimination in the healthcare context). This past evidence of discrimination is sufficient to show healthcare discrimination is reasonably likely to increase as a result of the Final Rule, which triggers all of the harms Washington set forth in its

---

[2] In fact, *Franciscan Alliance, Inc. v. Azar* also did not vacate other LGBTQ protections that the 2020 Rule attempts to eliminate now, including the prohibition on categorical coverage exclusions for gender affirming care. *Compare Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660, 681 (N.D. Tex. 2016) (citing and discussing former 45 C.F.R. § 92.207(b) (2020)) *with* 414 F. Supp. 3d 928, 947 (N.D. Tex. 2019)

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

7

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1 declarations. In fact, the Ninth Circuit has repeatedly recognized that a reduction or elimination of health benefits shows not only an injury, but an irreparable one. *See, e.g., M.R. v. Dreyfus*, 697 F.3d 706, 733 (9th Cir. 2012) (loss of medically necessary services under Washington law related to mental and physical health demonstrates likelihood of irreparable injury); *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (irreparable harm includes delayed and/or complete lack of necessary treatment, and increased pain and medical complications).

Defendants present new arguments in their supplemental brief to challenge Washington's standing, but those arguments, too, are unpersuasive. *See* Def's Supp Br., ECF 65, at 4-7. *First,* Defendants argue Washington fails to explain *why* the Final Rule requires the State to notify its residents of the changes to Section 1557 and incur administrative and harm mitigation costs. *Id.* at 4 (citing cases suggesting "mere interest in the problem" is not enough for standing). Defendants' argument wholly ignores the declarations of Washington's public health officials averring that the costs associated with notifying residents are necessary to let Washington residents know of their rights, *see* Decl. Moss ¶¶ 11-12, 17-19; Decl. Krehbiel ¶¶ 15-16, and to prevent other harms the treatment of which Washington would be forced to pay, *see* Decl. Todorovich ¶ 35. DOH's Chief of Staff specifically observed that it is "not an option" for the agency not to conduct outreach to impacted people and advise them of alternative healthcare providers, because otherwise the agency will pay for increased subsidized sexual health and reproductive health services as well as increased mental health services. Decl. Todorovich ¶¶ 35-37.

In other words, Washington incurs these costs not because it has a "mere interest in the problem," *see* Def's Supp. Br., ECF 65, at 4, but to mitigate the negative public health impacts of the Final Rule, which HHS itself previously recognized, *see* 81 Fed. Reg. at 31,460. None of the cases cited by Defendants to suggest otherwise are applicable. *Cf. San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996) (rejecting claim of economic injury where individual failed to show the gun control law at issue caused the increase in gun prices);

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

*Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (rejecting Sierra Club's standing to challenge proposed ski resort because it had not shown any economic interest or adverse impact); *Stoianoff v. Montana*, 695 F.2d 1214 (9th Cir. 1983) (rejecting a marijuana shop's standing to challenge law prohibiting advertisements of drugs or drug paraphernalia because it admitted that it did not plan to do any advertising).

*Second*, while Defendants do not—and cannot—refute Washington's evidence that the Final Rule will no longer protect those who seek care at religiously-affiliated hospitals and at least 1.5 million Washingtonians that rely on ERISA plans or FEHBP plans, Defendants still argue that Washington's estimates of its harms are "hypothetical," and even goes so far as to characterize as speculative its *own* conclusion that some insurers will not maintain coverage. *See* Def's Supp. Br., ECF 65 at 5-6; *see* 85 Fed. Reg. at 37,181. Not so. As Washington observed in its motion, the 2016 Rule's inclusion of LGBTQ protections resulted in a dramatic change in coverage for gender affirming care. *See* Pl.'s Mot., ECF 4 at 19 n.5 (citing data indicating categorical exclusions for transgender care were commonplace in 2015, but nearly extinct in 2020). It is therefore "reasonably plausible" to assume that healthcare entities will decline to provide coverage now that the Department no longer requires it. *See Azar,* 911 F.3d 558; *see also Dep't of Commerce*, 139 S. Ct. at 2551.

In other words, the Acting Assistant Secretary of DOH's estimate that between 5,271 and 16,266 transgender Washingtonians will lose healthcare is not based on "pure speculation," but based on careful consideration of how many health insurers changed their practices to include gender affirming care due to the 2016 Rule, and the number of transgender individuals in Washington, Decl. Roberts ¶¶ 13-15, as well as HHS's admission that coverage would be lost, 85 Fed. Reg. at 37,180-81. Indeed, this estimate and Washington's numerous other estimates of the public health impacts of LGBTQ discrimination in the healthcare context are based on the exact same data sources the Department itself relied on in issuing its 2016 Rule. *Compare* Decl. Roberts ¶¶ 16, 21 (citing the National Center for Transgender Equality's 2015

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

9

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

U.S. Transgender Survey) *with* 81 Fed. Reg. at 31,460 n.369 (citing the National Center for Transgender Equality 2011 survey); *compare* Decl. Roberts ¶¶ 13-15 (citing Out2Enroll) *with* 81 Fed. Reg. at 31,460 n. 372 (citing Out2Enroll).

*Finally,* Defendants' attempt to distinguish *California v. Azar* fails. Defendants argue that the presence of intervenor-defendants in *Azar* made the harm more imminent. Def's Supp. Br., ECF 65, at 7. However, *Azar*'s analysis of state standing nowhere considered the impact of intervenor-defendants at all. 911 F.3d at 570-72. Indeed, the district court opinion on review before the Ninth Circuit considered state standing and issued the injunction prior to intervenor-defendants even joining that action. *See id.* at 558. Since Washington presents the exact same evidence that the Ninth Circuit recently held to support standing in *California v. Azar*, and since, as the *Asapansa-Johnson* Decision correctly concluded, healthcare discrimination will result from the Final Rule, the Court should easily conclude that Washington has shown standing to challenge the provisions here.

### B. The *Asapansa-Johnson* Decision Shows Washington Is Likely to Succeed on the Merits of its APA Claim

Although the *Asapansa-Johnson* Decision does not explicitly consider the Final Rule's attempts to narrow the scope of Section 1557 by exempting religiously-affiliated health programs or activities, health insurers, or HHS's non-ACA programs or activities, the *Asapansa-Johnson* Decision bolsters Washington's merits arguments regarding the Final Rule's elimination of LGBTQ protections. *Asapansa-Johnson* Decision, at 23, 25. In *Asapansa-Johnson*, the individual plaintiffs challenged the Final Rule's repeal of numerous LGBTQ protections including, but not limited to the elimination of "on the basis of sex" definitions and the elimination of a prohibition on categorical exemptions for gender-affirming care. *See Asapansa-Johnson*, Case No. 20-cv-02834-FB-SMG, ECF 21 at 28-29 (Plaintiff's Appx ISO Reply). In holding that HHS's elimination of LGBTQ protections violated the APA, Judge Block expressly rejected the arguments that HHS makes in this case.

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

10

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

*First*, Judge Block rejected Defendants' argument that the Final Rule simply reverts Section 1557 back to the statutory text. *See* Def's Resp. Br., ECF 56 at 13 (quoting 85 Fed. Reg. at 37,168). As Judge Block explained, and as argued by Washington here, HHS changed its position and removed its own definition of "on the basis of sex" because it fundamentally disagreed with the U.S. Supreme Court's decision in *Bostock* that gender identity and sex stereotyping are prohibited grounds of sex discrimination. *Asapansa-Johnson* Decision, at 22; Pl.'s Mot., ECF 4 at 8; Pl.'s Reply Br., ECF 59 at 5. Although HHS would like this Court to ignore its preamble, the *Asapansa-Johnson* Decision refused to do so, observing, "the preamble to a regulation is evidence of an agency's contemporaneous understanding of its proposed rules." *Asapansa-Johnson* Decision, at 22. Since HHS's "contemporaneous understanding" is contrary to law, and HHS clung to it even after *Bostock* was decided, the *Asapansa-Johnson* court held, as this Court should, that HHS's repeal of LGBTQ protections was contrary to law, arbitrary, and capricious.

*Second,* the *Asapansa-Johnson* Decision rejected Defendants' argument that the Final Rule need not have addressed *Bostock* at all because compliance with *Bostock* is not precluded. Judge Block found that HHS's action was arbitrary and capricious because it "'entirely failed to consider an important aspect of the problem,'" namely the effect of *Bostock* and its holding when it removed the LGBTQ protections. *Asapansa-Johnson* Decision, at 24 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). HHS published the Final Rule four days after *Bostock*, yet failed to even acknowledge the decision, much less consider its impact, even though HHS had admitted that the case would have "ramifications" on HHS's pre-*Bostock* view of "on the basis of sex." Since HHS failed to take the time to consider *Bostock*, as many commenters had urged HHS to do, Judge Block held the Final Rule's elimination of LGBTQ protections was arbitrary and capricious. *Asapansa-Johnson* Decision, at 23-25. Again, this Court should hold the same.

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

11

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

C.  **This Court's Ruling on HHS's Final Rule is Necessary to Protect Washington and for the Proper Administration of Justice**

Nationwide injunctions may be, as the Court noted at oral argument, a "popular topic" after the travel ban cases, ECF 69, at 35, but they are "commonplace" in APA cases "and [are] often necessary to provide the plaintiffs with 'complete redress.'" *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1283 (9th Cir. 2020) (quotations in original); *see also Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1094 (9th Cir. 2020) ("[t]here is a presumption (often unstated) in APA cases that the offending agency action should be set aside in its entirety rather than only in limited geographical areas"). Overlapping nationwide injunctive relief—that is, issuing a nationwide injunction against the same conduct already enjoined by another court—is no different. *See, e.g., Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305, at *10 (W.D. Wash. Dec. 11, 2017) (enjoining transgender military ban on December 11, 2017); *Stockman v. Trump*, No. EDCV 17-1799-JGB-KKX, 2017 WL 9732572 (C.D. Cal. Dec. 22, 2017) (enjoining same conduct on December 22, 2017).

Courts do not and should not refrain from issuing injunctions in the cases before them just because other courts have issued similar injunctions, since those other injunctions may be lifted or overturned. *See, e.g., Mayor & City Council of Baltimore v. Azar*, 392 F. Supp. 3d 602, 618 (D. Md. 2019) (rejecting HHS's argument that there was no imminent threat of irreparable harm because a nationwide injunction had already issued since that injunction could be lifted or reversed); *Nat'l Ass'n for Advancement of Colored People v. Trump*, 298 F. Supp. 3d 209, 245 (D.D.C. 2018), *aff'd sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California, et al.*, 140 S. Ct. 1891 (2020); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 435 (E.D.N.Y. 2018), *vacated in part and rev'd in part on other grounds*, *Dept' of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020).

This is particularly true of an injunction "in a different circuit that could be overturned or limited at any time." *California v. Health & Human Servs.*, 390 F. Supp. 3d 1061, 1065–66

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

12

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

(N.D. Cal. 2019). But it is true even where the same court has issued the overlapping injunction, *see California Med. Ass'n v. Douglas*, 848 F. Supp. 2d 1117, 1124 (C.D. Cal. 2012) (rejecting the argument that an earlier injunction in the same judicial district mooted the plaintiff's motion since "the issuance of a preliminary injunction in an overlapping case does not operate to moot a parallel action because the original order is 'subject to reopening'") (citations omitted), *modified in part on other grounds*, *California Med. Ass'n v. Douglas*, No. CV 11-9688-CAS-MANX, 2012 WL 13069994 (C.D. Cal. Feb. 13, 2012), *and rev'd in part on other grounds, appeal dismissed in part sub nom. Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235 (9th Cir. 2013). Indeed, "overlapping injunctions appear to be a common outcome of parallel litigation, rather than a reason for the Court to pass on exercising its duty to determine whether litigants are entitled to relief." *California v. Health & Human Servs.*, 390 F. Supp. 3d at 1065-66.

The propriety of overlapping nationwide injunctions was demonstrated most recently in *Regents*, 140 S. Ct. 1891. There, three different parallel cases challenged the decision of the Department of Homeland Security (DHS) to end the Deferred Action for Childhood Arrivals (DACA) program which allowed undocumented immigrants brought to the United States as children the ability to remain in the country lawfully. *See id.* at 1901-02, 1903-05. The district courts in each case granted a preliminary injunction against the termination of DACA. *See Regents of Univ. of California v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018), *Batalla Vidal*, 279 F. Supp. 3d 401; *Nat'l Ass'n for Advancement of Colored People*, 298 F. Supp. 3d 209. *See* 140 S. Ct. at 1903-04. Although the Northern District of California issued a nationwide preliminary injunction first, on January 9, 2018, *see* 279 F. Supp. Ed at 1049-50, the Eastern District of New York issued a second injunction one month later and rejected DHS's argument that the plaintiff States, individuals, and nonprofit organization could no longer show irreparable harm because the Northern District of California had done so. *Batalla Vidal*, 279 F. Supp. 3d at 435 (citation omitted). The Eastern District of New York did so observing that, if the district judge in California or the Ninth Circuit were to lift the injunction,

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

13

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

the plaintiffs in his case would "no doubt suffer irreparable harm," and DHS cited no authority in support of the proposition that an overlapping injunction negates irreparable harm. *Id.* Two months later, the District of Columbia District Court issued a third preliminary injunction and vacated the termination of DACA. *Nat'l Ass'n for Advancement of Colored People,* 298 F.Supp. at 245. Like the Eastern District of New York, the District of Columbia District Court explained that vacatur was necessary regardless of the two other injunctions, because those injunctions were on appeal and could be reversed "in the not-too-distant future." *Id.* at 245 (citation omitted). When DHS moved to stay the vacatur pending appeal, the court refused, again citing the fact that the other injunctions could be reversed. 321 F. Supp. 3d 143, 148 (D.D.C. 2018). Ultimately, the Supreme Court agreed that the termination of DACA was arbitrary and capricious in violation of the APA. 140 S. Ct. at 1915.

Another example of overlapping nationwide injunctions is *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019). In that case, the Supreme Court upheld a district court's remand to the Commerce Department for a more reasoned explanation of the Secretary's decision to reinstate a citizenship question for the U.S. Census. *Id.* at 2575-76. Three district courts had previously issued nationwide injunctions. *See New York v. Dep't of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019), as did two other district courts after that, *California v. Ross*, 358 F. Supp. 3d 965 (N.D. Cal. 2019), *Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681 (D. Md. 2019).

All of these authorities strongly support this Court ruling on all the provisions of the Final Rule challenged by Washington in its Motion. HHS's new definition of "on the basis of sex" to exclude what *Bostock* demands will harm Washington if allowed to take effect, and that threat of irreparable harm remains regardless of the *Asapansa-Johnson* injunction because that injunction may be lifted or reversed. *See California v. Health & Human Servs.*, 390 F. Supp. 3d at 1065-66; *Batalla Vidal*, 279 F. Supp. 3d at 435; *Nat'l Ass'n for Advancement of Colored People*, 298 F. Supp. 3d at 245. As to the Final Rule's incorporation of the Title IX religious

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

14

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

exemption and the new definition of "covered entities," the *Asapansa-Johnson* injunction does not appear to enjoin these provisions at all.

Although the Ninth Circuit has cautioned that nationwide injunctive relief may not be appropriate in some cases where important questions exist which "might benefit from development in different factual contexts and in multiple decisions by the various courts of appeals," *see Azar*, 911 F.3d at 583, that is exactly why it *is* appropriate here. If the *Asapansa-Johnson* injunction is nationwide in its effect as to HHS's new definition of "on the basis of sex," then this Court's thorough analysis of Washington's similar challenge provides the "percolation" of the issues necessary for the correct resolution of any appeal. *Cf. U.S. v. Mendoza*, 464 U.S. 154, 160 (1984) (explaining that a rule allowing nonmutual collateral estoppel against the government would "deprive [the Supreme] Court of the benefit it receives from permitting several courts of appeals to explore a difficult question"). This is true whether this Court agrees with the result of the Eastern District of New York but not its reasoning.

Ultimately, all of the foregoing demonstrates why the Court must take HHS's suggestion at oral argument that the Court should "approach the record that's before [it] and address the case that's before [it]." ECF 69 at 37-38. The *Asapansa-Johnson* injunction has no impact on this Court's ability or duty to issue a nationwide injunction because the injunction in that case may be stayed or lifted at any time, threatening irreparable harm to Washington, and because the other injunction does not address two of the provisions of the Final Rule Washington challenges.

## CONCLUSION

For all the reasons set forth above, the Court should grant Washington's request to stay and enjoin the Final Rule's elimination of LGBTQ protections as well as HHS's attempts to unduly narrow the scope of Section 1557.

//

//

//

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

15

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

DATED this 26th day of August, 2020.

Respectfully Submitted,

ROBERT W. FERGUSON
Attorney General

*s/ Brian Sutherland*
BRIAN SUTHERLAND, WSBA No. 37969
NEAL LUNA, WSBA No. 34085
MARSHA CHIEN, WSBA No. 47020
Assistant Attorneys General
Attorneys for Plaintiff State of Washington
Wing Luke Civil Rights Division
Office of the Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Phone: (206) 464-7744
Brian.Sutherland@atg.wa.gov
Neal.Luna@atg.wa.gov
Marsha.Chien@atg.wa.gov

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

16

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed with the United States District Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

DATED this 26th day of August, 2020.

*s/ Anna Alfonso*
ANNA ALFONSO
Legal Assistant

PLAINTIFF STATE OF WASHINGTON'S
RESPONSE TO ORDER TO SHOW CAUSE
NO. 2:20-cv-01105-JLR

17

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744