1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

| STATE OF WASHINGTON, | CASE NO. C20-1105JLR |
| Plaintiff, | |
| v. | ORDER ON MOTION FOR PRELIMINARY INJUNCTION |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | |
| Defendants. | |

16

## I.    INTRODUCTION

17

18

19

20

21

22

Before the court is Plaintiff State of Washington's ("Washington") motion for a preliminary injunction.  (*See* Mot. (Dkt. # 4); Reply (Dkt. # 59).)  Defendants United States Department of Health and Human Services and Alex M. Azar (together "HHS") oppose the motion.  (*See* Resp. (Dkt. # 56).)  The parties also filed supplemental briefing (*see* Wash. Supp. Br. (Dkt. # 64); HHS Supp. Br. (Dkt. # 65)) and responses to the court's order to show cause (*see* Wash. OSC Resp. (Dkt. # 70); HHS OSC Resp. (Dkt.

# 71)).  Four *amici* also filed briefs.  (House of Reps. Amicus (Dkt. # 39-1); Local Gov'ts

Amicus (Dkt. # 47); Nw. Health Law Amicus (Dkt. # 52); Nat'l Health Law Amicus

(Dkt. # 63).)  The court also heard oral argument from the parties.  (*See* 8/14/20 Min.

Entry (Dkt. # 61).)  The court has considered the motions, the parties' and *amici's*

submissions filed in support of and in opposition to the motions, the oral argument of the

parties, the relevant portions of the record, and the applicable law.  Being fully advised,

the court DENIES Washington's motion for a preliminary injunction because

Washington lacks Article III standing.

## II.    BACKGROUND

This case arises from HHS's efforts to implement Section 1557 of the Patient

Protection and Affordable Care Act ("ACA").  42 U.S.C. § 18116.  Section 1557 directs

that:

> Except as otherwise provided for in this title (or an amendment made by this
> title), an individual shall not, on the ground prohibited under title VI of the
> Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq.*), title IX of the Education
> Amendments of 1972 (20 U.S.C. 1681 *et seq.*), the Age Discrimination Act
> of 1975 (42 U.S.C. 6101 *et seq.*), or section [504 of the Rehabilitation Act of
> 1973 (29 U.S.C. 794)], be excluded from participation in, be denied the
> benefits of, or be subjected to discrimination under, any health program or
> activity, any part of which is receiving Federal financial assistance, including
> credits, subsidies, or contracts of insurance, or under any program or activity
> that is administered by an Executive Agency or any entity established under
> [Title I of the ACA] (or amendments).   The enforcement mechanisms
> provided for and available under such title VI, title IX, section [504], or such
> Age Discrimination Act shall apply for purposes of violations of this
> subsection.

42 U.S.C. § 18116(a).  Section 1557 further states that the Secretary of HHS "may" issue

implementing regulations.  *Id.* at § 18816(c).

Acting under its Section 1557 authority to issue regulations to implement Section 1557, HHS issued a rule in May 2016, codified at 45 C.F.R. Part 92 ("the 2016 Rule"). *See* Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375 (May 18, 2016) (codified at 45 C.F.R. pt. 92). Three facets of the 2016 Rule are relevant to this case.

*First*, the 2016 Rule prohibited discrimination "on the basis of sex" and specifically defined "on the basis of sex" as including sex stereotyping and gender identity. *See id.* at 31,467-70. Section 1557 prohibits "sex" discrimination through its incorporation by reference of Title IX of the Education amendments of 1972, which states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); *see also* 42 U.S.C. § 18116(a) (prohibiting discrimination "on the ground prohibited under . . . [T]itle IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*)"). The 2016 Rule explicitly defined "[o]n the basis of sex" as: "discrimination on the basis of pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity."[1] 81 Fed. Reg. at 31,467.

---

[1] The 2016 Rule also defined "gender identity" as:

an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth. The way an individual expresses gender identity is frequently called 'gender expression,' and may or may not conform to social stereotypes associated with a particular gender. A transgender individual is an individual whose gender identity is different from the sex assigned to that person at birth.

1    *Second*, although the 2016 Rule incorporated Title IX's prohibition on

2    discrimination on the basis of sex, HHS declined to incorporate a religious exemption

3    codified in Title IX into the 2016 Rule.  *Id.* at 31,380 ("We decline to adopt commenters'

4    suggestion that we import Title IX's blanket religious exemption into Section 1557.").

5    The Title IX religious exemption at issue states that "this section shall not apply to an

6    educational institution which is controlled by a religious organization if the application of

7    this subsection would not be consistent with the religious tenets of such organization."

8    20 U.S.C. § 1681(a)(3).  Although HHS decided not to incorporate this exemption into

9    the 2016 Rule, the Rule did specifically state that "[i]nsofar as the application of any

10   requirement under this part would violate applicable Federal [and] statutory protections

11   for religious freedom and conscience, such application shall not be required."[2]  81 Fed.

12   Reg. at 31,466.

13         *Third*, the 2016 Rule stated that it applied to the following entities:

14         Except as provided otherwise in this part, this part applies to every health
           program or activity, any part of which receives Federal financial assistance
15         provided or made available by the Department; every health program or
           activity administered by the Department; and every health program or
16         activity administered by a Title I entity.

17   *Id.*  The 2016 Rule also defined the term "[c]overed entity" as:  (1) [a]n entity that

18   operates a health program or activity, any part of which receives Federal financial

19

20   _____

     81 Fed. Reg. at 31,467.

21         [2] The preamble to the 2016 Rule indicated that this portion of the Rule was intended to
     cover provisions like "provider conscience laws, the Religious Freedom Restoration Act
     (RFRA), provisions in the ACA related to abortion services, [and] regulations issued under the
22   ACA related to preventative health services."  *Id.* at 31,379-80.

assistance; (2) [a]n entity established under Title I of the ACA that administers a health program or activity; and (3) [HHS]."[3]  *Id.* at 31,466.  HHS molded these portions of the 2016 Rule on Section 1557's language prohibiting discrimination "under any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under [Title I of the ACA] (or amendments)."  42 U.S.C. § 18116(a).

In 2016, a number of states and private healthcare providers sued to enjoin portions of the 2016 Rule, arguing that gender identity discrimination should not be considered sex discrimination, and that religious organizations should enjoy greater exemptions from Section 1557.  *See Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016) ("*Franciscan All. I*").  The *Franciscan Alliance* court agreed and issued a nationwide preliminary injunction against the 2016 Rule's definition of "on the basis of

---

[3] The 2016 Rule also defined "health program or activity" as:

the provision or administration of health-related services, health-related insurance coverage, or other health-related coverage, and the provision of assistance to individuals in obtaining health-related services or health-related insurance coverage.  For an entity principally engaged in providing or administering health services or health insurance coverage or other health coverage, all of its operations are considered part of the health program or activity, except as specifically set forth otherwise in this part.  Such entities include a hospital, health clinic, group health plan, health insurance issuer, physician's practice, community health center, nursing facility, residential or community-based treatment facility, or other similar entity.  A health program or activity also includes all of the operations of a State Medicaid program, a Children's Health Insurance program, and the Basic Health Program.

*Id.* at 31,467.

sex" and its failure to incorporate the religious exemptions in Title IX. *Id.* at 687-96. In May 2017, HHS moved to voluntarily remand the 2016 Rule so that HHS could "assess the reasonableness, necessity, and efficacy" of the 2016 Rule. *Franciscan All. Inc. v. Price*, No. 7:16-cv-00108, at 1, ECF No. 92 (N.D. Tex. May 2, 2017). On October 15, 2019, on motions for summary judgment, the *Franciscan Alliance* court re-affirmed its preliminary injunction conclusion that the 2016 Rule violated the Administrative Procedure Act ("APA"), vacated the offending portions of the 2016 Rule, and remanded to HHS for further consideration.[4] *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 942, 944-45 (N.D. Tex. 2019) ("*Franciscan All. II*"), *appeal filed*, No. 20-10093 (5th Cir. Jan. 24, 2020).

In June 2019, in the wake of *Franciscan Alliance*, HHS published a new proposed rule, which sought "to make substantial revisions to the Section 1557 Regulation and to eliminate provisions that are inconsistent or redundant with pre-existing civil rights statutes and regulations prohibiting discrimination on the basis of race, color, national origin, sex, age, and disability." *See* Nondiscrimination in Health & Health Education Programs or Activities, 84 Fed. Reg. 27,846, 27,848-49 (June 14, 2019). This proposed rule served as the basis for the final rule at issue in this case ("the 2020 Rule"), which HHS published in the Federal Register on June 19, 2020. *See* Nondiscrimination in Health & Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg.

---

[4] Although HHS opposed entry of the preliminary injunction in 2016, by 2019, HHS agreed with the plaintiffs that the 2016 Rule violated the APA and supported the plaintiffs' summary judgment motion. *Franciscan All. II*, 414 F. Supp. 3d at 935-36. Accordingly, the court allowed a group of intervenors to appear and defend the 2016 Rule. *Id.* at 940.

1 | 37,160 (June 19, 2020) (to be codified at 42 C.F.R. pts. 438, 440, 460, 45 C.F.R. pts. 86,

2 | 92, 147, 155, 156).[5]  The 2020 Rule went into effect on August 18, 2020.  *Id.* at 37,160.

3 |       Three portions of the 2020 Rule are relevant to Washington's motion.  First, like

4 | the 2016 Rule, the 2020 Rule prohibits discrimination on the basis of sex.  The 2020 Rule

5 | includes a new provision which states:

6 |      (a) [A]n individual shall not, on any of the grounds set forth in paragraph (b)
     of this section, be excluded from participation in, be denied the benefits of,

7 |      or be subjected to discrimination . . . .

8 |      (b) The grounds are the grounds prohibited under the following statutes:

9 |      . . . .

10 |        (2) Title IX of the Education Amendments of 1972 (20 U.S.C. 1681
       *et seq.*) (sex);

11 |      . . . .

12 | *Id.* at 37,244.  Unlike the 2016 Rule, however, the 2020 Rule does not include a

13 | definition of "on the basis of sex."  *See id.*  Instead, the 2020 Rule removes the portion of

14 | the 2016 Rule that defined "on the basis of sex" and "gender identity," and intentionally

15 | left these terms undefined.  *See id.* at 37,178 (noting that the 2020 Rule "repeals the 2016

16 | Rule's definition of 'on the basis of sex,' [and] declines to replace it with a new

17 | regulatory definition").  HHS repeatedly states that this change is intended to merely

18 | revert to the "plain meaning" of the term "sex" as it is used in Title IX.  *See, e.g.*, *id.*

19 | (noting that the 2020 Rule "reverts to, and relies upon, the plain meaning of the term

20 |

21 |

22 |      [5] Although the 2020 Rule was published in the Federal Register on June 19, 2020, the Rule was finalized within HHS on May 20, 2020, and was filed on June 12, 2020.  *See* 85 Fed. Reg. at 37,248.

1 │ ['sex'] in [Title IX]").  As a result, HHS recognized that judicial interpretations of the

2 │ term "sex" or "on the basis of sex" could impact application of the 2020 Rule.  *See, e.g.,*

3 │ *id.* at 37,178 ("Because Section 1557 incorporates Title IX's prohibition on

4 │ discrimination 'on the basis of sex,' it presupposes that the executive and judicial

5 │ branches can recognize the meaning of the term 'sex.'"), 37,168 ("[HHS] continues to

6 │ expect that a holding by the U.S. Supreme Court on the meaning of 'on the basis of sex'

7 │ under Title VII will likely have ramifications for the definition of 'on the basis of sex'

8 │ under Title IX."), 37,168 ("[T]o the extent that a Supreme Court decision is applicable in

9 │ interpreting the meaning of a statutory term, the elimination of such term would not

10 │ preclude application of the Court's construction.").

11 │      Although portions of the preamble suggest that HHS intends to defer to judicial

12 │ construction of Title IX caselaw on the definition of "sex," HHS takes a position on the

13 │ appropriate interpretation of the term "sex" throughout the preamble to the 2020 Rule:

> "Sex" according to its original and ordinary public meaning refers to the biological binary of male and female that human beings share with other mammals.  As noted in briefs recently submitted by the Federal government to the Supreme Court, discrimination on the basis of sex means discrimination on the basis of the fact that an individual is biologically male or female.

*Id.* at 37,178.  HHS also explicitly states that it "disagrees with commenters who contend

that Section 1557 or Title IX encompass gender identity discrimination within their

prohibition on sex discrimination."  *Id.* at 37,183.  Although HHS repeatedly adopts this

position throughout the preamble, HHS's position on the appropriate definition of sex is

not included anywhere in the text of the final rule.  *See id.* at 37,244-45.

1    On June 15, 2020—three days after HHS filed the 2020 Rule and four days before

2    the Rule was published in the Federal Register—the United States Supreme Court issued

3    a decision that interpreted "sex" discrimination under Title VII, *Bostock v. Clayton*

4    *County.*, --- U.S. ---, 140 S. Ct. 1731 (2020). *Bostock* was a Title VII employment case

5    in which the Court was asked to determine "whether an employer can fire someone

6    simply for being homosexual or transgender." *Id.* at 1737. The Court determined that

7    employers could not take such action, and in so ruling, the Court held that "sex"

8    discrimination—as that term is used in Title VII—includes sexual orientation and gender

9    identity discrimination. *See id.* at 1741-54 ("An individual's homosexuality or

10   transgender status is not relevant to employment decisions. That's because it is

11   impossible to discriminate against a person for being homosexual or transgender without

12   discriminating against that individual based on sex."). Although the majority opinion in

13   *Bostock* offered no opinion on the impact of its interpretation of "sex" as used in Title VII

14   on other federal statutes that also use "sex," like Title IX, the dissent contended that

15   "[w]hat the Court has done today—interpreting discrimination because of 'sex' to

16   encompass discrimination because of sexual orientation or gender identity—is virtually

17   certain to have far-reaching consequences" and specifically cited Title IX as one example

18   of a statute that could be impacted. *See id.* at 1778 (Alito, J., Dissenting).

19   The second relevant portion of the 2020 Rule relates to the 2020 Rule's approach

20   to religious exemptions. The 2020 Rule incorporates the Title IX religious exemption

21   that the 2016 Rule omitted. *See id.* at 37,245 (stating that HHS's regulations shall not be

22   interpreted to "violate, depart from, or contradict definitions, exemptions, affirmative

1    rights, or protections provided by" a list of statutes, including Title IX).  HHS explains

2    that it believes that "it is appropriate for this rule to incorporate the Title IX statutory

3    language concerning religious institutions" because Section 1557 incorporates the scope

4    of Title IX, and Title IX includes religious exemptions.  *Id.* at 37,207-08.  HHS

5    repeatedly claims, however, that the 2020 Rule does not "create" religious exemptions; it

6    merely explicitly incorporates religious exemptions that Section 1557 already

7    incorporated by reference.  *See, e.g.*, *id.* at 37,206 ("This final rule does not . . . create any

8    new conscience or religious freedom exemptions beyond what Congress has already

9    enacted."), 37,207 ("This final rule does not craft a religious exemption to Section 1557.

10   Congress has already created various religious and conscience protections in healthcare

11   by enacting several statutes, including RFRA, healthcare conscience statutes, and the

12   religious organization exception in Title IX.  This final rule simply states that the Section

13   1557 regulation will be implemented consistent with those statutes.").

14        The third relevant portion of the 2020 Rule relates to the 2020 Rule's definition of

15   the scope of covered entities.  Specifically, the 2020 Rule states that it applies to:

16        (1) Any health program or activity, any part of which is receiving Federal
17        financial assistance (including credits, subsidies, or contracts of insurance)
          provided by the Department;

18        (2) Any program or activity administered by the Department under Title I of
          the Patient Protection and Affordable Care Act; or
19

20        (3) Any program or activity administered by any entity established under
          such Title.

21   *Id.* at 37,244.  The difference in the scope of coverage between the 2016 Rule and the

22   2020 Rule is relatively subtle.  The 2016 Rule applied to "every health program or

activity administered by the Department" and listed HHS as a "covered entity"; the 2020

Rule limited that coverage to "any program or activity" administered by HHS *under the*

*ACA.  Compare id.* at 37,244 *with* 81 Fed. Reg. at 31,466.

The 2020 Rule also repeals the 2016 Rule's definition of "health program or

activity" and replaces that provision with the following definition:

> As used in this part, "health program or activity" encompasses all of the
> operations of entities principally engaged in the business of providing
> healthcare that receive Federal financial assistance as described in paragraph
> (a)(1) of this section.  For any entity not principally engaged in the business
> of providing healthcare, the requirements applicable to a "health program or
> activity" under this part shall apply to such entity's operations only to the
> extent any such operation receives Federal financial assistance as described
> in paragraph (a)(1) of this section.

85 Fed. Reg. at 37,244.  The 2020 Rule then specifically states:

> For purposes of this part, an entity principally or otherwise engaged in the
> business of providing health insurance shall not, by virtue of such provision,
> be considered to be principally engaged in the business of providing
> healthcare.

*Id.* at 37,244-45.  Thus, the 2020 Rule exempts health insurers from the

nondiscrimination requirements in the 2020 Rule on the theory that the provision of

health insurance is not a "health program or activity."  *See id.*

### III.   ANALYSIS

Washington moves to enjoin the following portions of the 2020 Rule:  (1) HHS's

decision not to define the terms "sex" or "on the basis of sex" in the 2020 Rule; (2) the

2020 Rule's incorporation of the Title IX religious exemption; and (3) the 2020 Rule's

construction of the scope of entities the 2020 Rule covers.  (*See generally* Mot. at 7-24.)

Washington alleges that each of these three aspects of the 2020 Rule (1) exceeds HHS's

1    statutory authority and ignores applicable limitations on HHS's regulatory power in

2    violation of 5 U.S.C. § 706(2)(A) and (C); and (2) is arbitrary and capricious in violation

3    of 5 U.S.C. § 706(2)(A).  (*See* Mot. at 7-20.)  HHS disputes the merits of Washington's

4    substantive allegations (*see generally* Resp. at 11-22), but also challenges Washington's

5    standing to pursue its claims (*see generally id.* at 5-11).  Because standing impacts the

6    court's ability to address Washington's claims on the merits, the court first addresses

7    HHS's standing arguments before turning to the merits of Washington's request for a

8    preliminary injunction if Washington is able to establish that it has standing.

9    **A.    Standing**

10           Under Article III, Washington bears the burden of demonstrating that it has

11   standing to litigate in federal court.  *See* U.S. Const. art. III; *DaimlerChrysler Corp. v.*

12   *Cuno*, 547 U.S. 332, 352 (2006).  Because "[s]tanding is not dispensed in gross," *Davis v.*

13   *FEC*, 554 U.S. 724, 734 (2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)),

14   Washington "must demonstrate standing for each claim [it] seeks to press" and for "each

15   form of relief sought," *DaimlerChrysler Corp.*, 547 U.S. at 352.  Standing has three

16   elements:  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly

17   traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed

18   by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, --- U.S. ---, 136 S. Ct. 1540,

19   1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *Friends of*

20   *the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).

21   //

22   //

1    Because Washington must establish standing for each claim it asserts in this case,

2    the court addresses standing as it applies to each of Washington's three challenges to the

3    2020 Rule.

4         1.    Definition of "Sex"[6]

5         After reviewing Washington's supplemental brief on standing issues, the court

6    concludes that Washington bases its standing arguments on two alleged injuries that it

7    believes it will incur if the provisions of the 2020 Rule that choose not to define the term

8    "sex" go into effect:  (1) additional costs or other economic harms incurred by

9    Washington—including things like decreased tax revenue, additional healthcare coverage

10   costs, increased costs for unemployment benefits, and harm mitigation measures—

11   resulting from an increase in discrimination against Washingtonians or decreased

12

13        [6] The court is aware that the United States District Court for the Eastern District of New
York recently held that two private plaintiffs had standing to challenge the 2020 Rule's decision
not to define "on the basis of sex" and enjoined HHS from enforcing that portion of the 2020
14   Rule.  *See Asapansa-Johnson Walker v. Azar*, --- F. Supp. 3d ---, 20CV2834FBSMG, 2020 WL
4749859, at *6-10 (E.D.N.Y. Aug. 17, 2020) ("*Asapansa-Johnson Walker* Decision").  The court
15   ordered the parties to address the impact that the *Asapansa-Johnson Walker* Decision had on
Washington's motion for a preliminary injunction and on Washington's standing to pursue this
16   case.  (*See* 8/18/20 OSC (Dkt. # 70) at 3, 3 n.1.)  The parties agreed that the court can, and
should, continue to consider all aspects of this case despite the fact that the *Asapansa-Johnson
17   Walker* Decision enjoined portions of the 2020 Rule.  (*See* Wash. OSC Resp. at 1; HHS OSC
Resp. at 1.)  The court agrees that it is obligated to address Washington's standing.  *See
18   DaimlerChrysler Corp.*, 547 U.S. at 340 ("We have 'an obligation to assure ourselves' of
litigants' standing under Article III.") (quoting *Friends of the Earth, Inc.*, 528 U.S. at 180).
Because the court ultimately concludes that Washington lacks standing to pursue a preliminary
19   injunction, however, the court need not decide whether it would also be appropriate to address
the merits of Washington's motion.
20        The court also notes that it gives little weight to the *Asapansa-Johnson Walker*
Decision's standing analysis.  *See Asapansa-Johnson Walker*, 2020 WL 4749859 at *6-7.  The
21   court's finding in that case was based on specific facts supplied by two individual, private
plaintiffs.  *See id.*  Thus, the *Asapansa-Johnson Walker* Decision on standing does not provide a
useful analogy for the standing question presented in this case regarding whether Washington
22   has provided sufficient facts to establish standing to challenge the 2020 Rule.

1    healthcare coverage for Washingtonians; and (2) increased administrative costs that

2    Washington believes it will incur as a result of changes made in HHS policy under the

3    2020 Rule.[7]  (*See* Wash. Supp. Br. at 1-5.)  The court addresses each category of harm in

4    turn, below.

5             a.    *Increased Discrimination or Diminished Healthcare Coverage*

6             Washington's first alleged basis for standing—costs and other economic harms

7    resulting from increased discrimination against Washingtonians or diminished access to

8    healthcare for Washingtonians—fails at the injury in fact prong of the standing inquiry.

9    "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a

10   legally protected interest that is concrete and particularized and actual or imminent, not

11   conjectural or hypothetical."  *Friends of the Earth, Inc.*, 528 U.S. at 181, (quoting *Lujan*,

12   504 U.S. at 560); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

13   Washington must show that the injury is "certainly impending" or "there is a substantial

14   risk that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158

15   (2014) (internal quotation marks omitted).  "A future injury need not be 'literally certain,'

16   but there must be a 'substantial risk' that it will occur."  *Nw. Requirements Utils. v.*

17   *F.E.R.C.*, 798 F.3d 796, 805 (9th Cir. 2015) (quoting *Clapper*, 568 U.S. at 432).

18

19        [7] The court also notes that Washington's standing arguments are based on injuries that
     will allegedly be suffered by certain members of the group of "approximately 1,583,681

20   Washingtonians" who "will not be prevented by Washington state law from discrimination on
     the basis of pregnancy termination, sexual orientation, or transgender status or gender identity."

21   (*See* Wash. Supp. Br. at 2 n.2; Kreidler Decl. (Dkt. # 10) ¶¶ 10-14.)  According to Washington's
     allegations—which HHS does not dispute—these individuals are covered by healthcare plans
     that are governed by federal law that supersedes the protections provided by the Washington

22   Law Against Discrimination ("WLAD"), RCW ch. 49.60.  (*See* Kreidler Decl. ¶¶ 10-14.)

Washington bases its argument that the 2020 Rule will increase discrimination and decrease healthcare coverage on assumptions about the impact that the 2020 Rule will have on Washingtonians.  Washington submitted 17 declarations in support of its motion, many of which attempted to address expected harm to Washington.  (*See* Dkt. ## 6-22.) Many of these the declarations addressing the 2020 Rule's decision not to define "sex" or "on the basis of sex" assume that this portion of the 2020 Rule "provides that protection from discrimination on the basis of sex in healthcare does not extend to LGBTQ people." (*See, e.g.*, Booher Decl. (Dkt. # 6) ¶ 4; Roberts Decl. (Dkt. # 17) ¶ 5 ("As I understand it, the new regulation will restrict the scope of Section 1557 of the Affordable Care Act in certain ways, including but not limited to . . . eliminating protection from healthcare discrimination on the basis of pregnancy termination, sexual orientation, and transgender status and/or gender identity . . . ."); Knox Decl. (Dkt. # 8) ¶ 18 ("I understand that the Final Rule specifically rolls back protection from healthcare discrimination on the basis of sexual orientation and gender identity or transgender status."); Todorovich Decl. (Dkt. # 19) ¶ 9 ("As a result of these changes [in the 2020 Rule], the new regulation will allow health care providers and insurers to discriminate against LGBTQ people and women.").)  But it is far from clear whether the 2020 Rule will, in fact, have such an impact.  The text of the 2020 Rule prohibits discrimination on the grounds prohibited by Title IX.  *See* 85 Fed. Reg. at 37,244.  Thus, based on the text of the 2020 Rule, the 2020 Rule only "provides that protection from discrimination on the basis of sex in healthcare does not extend to LGBTQ people" (*see, e.g.*, Booher Decl. ¶ 4) if Title IX also provides

//

1    that protection from discrimination on the basis of sex in healthcare does not extend to

2    LGBTQ people.[8]

3           In fact, Washington vehemently argues throughout its brief that the inevitable

4    result of *Bostock*—which was issued after HHS finalized the preamble language that

5    Washington takes issue with—is that "on the basis of sex" under Section 1557 and Title

6    IX must now be interpreted to include concepts like gender identity and sexual

7    orientation.  (*See, e.g.*, Reply at 6 ("HHS cannot possibly offer any reason why Section

8    1557 does not encompass discrimination based on sexual orientation and gender identity

9    after *Bostock*.").)  Early returns on Title IX caselaw suggest that Washington may be

10

11           [8] Washington's briefing fixates on HHS's language in the preamble which suggests that
     the term "sex" as used in Title IX does not include gender identity and sexual orientation.  (*See*
12   Mot. at 9-12.)  However, the court is not convinced that referring to the language in the preamble
     is necessary to interpret the 2020 Rule.  In the Ninth Circuit, "preamble language should not be
13   considered unless the regulation itself is ambiguous."  *See El Comite Para El Bienestar de
     Earlimart v. Warmerdam*, 539 F.3d 1062, 1070 (9th Cir. 2008); *Safer Chems., Healthy Families
14   v. U.S. Envtl. Prot. Agency*, 943 F.3d 397, 420 (9th Cir. 2019) ("[B]ecause the scope provisions
     are not ambiguous on their face, reference to the preamble discussion would be improper.").
15   Here, the final regulations resulting from the 2020 Rule are arguably unambiguous in scope—the
     2020 Rule includes no definition of "on the basis of sex" and instead defers to the statutory
16   language in Title IX and the caselaw interpreting that term.  *See* 85 Fed. Reg. at 37,244.
            The court need not decide whether the 2020 Rule is ambiguous, however, because even if
17   the court considered HHS's interpretations of the term "sex" in the preamble, there are still two
     problems with Washington's reliance on preamble language.  First, the preamble does not state
18   that HHS's chosen interpretation of the term "sex" will control application of the 2020 Rule.
     Instead, the preamble itself states that the 2020 Rule reverts to the plain language in Section
19   1557 and Title IX, *see* 85 Fed. Reg. at 37,178, and explicitly concedes that "to the extent that a
     Supreme Court decision is applicable in interpreting the meaning of a statutory term, the
20   elimination of a regulatory definition of such term would not preclude application of the Court's
     construction," *id.* at 37,168.  Thus, the language in the preamble acknowledges that Title IX
21   caselaw will control the application of Section 1557, thereby rendering HHS's interpretation of
     the term "sex" in the preamble less meaningful.  Second, and most importantly, the language in
22   the preamble does not solve Washington's standing problem regarding the lack of concrete
     evidence that the 2020 Rule will have the impact on discrimination in Washington that
     Washington assumes it will have.

ORDER - 16

1   correct on that point.  *See, e.g.*, *Adams by & through Kasper v. Sch. Bd. of St. Johns Cty.*,

2   No. 18-13592, 2020 WL 4561817, at \*12 (11th Cir. Aug. 7, 2020) ("With *Bostock's*

3   guidance, we conclude that Title IX, like Title VII, prohibits discrimination against a

4   person because he is transgender, because this constitutes discrimination based on sex.").

5          Ironically, however, Washington's argument about the impact of *Bostock* harms

6   Washington's efforts to establish an injury in fact.  Washington's evidence in support of

7   its claim that it will suffer an injury in fact once the 2020 Rule is implemented presumes

8   that the 2020 Rule does not extend protection against discrimination to LGBTQ

9   individuals.  (*See, e.g.*, Booher Decl. ¶ 4; Roberts Decl. ¶ 5; Knox Decl. ¶ ; Todorovich

10  Decl. ¶ 9.)  Yet, if Washington is correct that *Bostock* means that Title IX and Section

11  1557 must incorporate protection for gender identity and sexual orientation

12  discrimination, then that means that the 2020 Rule does, in fact, extend protection against

13  discrimination to LGBTQ individuals via the Rule's incorporation of Title IX by

14  reference.  Admittedly, given that *Bostock* is a Title VII case, it remains unclear whether,

15  or to what extent, *Bostock*'s rationale will ultimately be applied to Title IX and Section

16  1557.  For purposes of standing, however, the key point is that Washington makes no

17  effort to explain why providers or insurers would be willing to risk revising their

18  practices or policies to discriminate against LGBTQ individuals in light of the Supreme

19  Court's recent guidance in *Bostock* and the very arguments that Washington advances in

20  this case.  (*See generally* Reply at 1-3; Wash. Supp. Br. at 1-5.)

21         Washington could overcome this deficiency if it could provide specific evidence

22  establishing that a third-party provider or insurer planned to discriminate against or limit

its healthcare coverage for LGBTQ individuals once the 2020 Rule went into effect.  The

case that Washington relies most heavily on in support of its standing argument,

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018), included such evidence.  In that case,

the Ninth Circuit found that a group of states had standing to challenge an HHS rule that

impacted contraceptive coverage based on its conclusion that "[t]he states show, with

reasonable probability, that the [challenged rule] will first lead to women losing

employer-sponsored contraceptive coverage, which will then result in economic harm to

the states."  *Id.* at 571.  Specifically, the court noted that (1) HHS conducted a detailed

regulatory impact analysis that analyzed the scope of expected coverage loss and

concluded that between 31,700 and 120,000 women nationwide would lose coverage; and

(2) "[t]he record . . . includes names of specific employers identified by the [regulatory

impact analysis] as likely to use the expanded exemptions, including those operating in

the plaintiff states like Hobby Lobby Stores, Inc."  *Id.* at 572.  Other examples of cases

relying on concrete evidence of impending injury sufficient to confer standing abound.

*See, e.g.*, *Dep't of Commerce v. New York*, --- U.S. ---, 139 S. Ct. 2551, 2565 (2019)

(affirming trial court's finding "that the evidence at trial established a sufficient

likelihood that the reinstatement of a citizenship question would result in noncitizen

households responding to the census at lower rates than other groups, which in turn

would cause them to be undercounted and lead to many of respondents' asserted

injuries");[9] *City & Cty. of San Francisco v. United States Citizenship & Immigration*

_____

[9] The trial court's findings of fact that the Supreme Court confirmed included more than
25 pages of detailed findings specifically related to standing.  *See New York v. United States*

1    *Servs.*, 944 F.3d 773, 787 (9th Cir. 2019) (noting that the Department of Homeland

2    Security estimated that its regulation would cause a 2.5 percent benefits disenrollment

3    rate—which would cost states over one billion dollars—and that "according to evidence

4    supplied by the States, the predicted results have already started").  If Washington could

5    point to similar evidence, then its claimed injuries would cross the line from "mere

6    speculation about the decisions of third parties," which is inadequate to confer standing,

7    to a showing of "the predictable effect of Government action on the decisions of third

8    parties," which is sufficient even when the injury depends on the future actions of third

9    parties.  *Dep't of Commerce*, 139 S. Ct. at 2566; *see also Azar*, 911 F.3d 571-73 (noting

10   that "[j]ust because a causal chain links the states to the harm does not foreclose

11   standing," so long as the links are not hypothetical or tenuous).

12        The problem, however, is that Washington lacks sufficient evidence to show that

13   the 2020 Rule's decision not to define on the basis of sex will yield an increase in

14   discrimination against LGBTQ individuals or a decrease in available healthcare or health

15   insurance coverage for that population.  Washington's best evidence on this point comes

16   from the Declaration of Michelle Roberts, who is the acting Assistant Secretary for the

17   division of Prevention and Community Health at the Washington State Department of

18   Health ("DOH").  (*See* Roberts Decl. ¶ 2.)  But Ms. Roberts' declaration reads more like

19

20   *Dep't of Commerce*, 351 F. Supp. 3d 502, 577-604 (S.D.N.Y. 2019).  For example, the *New York*
     court noted that "[t]he evidence in the trial record overwhelmingly supports the conclusion that

21   the addition of a citizenship question to the 2020 census will cause a significant net differential
     decline in self-response rates among noncitizen households (that is, households with at least one
     noncitizen)."  *Id.* at 578.  The court also addressed expert witness testimony provided by both

22   parties related to the standing question.  *See, e.g.*, *id.* at 580-81.

1    Washington's legal briefing on the proper conclusion to draw from HHS's statements in

2    the preamble than a fact witness declaration.  Ms. Roberts alleges that HHS found in the

3    preamble to the 2016 Rule that that Rule would result in more transgender women and

4    women with a history of pregnancy termination obtaining coverage and accessing

5    services, and that HHS "admits" in the preamble to the 2020 Rule that the Rule "will

6    result in at least some healthcare entities declining to provide coverage consistent with

7    the previous version of the regulation."  (*See* Roberts Decl. ¶ 6 (citing 81 Fed. Reg. at

8    31,460 and 85 Fed. Reg. at 37181).)  According to Ms. Roberts, this means that "the new

9    regulation will result in discrimination by healthcare providers, administrators of

10   healthcare coverage, and others against women with a history of pregnancy termination,

11   gay and lesbian individuals, and transgender individuals."  (*Id.*).

12        Ms. Roberts overstates the strength of HHS's actual conclusions.  In the 2016

13   Rule, HHS concluded that "[w]e expect that the Section 1557 regulation may contribute

14   to a continued reduction in the number of individuals who are uninsured, although the

15   reduction would be much more modest" than the changes created by Section 1557,

16   generally.  81 Fed. Reg. at 31,460.  This tentative and speculative conclusion—which

17   attributed most of the successful outcomes to the impact of Section 1557 and not the

18   expected outcome of the 2016 Rule—is hardly as resolute or fact-based as Ms. Roberts

19   makes it out to be.

20        Moreover, HHS's findings related to the impact of the 2016 Rule do not

21   categorically apply to the 2020 Rule and mean that "the reverse" of anything that HHS

22   said in the 2016 Rule can be applied to the 2020 Rule.  (*See* Roberts Decl. ¶ 7 ("HHS also

1    found in the previous version of the regulation that greater healthcare coverage for

2    transgender individuals and women would result in reduced violence against affected

3    individuals, reduced depression and suicide, and declines in substance abuse, smoking,

4    and alcohol abuse rates.  The reverse is also true . . . .”); *id.* ¶ 8 (relying on findings in the

5    2016 Rule that individuals who have been discriminated in healthcare may postpone or

6    avoid seeking healthcare); *id.* ¶¶ 15-16 (comparing pre-2016 data to post-2016 data to

7    support conclusion that the 2020 Rule will result in discrimination and loss of coverage).)

8    Ms. Roberts’ assumption on that point rests on the same unfounded argument discussed

9    above that the 2020 Rule’s failure to define “on the basis of sex” will inevitably lead to

10   increased discrimination or decreased coverage and a reversion to the state of the

11   healthcare industry before the 2016 Rule.  (*See* Roberts Decl. ¶ 6.)  Because it is not yet

12   clear what changes, if any, the 2020 Rule will have on the way Section 1557 is applied,

13   Washington cannot base its conclusion that the 2020 Rule will have a certain impact

14   based on factual findings or data that were specific to the 2016 Rule.

15        The 2020 Rule also does not “admit” that discrimination will increase, or

16   insurance coverage will decrease, as a result of the 2020 Rule.  (*See* Roberts Decl. ¶ 6.)

17   In one sentence unsupported by any evidence, the 2020 preamble speculates that

18   “[p]resumably some insurers will maintain coverage consistent with the 2016 Rule’s

19   requirements and some will not.”  85 Fed. Reg. at 37,181.  That kind of off-handed

20   speculation—which was in no way particular to Washington or the particular

21   Washingtonians on which Washington bases its standing arguments, *see supra* n.7—does

22   not measure up to the kind of detailed agency analysis about the expected impact of an

1   agency regulation that courts have relied on to find standing.  *Cf. Azar*, 911 F.3d at 572;

2   *City & Cty. of San Francisco*, 944 F.3d at 787.  Moreover, Washington also lacks the

3   kind of concrete evidence about potential providers or insurers who might revise policies

4   or practices in response to the 2020 Rule that was present in *Azar*, *see* 911 F.3d at 572

5   (pointing to evidence showing that specific employers who operated in the plaintiff states

6   would likely use newly enacted exemptions); or any evidence to show that "the predicted

7   results have already started" that the court relied on in *City and County of San Francisco*,

8   944 F.3d at 787.

9          Washington's general lack of evidence that the 2020 Rule will create an injury in

10  fact is also exacerbated by the impact that the WLAD could have on providers and

11  insurers.  Washington wisely bases its standing arguments on the group of

12  "approximately 1,583,681 Washingtonians" who will not be protected by WLAD because

13  they are covered by healthcare plans that are not subject to WLAD's protections.  (*See*

14  Wash. Supp. Br. at 2 n.2; Kreidler Decl. ¶¶ 10-14.)  However, this creates additional

15  standing hurdles that Washington fails to clear.  Because Washington relies on this

16  specific subset of Washingtonians, Washington has to show that the specific providers or

17  insurers who provide healthcare services for those 1.5 million Washingtonians intend to

18  revise their practices or policies to discriminate.  Washington has not made that showing.

19  Further, Washington fails to show that these hypothetical insurers and providers will

20  revise their policies and practices to discriminate against 1.5 million Washingtonians

21  when the other 6 million Washingtonians are protected against that same discrimination

22  by WLAD.

ORDER - 22

1    Washington may well prove correct that the 2020 Rule will have a discriminatory

2    impact on Washingtonians despite *Bostock* and WLAD.  But on the current record,

3    Washington has failed to provide evidence showing that such an impact is "certainly

4    impending" or at a "substantial risk" of occurring.  *Susan B. Anthony List*, 573 U.S. at

5    158.  Absent evidence showing that the type of impact Washington fears is impending,

6    Washington's arguments about all of the direct harms it will suffer as a result of that

7    impact—like decreased tax revenues or increased costs to provide healthcare coverage—

8    are insufficient.  Thus, the court concludes that this claimed injury is insufficient to

9    establish standing on the injury in fact prong.[10]

10                  *b.     Administrative Costs*

11    Even if the court agreed with Washington that its second category of claimed

12   harm—administrative costs that it intends to incur once the 2020 Rule goes into effect—

13   satisfies the injury in fact requirement for standing, this alleged injury still fails to

14   establish that Washington has standing to litigate this case because that injury is not

15   traceable to HHS or the 2020 Rule.[11]  To establish standing, Washington must show that

16   there is a "causal connection between the injury and the conduct complained of—the

17   injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not

18

19   ――――――――――――
      [10] Because the court concludes that Washington has not satisfied the injury in fact prong
20   of the standing requirement, the court need not address whether this claimed injury satisfies the
      remaining standing prongs—traceability or redressability.

21       [11] Because the court concludes that Washington cannot establish that its increased
      administrative costs are traceable to HHS or the 2020 Rule, the court need not address whether
22   Washington's impending administrative costs constitute an injury in fact or satisfy the
      redressability prong of the standing requirement.

1    . . . th[e] result [of] the independent action of some third party not before the court.'"

2    *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42

3    (1976)).

4          Washington submits evidence showing that it will incur increased administrative

5    costs of approximately $178,168.16 to "revise agency policies, websites, and materials"

6    once the 2020 Rule becomes effective.  (*See* Reply at 2; Krehbiel Decl. (Dkt. # 9)

7    ¶¶ 15-16; Moss Decl. (Dkt. # 13) ¶¶ 17-18.)  More specifically, Washington claims that it

8    "will be required to use staff time to undertake a comprehensive review of and make

9    necessary changes to" things like form letters, posters and brochures, websites,

10   "[p]olicies and standard operating procedures related to non-discrimination," notices, and

11   training materials.  (*See* Krehbiel Decl. ¶ 15; Moss Decl. ¶ 15.)

12         The problem with Washington's argument is that these administrative costs are

13   voluntary, "self-inflicted" costs that Washington imposes based on its desire to inform

14   Washingtonians of changes in federal law.  *Clapper*, 568 U.S. at 418 ("[R]espondents'

15   self-inflicted injuries are not fairly traceable to the Government's purported activities

16   . . . ."); *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("No State can be heard to

17   complain about damage inflicted by its own hand.").  Although it may well be prudent on

18   Washington's part to incur administrative costs to inform its citizens about changes in the

19   2020 Rule, Washington does not point to any provision in the 2020 Rule that requires

20   Washington to incur those costs beyond the general fact that the 2020 Rule is a new

21   agency regulation that includes differences from the 2016 Rule.  (*See generally* Reply at

22   1-3; Wash. Supp. Br. at 1-5.)  As the court noted during oral argument, however, if states

1    could establish standing based solely on administrative costs incurred because of a

2    change in agency regulation, then a state could manufacture standing any time it wanted

3    to challenge an agency regulation by expressing a desire to incur administrative costs as a

4    result of the changed regulations.  This is not the law.  *See Clapper*, 568 U.S. at 416

5    ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves

6    based on their fears of hypothetical future harm that is not certainly impending. . . .  If the

7    law were otherwise, an enterprising plaintiff would be able to secure a lower standard for

8    Article III standing simply by making an expenditure based on a nonparanoid fear.").

9           To be sure, there are cases in which agency regulations may impact state law or a

10   state's administrative functioning in a way that is fairly traceable to the agency.  For

11   example, in one of the cases Washington cites, *District of Columbia v. United States*

12   *Department of Agriculture*, the Department of Agriculture issued regulations that would

13   "dramatically alter the long-standing operations of the [Supplemental Nutrition

14   Assistance Program ("SNAP"), formally known as the food stamp program], placing

15   more stringent requirements on states' award of SNAP benefits with concomitant,

16   virtually immediate effects on the lives, by the federal government's estimate, of over

17   one million individuals currently receiving SNAP benefits."  CV 20-119 (BAH), 2020

18   WL 1236657, at *1 (D.D.C. Mar. 13, 2020).  The court specifically noted that the SNAP

19   program was a "joint federal-state effort to reduce hunger."  *Id.*  The court ultimately

20   found that the state plaintiffs in that case had established that they would suffer

21   irreparable harm "in the form of significant administrative burdens and costs, including

22   staffing and training costs, notification costs, and costs from expanding employment and

1   training programs." *Id.* at \*22.  In reaching that conclusion, the court noted that the

2   harms were not "self-inflicted" because "the complained of training costs would 'directly

3   result from' the regulatory changes announced in the [r]ule," and, as such, could not be

4   cured absent an injunction.[12]  *Id.* at \*24.

5       In contrast, the 2020 Rule does not regulate Washington's conduct, force

6   Washington to change its policies or practices, or impact Washington law.  To the

7   contrary, the 2020 Rule specifically states that it shall not be construed to "supersede

8   State laws."[13]  *See* 85 Fed. Reg. 37,245.  Washington does not need an injunction to

9   avoid incurring administrative costs, it merely needs to decide not to incur such costs.

10  Thus, the court concludes that the administrative costs that Washington expects to incur

11  to "revise agency policies, websites, and materials" (*see* Reply at 2) are not fairly

12  traceable to HHS or the 2020 Rule.  As such, this claimed category of injury cannot

13  support Washington's standing to challenge the 2020 Rule's decision not to define "on

14  //

15

16  [12] Another example is *Texas v. United States*, where the Fifth Circuit concluded that
    Texas had standing to challenge changes to federal regulations that would result in hundreds of
    thousands of illegal aliens in Texas becoming eligible to apply for Texas driver's license, which

17  would cost Texas millions of dollars.  809 F.3d 134, 155 (5th Cir. 2015).  In that case, as in
    *District of Columbia*, the federal regulation at issue directly impacted the way in which the state

18  implemented its laws and the court held that it would be unreasonable to require Texas to change
    its laws to avoid injury.  *Id.* at 156-57.  The regulation in *Texas* had a much more direct impact

19  on state law and state administrative costs than the 2020 Rule does.

20  [13] Indeed, Washington's Insurance Commissioner specifically issued a letter to "Health
    Insurance Carriers in Washington State" stating that state law would remain unaffected by the
    2020 Rule.  *See* Letter from Mike Kreidler, State of Washington Insurance Commissioner, to

21  Health Insurance Carriers in Washington State (June 23, 2020),
    https://www.insurance.wa.gov/sites/default/files/documents/final-letter-health-carriers-

22  transgender-protection-non-discrimination.pdf (last visited Aug. 17, 2020).

1    the basis of sex."  The court DENIES Washington's motion for a preliminary injunction

2    insofar as it challenges this portion of the 2020 Rule for lack of standing.

3              2.        The 2020 Rule's Religious Exemption

4              Washington lacks standing to challenge the 2020 Rule's religious exemption for

5    many of the same reasons that it lacks standing to challenge HHS's decision not to define

6    "on the basis of sex."  Washington alleges that the cost of "administrative burdens" and

7    "harm mitigation" measures that Washington will incur "if healthcare providers refuse to

8    provide services on the basis of a religious or conscious belief" confers standing on

9    Washington.  (*See* Wash. Supp. Br. at 6-7.)

10             The court does not take issue with Washington's evidence showing that *if*

11   healthcare providers or health insurers refuse to provide services to Washingtonians on

12   the basis of the 2020 Rule, *then* Washington will suffer direct harm.  (*See, e.g.*,

13   Todorovich Decl. ¶ 37 ("DOH will incur increased administrative costs for referring

14   people who have been denied care because of protected status or conscience of the scope

15   issue to providers who can provide the services."), ¶ 38 ("Increases to the cost of care for

16   LGBTQ persons due to loss of benefits, narrower interpretation of coverage and benefits,

17   and higher out-of-pocket costs create more barriers and will increase demand for services

18   and support from the Family Planning Program; the Breast, Cervical, and the Colon

19   Health Program; and the Office of Infectious Disease."), ¶ 41 ("DOH's Family Planning

20   Program will be required to redirect their staff and resources from providing their own

21   services to assisting individuals in determining who among the health care providers in

22   the region will serve LGBTQ patients and women who have had pregnancies terminated

1    in a nondiscriminatory manner.").)  The problem, however, is that this evidence assumes

2    the key premise—that healthcare providers or health insurers will refuse to provide

3    services if the 2020 Rule's religious exemption goes into effect.  But Washington failed

4    to identify any evidence in the record showing that it is certainly impending that

5    Washington healthcare providers or health insurers will refuse to provide services

6    because of the 2020 Rule's religious exemption.[14]  (*See* Reply at 1-3; Wash. Supp. Br. at

7    6-7); *see also Azar*, 911 F.3d at 572 (finding states had standing to challenge expanded

8    exemptions based on a detailed regulatory impact analysis from HHS and evidence in the

9    record that included "names of specific employers identified by the [regulatory impact

10   analysis] as likely to use the expanded exemptions, including those operating in the

11   plaintiff states like Hobby Lobby Stores, Inc.").

12        Absent concrete evidence showing that the harm Washington fears is impending

13   or substantially likely to occur, the court also rejects Washington's claim that the 2020

14   Rule's religious exemption forces Washington to expend resources on harm mitigation

15

---

16   [14] Here, again, Washington runs into standing problems caused by WLAD.  Washington
     notes that "nearly half of all hospital beds in Washington are religiously-affiliated" and in some

17   counties "the only hospital beds available are religiously-affiliated."  (*See* Wash. OSC Resp. at
     3.)  However, presumably, these hospitals treat some of the 6 million plus Washingtonians who

18   are covered by WLAD's protections and some of the 1.5 million plus Washingtonians who are
     not.  (*See* Kreidler Decl. ¶¶ 7-14.)  Thus, Washington's argument that "the Final Rule's inclusion

19   of a Title IX religious exemption leaves significant portions of Washington's population
     unprotected from sex discrimination" (*see* Wash. OSC Resp. at 4) assumes that these

20   religiously-affiliated hospitals will treat a subset of patients in accordance with one set of
     policies and practices that comply with WLAD and will treat another subset of patients

21   according to another set of policies and practices that do not comply with WLAD once the 2020
     Rule is implemented.  On the current record, the court cannot conclude that such a result is

22   "certainly impending" or at a "substantial risk" of occurring.  *Susan B. Anthony List*, 573 U.S. at
     158.

1    matters.  *See Clapper*, 568 U.S. at 416 ("[R]espondents cannot manufacture standing

2    merely by inflicting harm on themselves based on their fears of hypothetical future harm

3    that is not certainly impending. . . .").  At this point, Washington's proposed harm

4    mitigation measures are voluntary and, as such, not fairly traceable to HHS or the 2020

5    Rule.  *See id.*

6           In sum, Washington lacks standing to challenge the 2020 Rule's religious

7    exemption for many of the same reasons that Washington lacks standing to challenge the

8    2020 Rule's decision not to define "on the basis of sex."  Thus, the court DENIES

9    Washington's motion for a preliminary injunction insofar as it challenges the religious

10   exemption portion of the 2020 Rule for lack of standing.

11          3.      Covered Entities

12          Washington's arguments that it has standing to challenge HHS's construction of

13   the scope of entities covered by the 2020 Rule suffer from the same deficiencies.  (*See*

14   Wash. Supp. Br. at 6-7.)  Washington again assumes, without evidence, that entities who

15   are no longer subject to Section 1557 as a result of the 2020 Rule will freely engage in

16   discrimination against LGBTQ individuals, which will result in increased "administrative

17   costs," "enforcement costs," and "public health costs."  (*See id.*)  For the same reasons set

18   forth above, the court concludes that these speculative allegations are insufficient to

19   confer standing on Washington to challenge the 2020's Rule's construction of the scope

20   //

21   //

22   //

1    of covered entities.  Thus, the court DENIES Washington's motion for a preliminary

2    injunction insofar as it challenges this portion of the 2020 Rule for lack of standing.[15]

3    **B.    Order to Show Cause**

4          Although the court concludes that Washington lacks standing to advance its

5    challenges to the 2020 Rule and denies Washington's motion for a preliminary injunction

6    on those grounds, *see supra* § III.A, HHS did not separately move to dismiss

7    Washington's complaint for lack of subject matter jurisdiction or request dismissal in its

8    opposition to Washington's motion for a preliminary injunction.  (*See generally* Dkt.;

9    Resp.)  The court notes, however, that if Washington lacks Article III standing, then this

10   court lacks subject matter jurisdiction over Washington's claims and is obliged to dismiss

11   them under Federal Rule of Civil Procedure 12(b)(1) without prejudice without passing

12   on the merits of the claims.  *Cetacean Community v. Bush*, 386 F.3d 1169, 1174 (9th Cir.

13   2004).

14         Accordingly, in light of the court's obligation to ensure that Washington has

15   standing under Article III, *see DaimlerChrysler Corp.*, 547 U.S. at 340, the court

16   ORDERS Washington to show cause why this case should not be dismissed for lack of

17   subject matter jurisdiction.  Specifically, Washington must advise the court what remains

18   of this case and why this court has subject matter jurisdiction over any remaining portions

19   of this case in light of the court's conclusion in this order that Washington lacks standing

20

21         _____

22         [15] Because the court concludes that Washington lacks standing to advance each of its
     three challenges to the 2020 Rule, the court need not address the merits of Washington's
     substantive challenges to the 2020 Rule.

to pursue a preliminary injunction.  Washington must file a submission in response to this order within 10 days of the filing date of this order.  HHS's response to Washington's submission, if any, shall be filed within 10 days of the filing date of Washington's submission.  There shall be no reply unless the court orders otherwise.  The parties' briefing shall comport with the page limitations found in Western District of Washington Local Civil Rule 7(e)(3).  *See* Local Rules W.D. Wash. LCR 7(e)(3).

## IV.    CONCLUSION

For the reasons set forth above, the court concludes that Washington lacks standing to challenge the 2020 Rule's definition of "on the basis of sex," the 2020 Rule's incorporation of a religious exemption, and the scope of covered entities under the 2020 Rule, and, as such, DENIES Washington's motion for a preliminary injunction (Dkt. # 4). The court also ORDERS Washington to show cause within 10 days of the filing date of this order why this case should not be dismissed for lack of subject matter jurisdiction.

Dated this 28th day of August, 2020.

JAMES L. ROBART
United States District Judge